## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

DONALD J. TRUMP, the Forty-Fifth
President of the United States, ELIZABETH
ALBERT, KIYAN AND BOBBY
MICHAEL, AND JENNIFER HORTON,
INDIVIDUALLY AND ON BEHALF OF
THE CLASS,

               Plaintiffs,

    v.

FACEBOOK, INC., and MARK
ZUCKERBERG,

               Defendants.

**CLASS ACTION
COMPLAINT FOR:**

**FIRST AMENDMENT VIOLATION**

**JURY TRIAL REQUESTED**

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## INTRODUCTION

1.  Plaintiff, Donald J. Trump, the Forty-Fifth President of the United States,
individually, and on behalf of those similarly situated Putative Class Members, by and through
the undersigned counsel, brings this action against Defendant Facebook, Inc., ("Facebook"), and
its Chief Executive Officer, Defendant Mark Zuckerberg, individually. The allegations herein of
Plaintiff and Putative Class Members are based upon personal knowledge and belief as to their
own acts, and upon the investigation of their counsel, and upon information and belief as to all
other matters.

2.  As stated in its Community Standards, Defendant Facebook promotes itself as a
service for people "to talk openly about the issues that matter to them, even if some may disagree
or find them objectionable." Defendant Facebook's power and influence are immense. It

currently boasts close to three (3) billion registered Users worldwide and over 124 million Users in the United States. Defendant Facebook had $86.0 billion in total revenue, for a net profit margin of 33.9%, in fiscal year 2020.

3.      Defendant Facebook has increasingly engaged in impermissible censorship resulting from threatened legislative action, a misguided reliance upon Section 230 of the Communications Act , 47 U.S.C. § 230, and willful participation in joint activity with federal actors. Defendant Facebook's status thus rises beyond that of a private company to that of a state actor. As such, Defendant is constrained by the First Amendment right to free speech in the censorship decisions it makes regarding its Users.

4.      Legislation passed twenty-five (25) years ago intended to protect minors from the transmission of obscene materials on the Internet, and to promote the growth and development of social media companies, has enabled Defendant Facebook to grow into a commercial giant that now censors (flags, removes, shadow bans, etc.) and otherwise restricts with impunity the constitutionally protected free speech of the Plaintiff and the Putative Class Members.

5.      The immediacy of Defendants' threat to its Users, and potentially every citizen's right to free speech, cannot be overstated. Defendants' callous disregard of its Users' constitutional rights is no better exemplified than in the matter currently before the Court.

6.      On January 7, 2021, Defendants indefinitely banned the sitting President of the United States for exercising his constitutional right of free speech.

7.      Defendants extended their conditional and unconstitutional prior restraint of Plaintiff's right to free speech as a private citizen until at least January of 2023.

8.      Defendants then served warnings to members of President Trump's family, Team Trump, other Facebook Users, and Putative Class Members that its ban extends to anyone attempting to post Donald J. Trump's "voice." Censorship runs rampant against the Putative

2

Class Members, and the result is a chilling effect cast over our nation's pressing political, medical, social, and cultural discussions.

9.      Plaintiff, a sitting President of the United States, was banned by the Defendants, as were Putative Class Members, using non-existent or broad, vague, and ever-shifting standards. While Facebook's ban and prior restraint of Plaintiff are well-documented, the untold stories of Putative Class Members are now stirring the public conscience.

10.     Using unconstitutional authority delegated to them by Congress, Defendants have also mounted an aggressive campaign of censorship against a multitude of Putative Class Members through censorship (flagging, shadow banning, etc.) resulting from legislative coercion.

11.     Defendants deplatformed Plaintiff at the behest of, with cooperation from, and the approval of, Democrat lawmakers.

12.     Akin to forcing a round peg into a square hole, Facebook declared that specific posts of Plaintiff had violated Facebook's self-imposed "Community Standards."  Countless other Facebook Users have not been as fortunate, with Facebook taking detrimental action against their accounts with no explanation whatsoever.

13.     If Defendants' reliance on an unconstitutional delegation of authority to regulate free speech and under pressure from Congress, can effectively censor, and impose a prior restraint on the protected political speech of a sitting President of the United States, then the threat to Putative Class Members, our citizens, and our United States Constitution and form of government, is imminent, severe, and irreparable.

14.     Plaintiff respectfully asks this Court to declare that Section 230 on its face is an unconstitutional delegation of authority, that the Defendants' actions directed at the Plaintiff and the Putative Class Members are a prior restraint on their First Amendment right to free speech, to

order the Defendants to restore the Facebook account of Plaintiff, as well as those deplatformed Putative Class Members, and to prohibit Defendants from exercising censorship, editorial control or prior restraint in its many forms over the posts of President Trump, and Putative Class Members.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1332, 28 U.S.C. §§ 2201-2202, and the Constitution of the United States for the unconstitutional violation of the First Amendment right to free speech as pleaded below.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

17.     Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) ("CAFA"), because: (i) the proposed class consists of well over 1,000,000 Members; (ii) the Members of the proposed Class, including the Plaintiff, are citizens of states different from Defendant's home states; and (iii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), (d), and (e)(1). A substantial part of the events giving rise to this claim occurred in this District, and Plaintiff brings this suit for actions taken by Defendants that occurred while Plaintiff was serving in his capacity as President of the United States, and the Defendants' prior restraint of Plaintiff's speech continues to this day.

## PARTIES

### Plaintiff

19.     Donald J. Trump ("Plaintiff"), the 45th President of the United States, is a private citizen and is domiciled in Palm Beach, Florida.

20.     Elizabeth Albert ("Plaintiff"), a United States citizen, domiciled in the state of Florida.

21.     Kiyan and Bobby Michael ("Plaintiffs"), United States citizens, domiciled in the state of Florida.

22.     Jennifer Horton ("Plaintiff"), a United States citizen, domiciled in the state of Michigan.

### Class

23.     All Facebook platform Users ("Putative Class Members") who have resided in the United States between June 1, 2018, and today, and had their Facebook account censored by Defendants and were damaged thereby.

### Defendants

24.     Defendant Facebook is a foreign corporation with a principal place of business at 1601 Willow Road, Menlo Park, California, and conducts business in the State of Florida, throughout the United States, and internationally.  Facebook has forty-one (41) offices in the United States and forty-five (45) offices located worldwide. Facebook has been registered in Florida as a foreign profit corporation since 2011.

25.     Defendant Mark Zuckerberg ("Zuckerberg"), is the Chairman and Chief Executive Officer of Facebook, Inc. Zuckerberg owns a controlling interest in Facebook's stock, and upon information and belief, resides in Palo Alto, California.

## STATEMENT OF FACTS

I.  **DEFENDANTS FACEBOOK AND ZUCKERBERG**

**A. Defendant Facebook**

26.     The United States Supreme Court has recognized that social media platforms such as Facebook provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730. These platforms have been revolution[ary]," not least because they have transformed civic engagement by allowing elected officials to communicate instantaneously and directly with their constituents. *Id.* Facebook enables ordinary citizens to speak directly to public officials and listen to and debate others about public issues, in much the same way they could if gathered on a sidewalk or in a public park or city council meeting or town hall.

27.     In 2007, Facebook launched the Facebook platform, which allowed for the integration of third-party applications, known as "Apps," and for the website to be integrated into the larger world wide web through search-engine indexing.

28.     Facebook actively encourages Users to express their ideas and communicate via its platform in the forms of comments and "likes" on postings. While encouraging extensive User engagement, Facebook also collects massive amounts of its Users' data to sell to advertisers.

29.     As a social media conglomerate, Facebook allows Users to publish personal pages with personal message postings, links to news articles, videos, photographs, and to publicly interact with other Users through speech.  The speech posted on Facebook pages ranges from Users' mundane musings on everyday life to the most important new topics of the day, including political speech.

30.     In accordance with its Terms of Service ("TOS"), a Facebook "User" is an individual who is permitted to create an account on its platform in accordance with its TOS. A User can post on their "wall," a type of message board, a variety of speech, including their own commentary, videos, photographs, and links to news articles.  Other Users can view, share and comment on the content on the User's wall.  Users rate other Users' content and speech by giving it "likes."  Users also can send messages directly to each other and are updated by postings within their network of friends.  By communicating with each other, Users create valuable communications that may become newsworthy.

31.     Facebook created a Newsfeed for its Users to offer selective postings, news articles, and targeted advertisements that it determines a User may like, depending n the personal information and history of that User. Facebook determines which posts and advertisements appear on a User's Newsfeed by using an algorithm, which creates a ranking system that predicts which posts will be most valuable and meaningful to an individual.

32.     Facebook engages in targeted censorship decisions by using both algorithms and employees (referred to as "content moderators") utilizing an internal tool developed by Facebook called TASKS.

33.     Facebook's content moderators use TASKS to entertain censorship suggestions from employees. Facebook content moderators then often consult with their peers at other similarly situated social media platforms in deciding who, or what, to censor.

34.     Facebook and Twitter Inc. employees often coordinate their censorship efforts, which are authorized and immunized by Section 230.  A recent review of domain names on Facebook's TASKS platform referred to Twitter domain names, as well as particular phrases, words, or individuals both Facebook and Twitter were considering censoring, or ultimately did censor.

35.     Within two (2) minutes of one another, Facebook and Twitter suspended President Trump on January 7, 2021. Such simultaneous censorship and its origins are suspicious and worthy of the Court's consideration when evaluating the conduct of the Defendants.

36.     Facebook also has developed a powerful tracking platform, CENTRA, that allows Facebook to monitor its Users' speech and activity, not only on each individual User's Facebook page, but also that Users' speech and activity on any other social media platform across the entire Internet—and across all of that User's Internet-connected devices as well.

37.     By utilizing its CENTRA tracking platform, Facebook has the ability not only to censor (*i.e.*, flag, shadow ban, etc.) or otherwise constrain its own Facebook Users' constitutionally protected speech, but also potentially to censor Facebook Users on other social media platforms.

38.     Facebook's TOS contains what it refers to as its "Community Standards" and states: "These guidelines outline our standards regarding the content you post to Facebook and your other Facebook products."

39.     Facebook's Community Standards guidelines regarding hate speech, incitement, or praise of violence are vague, broad, ill-defined, or not defined at all.

40.     Facebook's Community Standards Guidelines on Hate Speech read as follows:

"We define hate speech as a direct attack against people — rather than concepts or institutions— on the basis of what we call protected characteristics: race, ethnicity, national origin, disability, religious affiliation, caste, sexual orientation, sex, gender identity and serious disease. We define attacks as violent or dehumanizing speech, harmful stereotypes, statements of inferiority, expressions of contempt, disgust or dismissal, cursing and calls for exclusion or segregation. We also prohibit the use of harmful stereotypes, which we define as dehumanizing comparisons that have historically been used to attack, intimidate, or exclude specific groups, and that are often linked with offline violence."

41.     Facebook's Community Standards Guidelines on Incitement of Violence read as follows:

"We aim to prevent potential offline harm that may be related to content on Facebook. While we understand that people commonly express disdain or disagreement by threatening or calling for violence in non-serious ways, we remove language that incites or facilitates serious violence. We remove content, disable accounts and work with law enforcement when we believe there is a genuine risk of physical harm or direct threats to public safety. We also try to consider the language and context in order to distinguish casual statements from content that constitutes a credible threat to public or personal safety."

42.     Facebook's Community Standards Guidelines on Praising Violence read as follows:

"In addition, we do not allow content that praises, substantively supports, or represents events that Facebook designates as violating violent events - including terrorist attacks, hate events, mass murders or attempted mass murders, multiple murders, or hate crimes."

43.     Additionally, Facebook directs Users to another website, www.oversightboard.com, where Facebook states that an independent review board reviews content removal and account suspension decisions selectively referred to it by Facebook. When Facebook referred its indefinite suspension of President Trump to its Oversight Board on January 21, 2021, the Oversight Board had never reviewed the banning by Facebook of a User in the United States.

44.     Facebook's own Oversight Board concluded that the January 21 indefinite deplatforming of President Trump lacked any basis in its existing, consistently applied community standards. *See* Facebook Oversight Board, Case decision 2021-001-FB-FBR.

**B. Defendant Mark Zuckerberg**

45.     Defendant Mark Zuckerberg is a co-founder of Facebook, and at all times relevant hereto has served as Facebook's Chairman, Chief Executive Officer, and controlling shareholder. Upon information and belief, He resides in the Northern District of California and is a "person" who may be sued under 18 U.S.C. § 1961(3).

46.     According to its 2018 Proxy Statement, Defendant Zuckerberg has the sole power to elect or remove any director from Facebook's Board, as he controls a majority (53.3%) of

Facebook's total voting shares.  Zuckerberg directs and controls Facebook's business and is personally responsible for the damages caused by his individual and controlled entities' misconduct as set forth herein.

47.     Defendant Zuckerberg was personally involved in, and personally responsible for the decision to deplatform President Trump. On the morning of January 7, 2021, Zuckerberg informed high-ranking Facebook officers of his decision that Plaintiff's Facebook account should be suspended indefinitely.

## II.  PLAINTIFF'S USE OF FACEBOOK'S PLATFORM

### A.  The Donald J. Trump Facebook account

48.     Plaintiff established his Facebook account in May of 2009 and used the account for several years to engage with his followers about politics, celebrities, golf, and his business interests, among other topics. After he announced his campaign for the presidential nomination of the Republican Party, Plaintiff used his Facebook account to speak directly to his followers and the public at large. By using social media, including Facebook, President Trump strategically circumvented what he saw as a mainstream media that was biased against him.

49.     After his inauguration as President in January of 2017, Plaintiff's Facebook account became an instrument of his presidency. By virtue of the way he used his account, Plaintiff's messages became an important source of news and information about the government, as did his followers' comments associated with Plaintiff's posts. Plaintiff's account became a public forum for speech by, to, and about government policy.

50.     When Plaintiff utilized his Facebook account in his official capacity as President: (a) it became an important outlet for news organizations and the U.S. government; and (b) his Facebook account operated as a public forum, serving a public function.

51.     The comments generated by Plaintiff's Facebook posts also gave rise to important public discussion and debate about government policy. Typically, his posts would generate thousands of replies posted by other Users, some of which would generate hundreds or thousands of replies in turn. President Trump's account was a digital town hall in which the President of the United States communicated news and information to the public directly. Members of the public used the reply function to respond directly to President Trump and his office and to exchange views with one another.

52.     Plaintiff used his Facebook account to interact on a myriad of subjects with the public at large. Supporters and critics alike were welcome on the President's Facebook page. No one was excluded, regardless of their views.

53.     Plaintiff used Facebook, and other social media platforms, to communicate directly with the American people more than any other President had directly communicated with them in the past.

54.     Not only were Plaintiff's Facebook posts accessible to his followers, but other members of the public could, and did, access his posts at any time on the Internet.

55.     The Putative Class Members used their Facebook accounts in a similar fashion, sharing information, opinions, photographs, videos, and news with their networks ranging from friends and family to larger public audiences.

### III. DEMOCRAT LEGISLATORS COERCED DEFENDANTS TO CENSOR THE PLAINTIFF AND PUTATIVE CLASS MEMBERS

56.     Democrat legislators in Congress feared Plaintiff's skilled use of social media as a threat to their own re-election efforts. These legislators exerted overt coercion, using both words and actions, upon Defendants to have Defendants censor the views and content with which Members of Congress disagreed with, of both the Plaintiff and the Putative Class Members.

57.     Not only did Democrat legislators openly voice their displeasure with Defendants for providing a platform to Plaintiff and Putative Class Members, but they also spoke publicly of the steps they would take against Defendants if Defendants continued to provide a platform for the expression of views and content contrary to the legislators' own agendas.

58.     Legislators (and in one instance Michelle Obama, the former First Lady) made it increasingly clear that they wanted Plaintiff and the Putative Class Members, and the views and content they espoused, to be banned from Defendants' platform.

59.     With Defendants shielded from liability for engaging in censorship by Section 230, the Democratic legislators then wielded that immunity, combined with threats to revoke that immunity or otherwise to regulate Defendants, to use Defendants as a tool to effect censorship and viewpoint discrimination against Plaintiff and the Putative Class Members that the Democrat legislators knew they could not accomplish on their own.

60.     Below are just some examples of Democrat legislators threatening new regulations, antitrust breakup, and removal of Section 230 immunity for Defendants and other social media platforms if Facebook did not censor views and content with which these Members of Congress disagreed, including the views and content of Plaintiff and the Putative Class Members:

- "But I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed." (Rep. Nancy Pelosi, Speaker of the House, April 12, 2019);

- "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one.  For Zuckerberg and other platforms." (Joe Biden/Interview in December of 2019 and published January 2020);

- "We can and should have a conversation about Section 230 – and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to . . . enable domestic terrorist groups to organize violence in plain sight." (Statement of US Sen. Mark Warner on Section 230 Hearing on October 28, 2020.);

- "It's long past time to hold the social media companies accountable for what's published on their platforms."  (Bruce Reed, Biden's Top Tech Advisor/December 2, 2020);

- @jack (Jack Dorsey) Time to do something about this Tweet.  (Sen. Kamala Harris' Tweet, October 2, 2019);

- 2020 Presidential candidate Sen. Kamala Harris calls on Twitter to suspend President Trump's account – ABC News (go.com) 10/2/2019;

- If the president goes on Facebook and encourages violence, that you will make sure your company's algorithms don't spread that content and you will immediately remove those messages?  (Sen. Markey October 23, 2020 (Zuckerberg Senate Testimony));

- "Senator, yes.  Incitement of violence is against our policy and there are not exceptions to that, including for politicians." (Mark Zuckerberg response, (November 17, 2020 Mark Zuckerberg and Jack Dorsey, Senate Tech Hearing);

- "…Daily, the president shocks our conscience and shakes the very foundations of our democracy using a powerful megaphone, social media.  The President has used this microphone to spread vicious falsehoods and an apparent attempt to overturn the will of voters…  Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age."  (Sen. Blumenthal (13:35) October 23, 2020: Tech CEO's Senate Testimony)

- I have urged, in fact, a breakup of tech giants because they've misused their bigness and power.  And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court.  (Sen Blumenthal (14:48) October 23, 2020: Tech CEO's Senate Testimony)

- "Now is the time for Silicon Valley companies to stop enabling this monstrous behavior and go even further than they have already by permanently banning this man (Trump) from their platforms.  (Michelle Obama on Twitter, January 7, 2021)

- "The law (230) acts as a shield allowing them (Internet platforms) to turn a blind eye.  The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause."  (Sen. Mazie Hirono's Tweet, February 5, 2021)

- Before the hearing the following statement was issued by the respective Democrat Chairmen. "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation.  Industry self-regulation has failed.  We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and

disinformation." (March 2021 Joint Hearing of the Communications and Technology Subcommittee)

- "There's no Constitutional protection for using social media to incite an insurrection. Trump is willing to do anything for himself no matter the danger to our country. His big lies have cost America dearly. And until he stops, Facebook must ban him. Which is to say, forever." (Rep. Adam Schiff's Tweet, May 5, 2021)

61.     Democrat legislators not only voiced their threats (e.g., new regulations and removing Section 230 immunity) to social media platforms but also employed additional measures to deliver their unmistakable message that they were prepared to act against the social media platforms if Defendants did not increase their censorship of disfavored views and content of Plaintiff and Putative Class Members.

62.     These additional measures included convening public hearings, issuing subpoenas, dragging in the CEOs of the largest social media companies to testify publicly before Congress, and subjecting these CEOs to lengthy, embarrassing questioning.

63.     Some specific examples of when these coercive measures were extended on Defendants:

On July 29, 2020, Four Big Tech CEOs testified before the House in an antitrust hearing. Amazon Founder and CEO Jeff Bezos, Zuckerberg, Apple CEO Tim Cook, and Alphabet and Google CEO Sundar Pichai attempted to defend their companies against accusations of anticompetitive practices. (Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google | U.S. House of Representatives Judiciary Committee); and

On October 23, 2019, Mark Zuckerberg Testimony Transcript: Zuckerberg Testifies on Facebook Cryptocurrency Libra and Is Confronted on Child Exploitation on Facebook. (Zuckerberg Testifies on Facebook Cryptocurrency Libra | October 23, 2019); and

On November 17, 2020, Zuckerberg and Twitter CEO Jack Dorsey testified before the Senate Judiciary Committee on November 17, 2020. They were questioned on speech moderation policies. (Censorship, Suppression, and the 2020 Election | Hearings | November 17, 2020); and

On March 25, 2021, Zuckerberg, Twitter's Jack Dorsey, and Google's Sundar Pichai appeared virtually before the House Energy and Commerce Committee. (House Hearing on Combating Online Misinformation and Disinformation | March 25, 2021).

64.     With this coercion directed at Defendants by repeatedly requiring their appearance at hearings, and reinforcing their potential to impose regulations, and strip them of 230 immunity, Democrat legislators intended to force Defendants into permanently banning Plaintiff's access to his Facebook account, his followers, and the public at large. The ancillary benefit was to deny the public access to Plaintiff's content and views.

65.     The message conveyed by Democrat legislators to Defendants was clear: use the authority of Section 230 to ban Plaintiff and those Putative Class Members who posted content and views contrary to these legislators preferred points of view or lose the competitive protections of Section 230 and tens of billions of dollars of market share altogether.

66.     The legislators who pressured Defendants to censor Plaintiff and Putative Class Members who supported his views employed social media themselves extensively to communicate with their own constituents, promote their accomplishments in office, and fundraise and campaign.

67.     With Plaintiff removed from Facebook, it is considerably more difficult for Plaintiff to act as head of the Republican Party, campaign for Republican candidates, fundraise, and lay the groundwork for his own potential campaign run for the 2024 Republican Party nomination for President of the United States.

68.     Likewise, with Plaintiff now removed from Facebook and other social media platforms, it has ended balanced, direct public discussions between competing political views on national and local issues.

69.     By banning Plaintiff, Defendants made it more difficult for Plaintiff to communicate directly with the American public. Our national discourse is becoming

immeasurably more altered and one-sided on race, medicine, the election process, the economy, immigration, etc.

## IV. CONGRESSIONAL LEGISLATION SIGNIFICANTLY ENCOURAGED DEFENDANTS' CENSORSHIP OF PLAINTIFF AND THE PUTATIVE CLASS MEMBERS

70.     Facebook is currently one of the largest, if not the largest, of the social media platforms. Its very existence and growth have been directly fueled by Congressional legislation.

71.     In 1996, Congress passed the Community Decency Act of 1996, which amended the Telecommunications Act of 1934 Section 230(c) intending to promote the growth and development of social media platforms and protect against the transmission of obscene materials over the Internet to children.

72.     It is this Congressional legislation, commonly referred to as simply Section 230, or the "Good Samaritan" provision, that Facebook relies on to censor constitutionally permissible free speech of Plaintiff and the Putative Class Members.

73.     Section 230(c) provides:

(1).  TREATMENT OF PUBLISHER OR SPEAKER

No provider or User of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2).   CIVIL LIABILITY
No provider or User of an interactive computer service shall be held liable on account of—

    A.  any action voluntarily taken in good faith to restrict access to or availability of material that the provider or User considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

    B.  any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

74.     Section 230(c) has accomplished and exceeded its original purpose in terms of promoting the growth and development of social media platforms.

75.    For example, founded in 2007, Facebook has grown to close to three (3) billion

Users, had revenue in 2020 of roughly eighty-six (86) billion dollars, and recently attained

market value surpassing one (1) trillion dollars.

76.    However, in terms of its other stated purpose, addressing the transmission of

obscene materials to minors over the Internet, Facebook has failed.

77.    Recently, the issue of child sexual abuse materials was raised to Zuckerberg by

Missouri Congresswoman Ann Wagner at an October 2020 hearing on Facebook: "16.8

million… reports of child sexual abuse materials are on Facebook. These… included a recorded

45 million photos and videos. These are absolutely shocking numbers." (U.S. House Committee

on Financial Services, entitled, "An Examination of Facebook and Its Impact on the Financial

Services and Housing Sectors." October 23, 2019.)

78.    Congresswoman Wagner's complaint was that Facebook was planning on

implementing an encryption program that would protect and shield the criminals who were using

the images in the sex exploitation arena. (U.S. House Committee on Financial Services, entitled,

"An Examination of Facebook and Its Impact on the Financial Services and Housing Sectors."

October 23, 2019.)

79.    Human smugglers are openly advertising their services on Facebook, falsely

telling Central Americans interested in crossing illegally into the United States that they can

promise a "100[%] safe journey," NBC News reported in April, citing Department of Homeland

Security officials, immigration experts, and lawyers.

80.    As discussed in the Harvard Journal of Law & Public Policy, Leary, Mary Graw,

*The Indecency and Injustice of Section 230 of the Communications Decency Act, Vol. 41, No. 2,*

pg. 564, 565 (2018):

> Congress expressly stated that th[is] is the policy of the United States 'to ensure vigorous
> enforcement of Federal criminal laws to deter and punish trafficking in obscenity,

stalking, and harassment by means of computer.'  That said, Congress appeared to recognize that unlimited tort-based lawsuits would threaten the then-fragile Internet and the 'freedom of speech in the new and burgeoning Internet medium.'
Although these two goals required some balancing, it was clear from the text and legislative history of § 230 that it was never intended to provide a form of absolute immunity for any and all actions taken by interactive computer services.  Section 230 is not 'a general prohibition of civil liability for web-site operators and other content hosts.'  Rather, Congress sought to provide limited protections for limited actions.

81.     In passing 230(c), Congress permits, but does not mandate, action be taken by social media platforms.

- Section 230(c) permits Facebook to take down or block speech deemed "objectionable… whether or not such material is constitutionally protected."

- Section 230(c) also pre-empts all conflicting state laws, preventing such censorship from being "made illegal… by any provisions of the laws of a State."

82.     In relying on the permissive language of Section 230 and statements and actions of Democrat legislators, those legislators made it clear that they had a "strong preference" for the censoring of the views and content of Plaintiff and Putative Class Members regarding, for example:

- COVID-19 "misinformation," including the lack of safety and efficacy of hydroxychloroquine and the use of face masks.

- COVID-19 originated in the Wuhan province of China and was a transmission from scientists in a government.

- Questioning the integrity and results of the 2020 Presidential election.

83.     Neither Plaintiff nor Putative Class Members were free to decline the speech restrictions imposed by Facebook in its TOS if they wished to use the Facebook platform. Use of

its platform was expressly conditioned on agreeing to these restrictions, or User access was denied.

84.     Federal actors are also sharing the fruits of Facebook censorship of Plaintiff and Members of the Class. These benefits include (without limitation):

•     The Centers for Disease Control and Prevention (CDC) and the White House have used Defendants to inexpensively and effectively promote their directives, messages, and policies concerning COVID-19; and suppress contradictory medical views and content.

•     suppression of information suggesting or showing flaws in CDC and/or other federal governmental policy

•     increasing the number of visitors to the CDC's website;

•     boosting the CDC's highly questionable reputation as reliable and authoritative in its factual and policy determinations;

•     creating a false impression of unequivocal support in the scientific community for the CDC and other governmental directives;

•     and suppression of opinions and information that might lead people to take actions contrary to the government's preferences.

## V. DEFENDANTS WILLFUL PARTICIPATION IN JOINT ACTIVITY WITH FEDERAL ACTORS TO CENSOR PLAINTIFF AND THE PUTATIVE CLASS MEMBERS

85.     The CDC has publicly stated that it works with "social media partners," including Facebook, to "curb the spread of vaccine misinformation."  In a document dated October 11, 2019, the CDC expressly stated that it was "engaging . . . partners" to "contain the spread of [vaccine] misinformation" and specifically states that the CDC would "work with social media companies" to that end.

86.     Facebook is among the social media "partners" referred to by the CDC.



87.     Defendants worked directly and in concert with the Centers for Disease Control and Prevention (CDC) and Dr. Anthony Fauci, Director of National Institute of Allergy and Infectious Diseases (NIAID) to advance only the narrative that Defendants and Dr. Fauci subscribe to, according to publicly available emails that recently came from a Freedom of Information Act (FOIA) release.

88.     However, in an email chain from March 15 – 17, 2020, between Defendant Zuckerberg and Dr. Anthony Fauci, it is clear that the CDC, a government agency, was more than engaging "partners" merely to contain the spread of vaccine "misinformation." The following is a copy of a March 15, 2020, email from that chain:

**From:** Mark Zuckerberg          (b) (6)
**Sent:** Sunday, March 15, 2020 12:18 PM
**To:** Fauci, Anthony (NIH/NIAID) [E]          (b) (6) >
**Subject:** Thanks and Ideas

Tony:

I wanted to send a note of thanks for your leadership and everything you're doing to make our country's response to this outbreak as effective as possible. I also wanted to share a few ideas of ways we could help you get your message out, but I understand you're incredibly busy, so don't feel a need to reply unless these seem interesting.

This isn't public yet, but we're building a Coronavirus Information Hub that we're going to put at the top of Facebook for everyone (200+ million Americans, 2.5 billion people worldwide) with two goals: (1) make sure people can get authoritative information from reliable sources and (2) encourage people to practice social distance and give people ideas for doing this using internet tools. This will be live within the next 48 hours.

As a central part of this hub, I think it would be useful to include a video from you because people trust and want to hear from experts rather than just a bunch of agencies and political leaders. This could be done in a number of formats if you're open to it. Probably best would be recording a Q&A where you answer people's top questions, but we'd be open to other formats too.

I'm also doing a series of livestreamed Q&As with health experts to try to use my large following on the platform (100 million followers) to get authoritative information out as well. I'd love to have you do one of these Q&As. This could be the video we put in the Coronavirus Hub or it could be a different thing that we distribute separately, but I think it could be effective as well.

Finally,                                                        (b) (4)

Again, I know you're incredibly busy, so don't feel the need to respond if this doesn't seem helpful. If it's easy to talk live, give me a call anytime on my mobile phone:          (b) (6).

Thanks again for everything you're doing.

Mark

89.      In response to Zuckerberg's email, National Institute of Health (NIH)

Communications Director Courtney Billet sent Dr. Fauci an email the next day, March 16, 2020,

which read:

**From:** Billet, Courtney (NIH/NIAID) [E]                    (b) (6)>
**Sent:** Monday, March 16, 2020 6:53 PM
**To:** Fauci, Anthony (NIH/NIAID) [E] <                    (b) (6)>
**Cc:** Folkers, Greg (NIH/NIAID) [E]                    (b) (6); Conrad, Patricia (NIH/NIAID) [E]
                    (b) (6); Stover, Kathy (NIH/NIAID) [E]                    (b) (6)>; Routh, Jennifer
(NIH/NIAID) [E]                    (b) (6)>
**Subject:** ASF: offer from Mark Zuckerberg

Per email below, Mark Zuckerberg has extended a few offers to do videos with you that we would be
happy to seek clearance on for you to do, if you are amenable. These would have the weight and impact
of television – really, more so.  Please advise if you want to do and we will seek clearance with VP office
and work with Patty to sort out the logistics.

But an even bigger deal is his offer                                        (b) (4)
            The sooner we get that offer up the food-chain the better. I gave Bill Hall a heads-up about this
opportunity and he is standing by to discuss this with HHS and WH comms, but I didn't want him to do
anything without you being aware of the offer. Is it OK if I hand this aspect off to Bill to determine who
the best point of contact would be so the Administration can take advantage of this offer, soonest?

Do you plan to call MZ? His cell number is in his message below.

90.     Fauci responded to Billet by email the following day, March 17, 2020.

**From:**          Fauci, Anthony (NIH/NIAID) [E]
**Sent:**          Tue, 17 Mar 2020 00:23:16 +0000
**To:**            Billet, Courtney (NIH/NIAID) [E]
**Cc:**            Folkers, Greg (NIH/NIAID) [E];Conrad, Patricia (NIH/NIAID) [E];Stover, Kathy
(NIH/NIAID) [E];Routh, Jennifer (NIH/NIAID) [E]
**Subject:**       RE: offer from Mark Zuckerberg

I will write to or call Mark and tell him that I am interested in doing this.  I will then tell him
that you will get for him the name of the USG point of contact.  I agree it should be Bill Hall
who could then turf to the White House Comms if he wishes

91.     Dr. Fauci also responded by email to Zuckerberg that same day, March 17, 2020,

agreeing to the collaboration Zuckerberg proposed.

| From: | Fauci, Anthony (NIH/NIAID) [E] |
| Sent: | Tue, 17 Mar 2020 00:22:45 +0000 |
| To: | Mark Zuckerberg |
| Cc: | Conrad, Patricia (NIH/NIAID) [E];Billet, Courtney (NIH/NIAID) [E];Barasch, Kimberly (NIH/NIAID) [C] |
| Subject: | RE: Thanks and ideas |

Mark:

   Thank you for your kind note.  I tried to call you, but got voice mail.  FYI, my cell phone number is [(b) (6)]  Your idea and proposal sound terrific.  I would be happy to do a video for your hub.   We need to reach as many people as possible and  convince them to take mitigation strategies seriously or things will get much, much worse.  Also, your idea abou [(b) (4)] is vey exciting.  I am copying my Special Assistant, Patty Conrad.  Her office number is [(b) (6)] [(b) (6)].  Please have your people contact her to arrange for the video.  I am also copying the Director of my Communications and Government Relations group.  She can put your people in contact with the best person who could be the US Government point of contact fo [(b) (4)]
Best regards,
Tony

92.     All the redactions referred to in the above emails are notated "(b)(4)" indicating that the purported legal basis for the redaction was commercial or financial information." *See* 5 U.S.C. § 552(b)(4).

93.     In April of 2020, following the surreptitious emails between Dr. Fauci, NIH Communications Director Billet and Defendant Zuckerberg, Defendants would begin what became a concerted, massive, system-wide, and indeed worldwide program of monitoring COVID-related views and content and censor posts deemed false claims by Facebook.

94.     Facebook's "COVID and Vaccine Policy" states Facebook does "not allow false claims about the vaccines or vaccination programs which *public health experts have advised us* could lead to COVID-19 vaccine rejection" and other "false claims" that "could lead to negative outcomes."  Facebook, COVID-19 and Vaccine Policy Updates & Protections, https://www.facebook.com/help/230764881494641.

95.     The Policy clarifies that what Facebook means by "false" is not actual or factual falsity, but rather whether the claim contradicts or challenges the pronouncements or recommendations propounded by public health authorities, including the CDC.  *See id*. (stating that Facebook removes vaccine-related content).

23

96.     A senior official in the Biden Administration has stated that the White House has been involved in "direct engagement" with social media companies, specifically including Facebook, to remove so-called COVID or vaccine "misinformation," and Facebook has publicly confirmed that it assists the White House in achieving this objective.

97.     Defendants thus acted to censor other medical opinions that did not uphold that narrative of Dr. Fauci and the CDC, which took on both a political and medical nature, given the interconnection between government policy and science.

98.     Facebook's censorship (i.e., flagging, shadow banning, etc.) of Users who engaged in speech with a different opinion regarding the COVID-19 vaccination than Facebook advanced for Dr. Fauci and the CDC, irrespective of the credentials of those posting said different opinions, was a closely coordinated interaction between Defendants and a specific government actor (Dr. Fauci) and government agency (CDC) to constrain free speech.

99.     When Facebook states or implies that Users who espouse a different narrative regarding the safety and efficacy of the vaccination are spreading "false" information, it is an act of bad faith. It is necessary in society for people to have a robust exchange of ideas, yet Zuckerberg and Facebook have worked closely with government actors to silence any opposing views.

100.    Before, during, and after the 2020 Presidential election, Plaintiff's Facebook account was censored multiple times, as were the accounts of Putative Class Members for the views they expressed or content they shared on Facebook. For example:





**Donald J. Trump** was live.
October 19, 2020 · 🌐

LIVE: President Donald Trump in Tucson, AZ #Arizona

Text VOTE to 88022

Joe Biden is the President of the United States. Kamala Harris is the Vice President.
Get More Info

👍❤️ 97K                    40K Comments   8.9K Shares



**Donald J. Trump** was live.
October 26, 2020 · 🌐

LIVE: President Donald Trump in Allentown, PA #Pennsylvania

Text VOTE to 88022

Both voting by mail and voting in person have a long history of trustworthiness in the US. Voter fraud is extremely rare across voting methods.
Source: Bipartisan Policy Center
Get Accurate Election Info

👍❤️ 65K                    43K Comments   7.6K Shares

101.    Another example of Defendants working directly with government actors to censor free speech was when Plaintiff and Putative Class Members supported the view that hydroxychloroquine might be an effective, preventative option to protect against the coronavirus.

102.    Plaintiff and Putative Class Members' posts about hydroxychloroquine were censored by Facebook, as only the narrative crafted by Dr. Fauci, NIAID, and the CDC was allowed on Facebook regarding best practices for treating the novel COVID-19.

> Defendant Zuckerberg has admitted to this in his House Anti-trust Hearing testimony on July 29, 2020.  "So we do take that down," Zuckerberg told a House panel, treading on hydroxychloroquine. "It has not been proven to cure COVID," Zuckerberg told Rep. Jim Sensenbrenner (R-WI). "Some of the data suggests that it might be harmful to people," although medical professionals openly disagreed with Zuckerberg's conclusion, and it has been approved for other ailments like malaria for decades.

103.    Plaintiff also expressed the view on Facebook that COVID-19 originated in the Wuhan laboratory in China and would specifically refer to it as the "China virus."

104.    Subsequently, Facebook Users posting comments discussing the Wuhan laboratory in China as the origin of COVID-19 or referring to COVID-19 as the "China virus" were similarly censored (flagged, shadow banned, etc.)

105.    Other instances when Defendants also worked directly with government actors to censor free speech included when Plaintiff challenged the integrity of the 2020 Presidential election process and the results of the 2020 Presidential election, *supra* paragraph 97.

106.    Posts concerning a lack of integrity in the 2020 Presidential election were then similarly censored.

107.    Defendants' ban on Plaintiff and Putative Class Members continues to this day. The ban directly impacted Plaintiff's ability to communicate with family and friends and politically, including: (1) daily communications necessitated by his unquestioned position as head of the Republican Party; (2) campaigning for Republican 2022 candidates; (3) fundraising for the Republican Party; (4) laying a foundation for a potential 2024 Presidential campaign.

## VI. PRESIDENT TRUMP AND THE CLASS DEPLATFORMED

### A. **Plaintiff President Trump**

108.     Plaintiff's Facebook posts on January 6, 2021, were used in his official capacity as President of the United States and served a public function in posting his robust political rhetoric addressed to those who had attended his rally that day.

109.     On January 7, 2021, Facebook, at the personal direction of Zuckerberg, censored Plaintiff's Facebook account, blocking his ability to communicate with his approximately thirty-five (35) million followers and the ability of Plaintiff's approximately thirty-five (35) million followers to hear, and comment on, the views and content of the speech he was expressing.

110.     In early January of 2021, as Defendant Zuckerberg was directing these decisions of constitutional import regarding the Plaintiffs right of free speech, Defendant was at his vacation home in Kauai, Hawaii.

111.     On January 7, 2021, Zuckerberg issued a public statement to the effect that Plaintiff had posted messages on his Facebook page on January 6, 2021, that could be interpreted by Facebook as inciting violence, specifically citing the events of January 6, 2021, stating in part:

> We believe the risks of allowing the President to continue to use our service during this period are simply too great.  Therefore, we are extending the block we have placed on his Facebook and Instagram accounts indefinitely and for at least the next two weeks until the peaceful transition of power is complete.

112.     On January 7, 2021, at the direction of Zuckerberg, Facebook blocked President Trump's accounts and threatened his family and associates with deletion of their personal accounts if they attempted to post in the "voice" of Donald J. Trump the warnings read as followers:





113.    On June 4, 2021, as a result of a scathing opinion from its Oversight Board issued

on May 5, 2021, Facebook announced new policies that resulted in a definitive two-year ban

from Facebook for Plaintiff, through January 21, 2023, conveniently beyond the midterm elections of 2022.

114.    In October of 2020, Facebook formed an Oversight Board, which consists of twenty (20) people around the world, six (6) members from the United States, and forty (40) people when fully staffed. The Oversight Board is described as the Facebook "Supreme Court." The purpose of the Board is to review "select" cases, review content decisions of Facebook staff, analyze whether the decisions made by Facebook are compliant with their set guidelines and standards, and ensure free speech flourishes on Facebook and Instagram platforms.

115.    The Oversight Board met for the first time at the end of January 2021, reviewed five cases, and overturned four of the five decisions under review. (Oversight Board overturns Facebook decision: Case 2020-002-FB-UA | Oversight Board)

116.    On January 7, 2021, Mark Zuckerberg unilaterally decided to "indefinitely suspended" Donald J Trump's Facebook and Instagram accounts.

117.    On May 5, 2021, the Oversight Board reviewed the decision made by Mark Zuckerberg to delete Facebook President Trump's Facebook account. The Oversight Board, operating with half the members intended, issued an order which stated in part:

> It is not permissible for Facebook to keep a user off the platform for an undefined period, with no criteria for when or whether the account will be restored. In applying this penalty, Facebook did not follow a clear, published procedure. 'Indefinite' suspensions are not described in the company's content policies. Facebook's normal penalties include removing the violating content, imposing a time-bound period of suspension, or permanently disabling the page and account. It is Facebook's role to create necessary and proportionate penalties that respond to severe violations of its content policies. The Board's role is to ensure that Facebook's rules and processes are consistent with its content policies, its values and its human rights commitments.

118.    The Oversight Board went on to state that they would not decide on how long Plaintiff would be banned from the platform, instead ordering Facebook leadership to "supply and justify a defined penalty." The Oversight Board also made multiple recommendations,

including some suggestions regarding Facebook standards and policies. The case of President Trump was, in essence, remanded back to Mark Zuckerberg to define a penalty in accordance with their ruling.

119.    On June 4, 2021, Facebook responded to the Oversight Boards' ruling, changed its policies regarding political figures, and suspended President Trump for at least 2 years until January 2023.  Facebook included that if President Trump were reinstated in 2023, there would be a strict set of rapidly escalating sanctions applicable to his account.

> "At the end of this period, we will look to experts to assess whether the risk to public safety has receded. We will evaluate external factors, including instances of violence, restrictions on peaceful assembly and other markers of civil unrest…"
> -Nick Clegg, Facebook's Vice President of Global Affairs

120.    In a far more sweeping gesture, Facebook pivoted on its policy of assessing the newsworthiness of accounts and posts in its analysis of whether to delete content.  The newsworthiness balancing test is now applied equally to all users, and the political status of a User would no longer be considered.

121.    While Facebook's censoring of Plaintiff was the most widely publicized action taken by Defendants, countless other Putative Class Members have had their views or content similarly deplatformed or censored by Defendants for arbitrary reasons or no reason at all.

122.    These Putative Class Members censored by Defendants lost not only a primary means of communicating with friends and family but also their ability to access wide-ranging views and content on the most pressing issues of the day.

**B.  Plaintiff Elizabeth Albert**

123.    Plaintiff Elizabeth Albert ("Mrs. Albert") is a United States citizen residing in Greenacres, Florida.

124.    In 2007, Mrs. Albert opened a personal Facebook account where she regularly posted photos of her family and used the platform to share news such as her wedding day, the birth of her children, birthdays, and vacations. Mrs. Albert's personal Facebook account had never been warned, censored, or flagged by Facebook for the content of her posts.

125.    In 2018, Mrs. Albert became an administrative member of the Facebook page called "#WalkAway Campaign." "WalkAway Campaign" was a Facebook group and page that allowed Users to share their personal stories of why they decided to leave the Democrat party.

126.    On January 8, 2021, without warning, the Defendants deleted the "#WalkAway Campaign" group and page. They additionally banned the personal accounts of all page administrators and the business pages they managed, including Mrs. Albert.

127.    Defendants banned Plaintiff Albert's personal Facebook account, which resulted in her loss of thousands of treasured family photos and memories.

**C.  Plaintiffs Kiyan and Bobby Michael**

128.    Plaintiffs Kiyan and Bobby Michael (together, the "Michaels") are United States citizens residing in Florida.

129.    In 2019 the Michaels opened a joint Facebook page where they shared family photos, religious beliefs as Christians, tips on gardening, recipes, and their political views.

130.    Before 2020, the Michaels' account had never been warned, censored, or flagged by Facebook for the contents of its posts.

131.    Beginning in January of 2020, the Michaels began to have content on their Facebook page censored by Facebook. To the Michaels' knowledge, the censorship took place more than three (3) times in the form of content relating to COVID-19 and support for President Donald Trump and his policies being removed by Facebook.

132.     The Michaels now experience a delay when they post things to their personal page and notice that their page is heavily monitored and "fact-checked." Below are a few examples of censorship the Defendants have used against them.



### D.  <u>Plaintiff Jennifer Horton</u>

133.     Plaintiff Jennifer Horton ("Ms. Horton") is a United States citizen residing in Fenton, Michigan. Ms. Horton has been an elementary school teacher since 1994.

134.     In roughly 2009, Ms. Horton created a personal Facebook account where she regularly shared photos of her family, posted updates on major life events, shared professional accomplishments, and used the page to post her opinions on the news of the day.

135.     To her recollection, Ms. Horton had only been censored on one other occasion when she saved another user's post regarding vaccines to read later. She received a warning from the Defendant that the post she saved was false information.

136.    In April of 2021, the Governor of Michigan, Gretchen Whitmer, mandated children under two (2) years wear face masks during gatherings.

137.    In response to this mandate, Ms. Horton posted on her Facebook wall an article listed on the NIH government website that challenged the safety and efficiency of children wearing masks. Plaintiff posted with the article, "If your child wears a mask all day at school, this article from National Institute of Health is a must-read. Link in comments." Screenshot below:



138.    On April 17, 2021, Plaintiff's brother in Tennessee went missing, and she began using Defendant's platform to communicate with missing persons pages and others living in Tennessee.

139.    On April 29, 2021, her account was suspended for 24 hours, and she was notified it was due to her post.

140.    The Plaintiff felt helpless and hopeless not being able to access the platform that she had turned to for over 10 years to distribute information and that she used to communicate with larger networks that may have helped her locate her brother.

141.    After being shut down, Plaintiff was terrified of how to operate within the boundaries of the Defendants' Terms of Service because she did not want to lose her ability to communicate again.

142.    Nearly 2 months later, Plaintiff's brother was found deceased. She was left devastated, wondering if she could have prevented his death had she been able to communicate with her network on Facebook.

143.    Defendant lied and deceived the Plaintiff and the American people when it was in its infancy and growth stage. They marketed themselves as a town square and a safe place for users to communicate and discuss personal news, professional news, and their feelings on topics relating to news of the day.

144.    For years, Plaintiff was reliant on the platform as a communication tool with friends, family, and community.

145.    At one of the most difficult times of her life, when communication with her "network" was the most important, Defendants took her voice away from her due to her post regarding masks.

## COUNT ONE

## VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION

146.     Plaintiff restates the allegations set forth in paragraphs 1-145.

147.     Pursuant to Section 230, Defendants are encouraged and immunized by Congress to censor constitutionally protected speech on the Internet, including by and among its approximately three (3) billion Users that are citizens of the United States.

148.     Using its authority under Section 230 together and in concert with other social media companies, the Defendants regulate the content of speech over a vast swath of the Internet.

149.     Defendants are vulnerable to and react to coercive pressure from the federal government to regulate specific speech.

150.     In censoring the specific speech at issue in this lawsuit and deplatforming Plaintiff, Defendants were acting in concert with federal officials, including officials at the CDC and the Biden transition team.

151.     As such, Defendants' censorship activities amount to state action.

152.     Defendants' censoring the Plaintiff's Facebook account, as well as those Putative Class Members, violates the First Amendment to the United States Constitution because it eliminates the Plaintiffs and Class Member's participation in a public forum and the right to communicate to others their content and point of view.

153.     Defendants' censoring of the Plaintiff and Putative Class Members from their Facebook accounts violates the First Amendment because it imposes viewpoint and content-based restrictions on the Plaintiffs' and Putative Class Members' access to information, views, and content otherwise available to the general public.

154.    Defendants' censoring of the Plaintiff and Putative Class Members violates the First Amendment because it imposes a prior restraint on free speech and has a chilling effect on social media Users and non-Users alike.

155.    Defendants' blocking of the Individual and Class Plaintiffs from their Facebook accounts violates the First Amendment because it imposes a viewpoint and content-based restriction on the Plaintiff and Putative Class Members' ability to petition the government for redress of grievances.

156.    Defendants' censorship of the Plaintiff and Putative Class Members from their Facebook accounts violates the First Amendment because it imposes a viewpoint and content-based restriction on their ability to speak and the public's right to hear and respond.

157.    Defendants' blocking the Plaintiff and Putative Class Members from their Facebook accounts violates their First Amendment rights to free speech.

158.    Defendants' censoring of Plaintiff by banning Plaintiff from his Facebook account while exercising his free speech as President of the United States was an egregious violation of the First Amendment.

159.    Defendant Zuckerberg is sued in his personal capacity and is liable in damages because he was personally responsible for Facebook's unconstitutional censorship of Plaintiff and the Putative Class Members, including Facebook's deplatforming of Plaintiff and other Putative Class Members.

160.    Zuckerberg is also sued in his official capacity, along with Facebook itself, for injunctive relief to and the unconstitutional censorship of the Plaintiff and Putative Class Members, including Facebook's deplatforming of Plaintiff and other Putative Class Members.

**COUNT TWO**

**DECLARATORY JUDGEMENT OF UNCONSTITUTIONALITY OF SECTION 230 AND THE COMMUNICATIONS DECENCY ACT**

161.    Plaintiff restates the allegations set forth in 1-160.

162.    In censoring (flagging, shadow banning, etc.) Plaintiff and the Class, Defendants relied upon and acted pursuant to Section 230 of the Communications Decency Act.

163.    Defendants would not have deplatformed Plaintiff or similarly situated Putative Class Members but for the immunity purportedly offered by Section 230.

164.    Section 230(c)(2) purports to immunize social media companies from liability for action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that speech is "constitutionally protected."  47 U.S.C. § 230(c)(2).

165.    In addition, Section 230(c)(1) also has been interpreted as furnishing an additional immunity to social media companies for action taken by them to block, restrict, or refuse to carry constitutionally protected speech.

166.    Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social medial companies to accomplish an objective—the censorship of supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress could not constitutionally accomplish itself.

167.    Congress cannot lawfully induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 US 455, 465 (1973).

168.    Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has interpreted to immunize social media companies for action they take to censor constitutionally protected speech.

169.   Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content- and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and viewpoint. *See Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996)*.*

170.   Such heightened scrutiny cannot be satisfied here because Section 230 is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression and to democracy itself; because the word "objectionable" in Section 230 is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; because Section 230 purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; because Section 230 has turned a handful of private behemoth companies into "ministries of truth" and into the arbiters of what information and viewpoints can and cannot be uttered or heard by hundreds of millions of Americans; and because the legitimate interests behind Section 230 could have been served through far less speech-restrictive measures.

171.   Accordingly, Plaintiff, on behalf of himself and the Class, seeks a declaration that Section 230(c)(1) and (c)(2) are unconstitutional insofar as they purport to immunize from liability social media companies and other Internet platforms for actions they take to censor constitutionally protected speech.

## CLASS ACTION ALLEGATIONS

172.     Plaintiff and the Class brings this lawsuit pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of the following proposed class (the "Class"):

***All Facebook platform Members who reside in the United States, and between June 1, 2018, and today, had their access to their social media accounts wrongly restricted or curtailed by these Defendants and who were damaged thereby.***

173.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

174.     Specifically excluded from the Class are Defendants, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or any entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

175.     ***Numerosity***. The Members of the Class are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff and the Class alleges that the Class contains hundreds of thousands of Members. Although the precise number of Putative Class Members is unknown to Plaintiff and the Class, the true number of Putative Class Members is known by Defendants, and thus, may be notified of the pendency of this action by first class mail, electronic mail, social media, and/or published notice.

176.     ***Existence and predominance of common questions of law and fact***. Common questions of law and fact exist as to all Members of the Class and predominate over any

questions affecting only individual Putative Class Members. These common legal and factual questions include, but are not limited to, the following:

(a) whether  the Defendants' conduct violated the First Amendment of the Constitution of the United States

(b) whether Section 230 is an unconstitutional delegation of power Congress cannot exercise.

(c)  whether the Defendants conduct violates any other state or federal statutes.

177.    ***Typicality***.  Plaintiff and the Class's claims are typical of the claims of the other Members of the Class in that Defendants arbitrarily prevented Plaintiff and the Class and Putative Class Members from using their social media accounts or curtailed or limited Plaintiff and the Class and the Class' use of their accounts to inhibit or prevent Plaintiff and the Class from engaging in speech that Defendants disliked or contrary to Defendants' opinions or beliefs, in violation of the First Amendment of the U.S. Constitution.

178.    ***Adequacy of representation***. Plaintiff and the Class will fairly and adequately protect the interests of the Class. Plaintiff and the Class have retained counsel highly experienced in complex consumer class action litigation, and Plaintiff and the Class intend vigorously to prosecute this action. Further, Plaintiff and the Class have had no interests that are antagonistic to those of the Class.

179.    ***Superiority***. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Putative Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if Putative Class Members could afford

such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court and presents no unusual management difficulties under the circumstances here.

89.   The Class may also be certified because:

(a)   the prosecution of separate actions by individual Putative Class Members would create
a risk of inconsistent or varying adjudication with respect to individual Putative Class Members that would establish incompatible standards of conduct for the Defendant;

(b)   the prosecution of separate actions by individual Putative Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Putative Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)   Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the Members of the Class as a whole.

## DEMAND FOR JURY TRIAL

90.   Plaintiff and the Class demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Donald J. Trump and the Class respectfully request that the Court enter an Order certifying this case as a class action, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Lead Class Counsel and that the Court Order, adjudge, and decree in favor of Plaintiff and the Class against the Defendants for:

A.  An award of Compensatory and Punitive damages to the Plaintiff and the Class in an amount to be determined at trial;

B.  An injunction and declaratory judgment ordering Facebook immediately to reinstate Plaintiff and Putative Class Members to their Facebook accounts;

C.  An injunction and declaratory judgment ordering Facebook to remove its warning labels and misclassification of all content of the Plaintiff and the Class and to desist from any further warnings or classifications;

D.  Adjudgment declaring Sections 230(c)(1) and (c)(2) of the Communications Decency Act of 1996 unconstitutional;

E.  An award of attorneys' fees and costs to Plaintiff and the Class in an amount to be determined at trial; and

F.  An award of punitive damages to Plaintiff and the Class in an amount to be determined at trial.

G.  An award of such other and further relief as the Court may deem just and proper.

Date: July 7, 2021

*/s/ Matthew Lee Baldwin*
Matthew L. Baldwin, Esq.
Florida Bar No. 27463

VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd.,
Third Floor
Coral Gables, FL  33134
Tel: 305.631.2528
E-mail: Matthew@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com

JOHN P. COALE
(*Pro Hac Vice Forthcoming*)
2901 Fessenden St. NW
Washington, D.C.  20008
johnpcoale@aol.com
Telephone: (202) 255-2096

THE DUDENHEFER LAW FIRM L.L.C
FRANK C. DUDENHEFER, JR.
*(Pro Hac Vice Forthcoming*)
fcdlaw@aol.com
2721 St. Charles Ave, Suite 2A
New Orleans, LA  70130
Telephone: (504) 616-5226

IVEY, BARNUM & O'MARA
JOHN Q. KELLY
(*Pro Hac Vice Forthcoming*)
jqkelly@ibolaw.com

MICHAEL J. JONES
(*Pro Hac Vince Forthcoming*)
mjones@ibolaw.com

ROLAND A. PAUL
*(Pro Hac Vice Forthcoming)*
rpaul@ibolaw.com

RYAN S. TOUGIAS
*(Pro Hac Vice Forthcoming)*
rtougias@ibolaw.com

SEAN M. HAMILL
*(Pro Hac Vice Forthcoming)*
shamill@ibolaw.com

170 Mason Street
Greenwich, CT  06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9462