IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
DISTRICT OF FLORIDA MIAMI DIVISION

| | |
|---|---|
| **DONALD J. TRUMP, the Forty-Fifth President of the United States, LINDA CUADROS AND AMERICAN CONSERVATIVE UNION, INDIVIDUALLY AND ON BEHALF OF THE CLASS,** | 1:21-cv-22440-KMW |
| **Plaintiffs,** | |
| **V.** | |
| **FACEBOOK, INC., and MARK ZUCKERBERG, Defendants.** | |

**AMICUS CURIAE BRIEF BY CHRIS SEVIER OF DE FACTO ATTORNEYS
GENERAL, JOHN GUNTER JR OF SPECIAL FORCES OF LIBERTY, AND PASTOR
RICH PENKOSKI OF WARRIORS OF CHRIST ON THE ISSUE OF STANDING IN
PARTIAL SUPPORT AND IN PARTIAL OPPOSITION OF THE PLAINTIFFS**

*"Why just make a political statement, when you can win by having Florida enact the Stop
Social Media Censorship Act and by then bringing a cause of action under a state statute that
falls squarely in the state law exemption under Section 230(e)(3)" - De Facto Attorneys General*

**www.specialforcesoflibety.com**

**TABLE OF CONTENTS**

I. INTRODUCTION
………....................................................................................................................1

II. THE LEGISLATIVE HISTORY AND PROCEDURAL HISTORY OF OF THE STOP
SOCIAL MEDIA CENSORSHIP ACT, SB 7072, AND RELEVANT CASES
………....................................................................................................................3

III. IDENTIFYING THE BEST COURSE OF ACTION FOR THE PLAINTIFFS TO TAKE
………....................................................................................................................5

VI. ARGUMENT
………....................................................................................................................8

A.  What Is The Best Solution To This Ongoing Bi-partisan Problem?
………....................................................................................................................8

B.  How Did We Get Here - Understanding The Current Landscape And The Misuse Of Section
230

……......…………………………………………………………………………………9

C. The Stop Social Media Censorship Act Is The Cure-all In View Of The Significant State-law Exemption Already Built Into Section 230 By Congress

……......…………………………………………………………………………………11

D. Comparing The Differences Between HB 33, the Stop Social Media Censorship Act & SB 7072

……......…………………………………………………………………………………12

E. The First Amendment Is On The Side Of The Stop Social Media Censorship Act

……......…………………………………………………………………………………20

V. CONCLUSION

……......…………………………………………………………………………………20

**Cases**

*Almeida v. Amazon.com*, Inc.,
456 F.3d 1316 (11th Cir. 2016)

……......…………………………………………………………………………………11

*Biden v. Knight First Amend. Inst.*,
141 S. Ct. 1220 (2021)

……......…………………………………………………………………………………16

*Burroughs v. United States*,
290 U.S. 534 (1934)

……......…………………………………………………………………………………15

*Curry v. Baker*,
802 F.2d 1302 (11th Cir. 1986)

……......…………………………………………………………………………………16

*Crellin Techs., Inc. v. Equipmentlease Corp.*,
18 F.3d 1 (1st Cir. 1994)

……......…………………………………………………………………………………15

*Cf. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)

……......…………………………………………………………………………………12

*Domen v. Vimeo, Inc.*,
991 F.3d 66 (2d Cir. 2021)

……......…………………………………………………………………………………19

*FCC v. Fox TV Stations, Inc.*,
567 U.S. 239, 253 (2012)

……......…………………………………………………………………………………13

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)

……......…………………………………………………………………………………13

*Google, Inc. v. Hood*,
822 F.3d 212 (5th Cir. 2016)

……......…………………………………………………………………………………11

*Jackson v. Metro. Edison Co.*,
419 U.S. 345 (1974)

……......…………………………………………………………………………………2

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018)
……...........................................................................................................................2

*Lindell v. McCallum*,
352 F.3d 1107 (7th Cir.2003)
……...........................................................................................................18

*Malnak v. Yogi*,
592 F.2d 197 (3d Cir.1979)
……...........................................................................................................18

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019)
……...........................................................................................................................2

*Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)
……...................................................................................2, 4, 6, 7, 9, 12, 15, 19

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978)
……...........................................................................................................15

*Parks v. Alta Cal. Tel. Co.*,
13 Cal. 422 (1859)
……...........................................................................................................17

*Prager Univ. v. Google LLC*,
951 F.3d 991 (9th Cir. 2020)
……...........................................................................................................................2

*Real Alternatives, Inc. v . Sec'y Dep 't of Health & Human  Servs.*, 150 F. Supp. 3d 419 (3d Cir. Aug. 4, 2017)
……...........................................................................................................18

*Reno v. American Civil Liberties Union*,
521 U.S. 844 (1997)
……...........................................................................................................12

*Rossignol v. Voorhaar*,
316 F.3d 516 (4th Cir. 2003)
……...........................................................................................................................2

*Sable Commc'n of Cal., Inc. v. FCC*,
492 U.S. 115 (1989)
……...........................................................................................................12

*School District of A Bington Township, Pa. v. Schempp*,
374 U.S. 203 (1963)
……...........................................................................................................18

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110, 119 (2d Cir. 2012)
……...........................................................................................................17

*Sevier et. al. v. Garland et. al.*
1:21-cv-22577 (S.D.F.L July 2021)
……...........................................................................................................................1

*Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*,
2010 WL 1799456, (D.N.J. May 4, 2020)
……...........................................................................................................16

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,

1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)
.........................................................................................................................9

*Skinner v. Ry. Lab. Execs.' Ass'n*,
489 U.S. 602 (1989)
.........................................................................................................................2

*Theriault v. Silber*,
547 F.2d 1279, 1281 (5th Cir.1977)
.........................................................................................................................18

*Thomas v. Review Bd.*,
450 U.S. 707 (1981)
.........................................................................................................................18

*Torcaso v. Watkins*, 367 U.S. 488 (1961)
.........................................................................................................................18

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)
.........................................................................................................................15

*United States v. Seeger*,
380 US 163 (1965)
.........................................................................................................................18

*United States v. Williams*,
553 U.S. 285 (2008)
.........................................................................................................................13

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)
.........................................................................................................................13

*Wells v. City and County of Denver*,
257 F.3d 1132 (10th Cir. 2001)
.........................................................................................................................18

*Welsh v. United States*,
398 U.S. 333 (1970)
.........................................................................................................................18

*Wollschlaeger v. Governor*,
848 F.3d 1293 (11th Cir. 2017)
.........................................................................................................................13


**Other Authority**
47 U.S.C. § 230
...............................................................................1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16
HB33 - THE STOP SOCIAL MEDIA CENSORSHIP ACT
...........................................................................1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18
SB7072 - §106.072, § 287.137, and § 501.204
...........................................................................................1, 4, 6, 7, 8, 12, 13, 14, 15, 16, 17, 18
Fla. Stat. § 48.193
.........................................................................................................................17
I. AMEND. U.S. CON.

…………………………………………………………………2, 3,  8, 11, 12, 13, 15, 19, 20
X AMEND. U.S. CON

…………………………………………………………………………………17
XIV AMEND. U.S. CON

…………………………………………………………………………………..2
ARTICLE III, SECTION 3, OF THE FLORIDA CONSTITUTION

…………………………………………………………………………………..4, 6
FRCP 15

…………...…………………………………………………………………..6
FRCP 12

…………...…………………………………………………………………10
CLAUSE 3, ARTICLE VI U.S. CON

…………...…………………………………………………………………..6
15 U.S.C. §§ 1051

…………...…………………………………………………………………..7
28 U.S. Code § 1332

…………...…………………………………………………………………..7
FRCP 8(e)(2)

…………...…………………………………………………………………..7
1 Corinthians 3:15

…………...…………………………………………………………………10

# I.   INTRODUCTION

Christopher Sevier Esq., executive director of De Facto Attorneys General, John Gunter Jr., executive director of Special Forces Of Liberty Miami Division, and Pastor Rich Penkoski, executive director of Warriors For Christ respectfully submit this *amicus* brief on the narrow issue of standing, given how the original complaint is pled.[1]  The *Amici* filed a lawsuit against the Attorney General on the same topic before the Southern District. See *Sevier et. al. v. Garland et. al.*1:21-cv-22577 (S.D.F.L July 2021).  The *Amici* ask the Court to take judicial notice of their pending case before and how it relates to this controversy.  The *Amici* want to help the courts in the Southern District make the right decision.  The *Amici* partially support the Plaintiffs' case, but not necessarily under the current causes of action asserted in the original complaint on certain conditions.  On the surface, Plaintiffs' causes of action unnecessarily put the judicial

---

[1]  The evidence shows that lawyers know just enough to be dangerous on any topic unless they have litigated the issue. (See the staff lawyers who work for Governor Desantis, who wrote SB7072 the bill which created §106.072, § 287.137, and § 501.204).  The *Amici* have litigated Section 230 issues and social media censorship before a host of Federal Courts, but most importantly, they have litigated the matter before countless legislative committees in the face of robust opposition.
  (1) See the video of the hearing on the Social Media Censorship Act before the public laws committee in Missouri, which included arguments from De Facto Attorneys General, Google, and the Heartland Institute: (https://www.youtube.com/watch?v=e4QUKoTHKZs)
  (2) See the video of the hearing  before the Commerce Committee in the Louisiana Senate with testimony by Senator Morris, De Facto Attorneys General, Netchoice, and (https://www.youtube.com/watch?v=c-NqZhBqkBs&t=8s)
  (3) See the video of the hearing before the Judiciary Committee in the State of Maine with testimony by Rep. Sampson and De Facto Attorneys General.
  (https://www.youtube.com/watch?v=jjZ_LJnx-dE)
It is in the wake of fighting in legislative committees against their adversaries that the *Amici* have been able to perfect the language of a proposed legislative instrument for all 50 states entitled the Stop Social Media Censorship Act,  a bill parallels the spirit of Section 230 and draws from it in a manner so that the statute will fall squarely in the state-law exemption under subsection (e) subparagraph (3) of Section 230. (See Appendix A). The Stop Social Media Censorship Act is not preempted by Federal law and a cause of action brought under it, once enacted, will cut through an immunity defense floated by social media websites that break their promises, deceive consumers, and act in bad faith. At the 2021 legislative session Rep. Sabatini introduced the measure as HB 33, which is referred to as the Stop Social Media Censorship Act.

branch in a difficult position by asking the courts to either (1) strike down or void 47 U.S.C. §

230 [2] (which is generally "good law" but is undoubtedly being wrongfully abused by social

media websites to perpetuate bad faith acts at the expense of a litany of fundamental freedoms)

or to (2) find that certain social media websites are quasi-state actors that are subject to comply

with First Amendment restrictions. [3] While Plaintiffs' causes of action are not necessarily invalid,

they are seemingly weak, asking too much from the judicial branch.  But the recent decision in

---

[2] If the Plaintiffs want to ask a Court to strike down Section 230, the Plaintiffs might need to name the enforcer of Congress's laws as the defendant, not Twitter. The U.S. Congress created Section 230, not Twitter.  Perhaps if the Plaintiffs named the U.S. as the Defendant, the Plaintiffs would have colorable claim to have Section 230 struck down for violating the "right to reddress grievence clause" or petition and access clause of the First Amendment, if and only if the "state-law exemption" under subsection (e) subparagraph (3) doesn't allow for proposed statutes like the Stop Social Media Censorship Act to stop the abusive misuse of Section 230 in the view of verifiable injuries. Congress provided a way for an aggrieved individual to seek redress through the state-law exemption. But not a single state has passed the Stop Social Media Censorship Act, which is a very narrowly tailored proposed state-statute that would allow for aggrieved party to get reddress against the a social media website for the kinds of wrongdoing inflicted on the Plaintiffs in this case by the Defendants. The evidence shows that if Section 230 was construed to preempt the Stop Social Media Censorship Act, which is designed to protect Florida consumers from fraud, breach of contract, and safeguard their free speech rights, it would raise serious doubts about Section 230's constitutionality under the First Amendment under *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (discussing constitutional avoidance canon)

[3] First Amendment says "Congress" shall make no law abridging the freedom of speech or of the press. The Fourteenth Amendment extended this prohibition to state and local governments. The First Amendment does not restrict the rights of private entities not performing traditional, exclusive public functions. *See, e.g., Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019).  Some courts have found that private forums—however popular they might be—are not state actors, and thus cannot violate anyone's First Amendment rights. See *Prager Univ. v. Google LLC*, 951 F.3d 991, 994 (9th Cir. 2020).  Yet, the Plaintiffs could argue that Section 230 creates a broad law-free zone in which internet companies can censor however they like, even in bad faith, raising serious questions whether their censorship constitutes state action. See *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 615 (1989) (finding state action where the government "removed all legal barriers" to private companies drug-testing their employees and "made plain . . . its strong preference for testing"). If total immunity exists then, Section 230 would create "a sufficiently close nexus between" Congress and social-media platforms engaged in censorship to support a finding of state action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). This analysis is powerfully reinforced by the history of the First Amendment, for censorship by nominally private actors with monopoly power over an important form of communication was the precise evil that the founding generation had in mind when the First Amendment was ratified. See *Rossignol v. Voorhaar*, 316 F.3d 516, 526– 27 (4th Cir. 2003)

*Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) changes everything.   In the wake of the *Netchoice* decision, either (1) Section 230 is unconstitutional under the petition and access clause of the First Amendment or (2) the Court must rule that Florida needs to pass a better law, like the amended version of HB 33, the Stop Social Media Censorship Act, by Rep. Sabatini and Sen. Gruters, that will allow consumers like the Plaintiffs to obtain relief when they are the victims of deceptive trade practices, fraudulent inducement, breach of contract, unjust enrichment, false advertising, and deceptive trade practices.  The *Amici* believe that the Court should find that the Stop Social Media Censorship Act is the "cure-all" to the litany of competing problems presented in this ongoing controversy and that the state-law exemption under subsection (e) subparagraph (3) is the saving grace, while advising that if Florida wants to protect consumers like the Plaintiffs it should enact the Stop Social Media Censorship Act.

By permitting the *Amici* to submit this brief, perhaps all parties and this Honorable Court will better understand the complex issues involved that will help all interested parties in the adjudication of these proceeding, while permitting the Court to reach the best outcome in the interest of justice in a manner that does not offend the rule of law or hurt the public's welfare. The bottom line is that either this Court needs to acknowledge that Florida needs to pass a better law like the Stop Social Media Censorship Act, HB 33 in its amended form, or the Court needs to rule Section 230 of the Communications Decency Act unconstitutional for constituting Congressional action that violates the petition and access clause of the First Amendment of the United States Constitution. Those are the only two legally cognizable options.

## II.  THE LEGISLATIVE HISTORY AND PROCEDURAL HISTORY  OF OF THE STOP SOCIAL MEDIA CENSORSHIP ACT, SB 7072, AND RELEVANT  CASES

Here is a breakdown of the relevant legislative and procedural history concerning this case. In 2019, the *Amici* convinced Sen. Gruters to draft and introduce the Stop Social Media Censorship Act. The bill was reintroduced at the 2020 legislative session by Sen. Gruters and Rep. Sabatini.[4]  In 2021, Rep. Sabatini introduced the Stop Social Media Censorship Act (HB33), and subsequently, for unknown reasons, Rep. Sabatini got into some kind of squabble with Speaker Sprowls, as passions do tend to run high in the legislative branch, unlike in the cooler judicial one. This dust-up caused the members of the Florida House to oppose Rep. Sabatini's bills simply because of "who he was" and not because of "the meritorious substance of his bills."  In the wake of the Sabatini/Sprowls squabble, Governor DeSantis got his staff to use the Stop Social Media Censorship Act as a preliminary foundation to draft the monstrosity that became SB 7072.  SB 7072 was undoubtedly perverted by ambitions and legal ignorance issues at hand.  On May 24, 2021, SB 7072 was enacted and set to go into effect in early July.  In early June, Netchoice and others filed a lawsuit to stop the state from enforcing the statutes.  See *Netchoice, LLC et al., v. Moody et. al.* 4:21-cv-00220-RH-MAF (N.D.F.L 2021).  On June 30, 2021, the court in *Netchoice* granted the plaintiffs' motion for preliminary injunction to enjoin Florida state officials from enforcing parts of SB 7072. (DE 113).  On July 7, 2021, the Plaintiffs, here, filed the instant case but did not include a cause of action under state statute written to fall within the state-law exemption of Section 230.[5]  The *Amici* now request leave to have this brief

---

[4] See the press conference with Laura Loomer:
https://www.facebook.com/watch/live/?v=907548599640066&ref=watch_permalink)

[5] The evidence shows that President Trump - alone - has the leadership skills to sort this out.  The *Amici* are calling upon President Trump to lean on his connections with Governor DeSantis to call a special session pursuant to Article III, Section 3, of the Florida Constitution to enact the Stop Social Media Censorship Act in its amended form: see Appendix B.  The *Amici* are then recommending that the Plaintiffs amend their complaint to include a cause of action under the Stop Social Media Censorship Act.  President Trump should remind Governor of Florida, Speaker Sprowls, and Rep. Sabatini of the Reagan principle that "there is no limit to the amount of good you can do if you don't care who gets the credit."  President Trump should be advised that if he gets Florida to call a special session and pass the Stop Social Media Censorship

docketed. Having authored the Stop Social Media Censorship Act for all 50 states, the *Amici*

have a special interest in the outcome of this case.[6] The *Amici* are working in over 37 states on

this issue before the state legislatures. (See Appendix A). While the *Amici* appreciate Florida's

initiative on this topic, Florida cannot be allowed to muck it up for the rest of the nation. No

matter what, the evidence shows that the days of social media tyranny are going to end.

---

Act, then he can rest assured that virtually all of the states will pass the Stop Social Media
Censorship Act out of the gate at the 2022 legislative session. (See Appendix A). Even if
President Trump does not take this recommended course of action, the *Amici* will all but ensure
that countless states will enact the Stop Social Media Censorship Act at the inception of the 2022
legislative session.

[6] The *Amici* consists primarily of Christ-followers, who served in the United States
Military in foreign theaters of war, namely on the rule of law mission, which is purposed to
better ensure a government's compliance with their highest Constitutional authority. The *Amici*
have continued that mission state-side in America even though they no longer officially
operating under Title 10 jurisdiction on behalf of the Armed Forces. The *Amici* routinely file
comprehensive lawsuits across the United States on different controversial and complex issues
that typically concern the "culture wars" and First Amendment issues that are too "politically
hot" for the government-funded Attorneys General to pursue. In bringing such lawsuits, the
*Amici* - without apology - often end up converting Article III Courts into their own private
legislative research commission. Out of the overflow of the litigation pursued by the *Amici*, the
*Amici* subsequently draft legislation for all 50 states and for the federal government, which is
then routinely introduced by a bi-partisan network of sponsors that stretches across the Country
before the Article I branch. The legislation authored by the *Amici* that gets presented to the
members of legislative branch is legally vetted ad nausem and is calculated to survive judicial
review, if subsequently challenged once enacted.

One of the fights that the *Amici* have undertaken in multitudes of Federal District Courts
concerns Big Tech censorship, since this fight has created a freedom crisis that is eroding the
quality of life for millions of Americans. Subsequently, the *Amici* authored a proposed bill
called the "Stop Social Media Censorship Act" that is customized for all 50 states and is
narrowly tailored to parallel the spirit of Section 230 of the CDA so that it falls squarely in the
state-law exemption under subsection (e) subparagraph (3) of the Section 230 - thereby getting
around the problem of preemption. Here is a website for the bill:
https://www.specialforcesofliberty.com/. Here is a short video that the *Amici* provide to
state legislatures who prime sponsor, co-sponsor, or support the bill so that they can easily
understand the bill and the issues involved: (https://youtu.be/CCcOALXNteM).

Over 25 states moved on two primary bills written to stop the on-going problem of social
media censorship that were drafted by either De Facto Attorneys General or Professor
Hamburger of Columbia Lawschool. Countless Republicans and Democrats prime sponsored,
co-sponsored, or supported these legislative measures. For a breakdown by state and by prime
sponsor for the 2021 legislative session and the 2022 legislative session of the proposed language
of the bills see Appendix A.

## III.  IDENTIFYING THE BEST COURSE OF ACTION FOR THE PLAINTIFFS TO TAKE

President Trump likes to win. So do the *Amici*.  If Plaintiffs want to prevail in this legal fight, not just making a political statement, they should take the following steps:

(1) seek leave to temporarily hold these proceedings in abeyance or delay serving process on the Defendants pursuant to FRCP 4;

(2) President Trump should use his personal connections to press Governor DeSantis to immediately hold a special session pursuant to Article III, Section 3,[7] of the Florida Constitution, to pass the amended version of HB33, [8] the "Stop Social Media Censorship Act" (a narrowly tailored state bi-partisan statute that parallels the spirit of Section 230 and was intentionally created to fall in the state-law exemption under subjection (e) subparagraph (3) of Section 230, that over 25 states introduced this past session, and that does not suffer from the same overt problems presented by Senate Bill 7072);

(3) after the Stop Social Media Censorship Act is enacted, the Plaintiffs should then reopen this case, amend their original complaint pursuant to FRCP 15 et. seq, as a matter of course, to include a cause of action under the Stop Social Media Censorship Act, which will not be preempted under the doctrine of preemption, cutting through any Section 230 immunity defense - thereby having the potential to solve this ongoing bi-partisan problem for the whole of the Nation, accomplishing the Plaintiffs paramount objective; [9]

---

[7] In view of the recent decision in *Netchoice, LLC et al., v. Moody et. al.* 4:21-cv-00220-RH-MAF (N.D.F.L 2021), Governor DeSantis has a duty pursuant to his oath of office undertaken pursuant to clause 3 of Article VI of the United States Constitution to call a special session under Article III, Section 3 of the Florida Constitution to enact the Stop Social Media Censorship Act to cure the Constitutional defects presented in SB7072.

[8] https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

[9] If the Plaintiffs undertake this suggested course of action - getting Florida to enact the Stop Social Media Censorship Act and then amending the complaint to include a cause of action under that statute - then this Court would retain jurisdiction over these proceedings under

(4) the Plaintiffs should also amend their original complaint to include a cause of action

for false advertising under the Lanham Act, 15 U.S.C. §§ 1051 et seq, which is not preemption

by section 230 and which will confer Federal Question jurisdiction on this Court;

(5)  If Governor DeSantis refuses to call a special session under Article III, Section 3, to

enact the Stop Social Media Censorship Act for whatever reason, the Plaintiffs should amend

their complaint and include a cause of action under § 501.2041(6)[10] which may still be alive and

found to fall in the state-law exemption under 47 U.S.C. § 230(e)(3) by this Court;

(6) The Plaintiffs should amend their complaint and file a cause of action under Florida's

existing deceptive trade practice law, which the Court might also fall in the state-law exemption

under section 230.

---

diversity question jurisdiction because the parties are diverse and the amount in controversy is more than $75,000. 28 U.S. Code § 1332. Fraud, false advertising, breach of contract, bad faith, unfair dealing are not protected forms of speech for purposes of the First Amendment, and the state of Florida has a narrowly tailored compelling public interest to deter those forms of harmful unprotected speech to protect consumers from the kinds of abuses that the Plaintiffs have experienced. But because the Doctrine of preemption under the Supremacy Clause of the United States Constitution might allow the Defendants to currently invoke blanket immunity under Section 230 - a federal law - the Plaintiffs need a sure fire way around this immunity defense. Fortunately, Congress already built into Section 230 exemptions where Section 230 immunity defense could not be successfully invoked by internet providers.  If the State of Florida would enact the Stop Social Media Censorship Act - unmolested by petty politics and self-interests - then the Plaintiffs will prevail here, taking a massive step towards combating the epidemic of censorship that has cultivated a threat to election integrity and a litany of fundamental freedoms that undermine our citizens right to pursue life, liberty, and hapiness.

[10] FRCP 8(e)(2) allows for a plaintiffs to plead inconsistent and alternative claims.- so the Plaintiffs could ask the Court to either (1) let them enforce Sec. 501.2041(6) or to (2) render Section 230 unconstitutional in view of Judge Hinkle's decision in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021).  Sec. 501.2041(6), part of SB 7072, creates a private right of action: any "user" may sue if she (1) believes moderation standards were not applied "in a consistent manner" or (2) did not receive the required notice following a moderation action. Courts may award up to $100,000 in statutory damages per violation, plus actual and potentially punitive damages. Id. While Judge Hinkle granted a preliminary injunction against Florida state actors in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) when it comes to enforcing SB 7072, this does not necessarily mean that the injunction extends to private citizens like the Plaintiffs.  Therefore, the Plaintiffs could include a cause of action under Sec. 501.2041(6). But there is no doubt that the Stop Social Media Censorship Act is a vastly superior law for a host of reasons discussed throughout this brief.

## VI.  ARGUMENT
### A.   What Is The Best Solution To This Ongoing Bi-partisan Problem?

The ultimate question presented is what is the best solution to the ongoing bi-partisan

problem of social media censorship?  Is it (a) "an executive order by the President?" or (b) "to

have the judicial branch decree that social media websites are quasi-state actors for purposes of

the First Amendment?" or  (c) "the striking down Section 230 by judcial action or the total repeal

of Section 230 by Congressional responsiveness?";  or (d) "to do nothing, allowing the status quo

of abuse to continue in total disregard of the Petition and Access Clause?"  or (e)  "to allowing

censored litigants to successfully bring a cause of action pursuant to a sound narrowly tailor state

statute that will allow injured consumers to punish social media websites for having engaged in

self-evident unprotected harmful forms of speech and practices to include: (1) breach of contract,

(2) false advertising, (3) deceptive trade practices, (4) bad faith, (5) unfair dealing, (6) unjust

enrichment, and (7) fraudulent inducement?" The best solution to this problem is unequivocally

the fifth option - option (e). This is because already built into section 230 is the "state-law

exemption" under subsection (e) subparagraph (3). [11]  Put simply, this Court should ultimately

indicate that Florida made a mistake in enacting SB 7072, when it should have enacted the

amended version of HB33.[12] If this Court does not make that finding, then some logically

---

[11] When Congress passed section 230 they included exception provisions for when a section 230 immunity defense could not be successfully invoked by an internet intermediary, like the Defendants, under subsection (3). While the Plaintiffs filed a federal question lawsuit that asks the Court to hold that the Defendants' conduct and the validity of Section 230, in view of the First Amendment of the United States Constitution, the Plaintiffs would dramatically increase their chances of success if they would amend their complaint to include at least one cause of action under a state statute that would fall in the state-law exemption.

[12] President Trump should (1) hold these proceedings in abeyance; (2) press Governor Desantis to hold a special session to pass the amended version of HB33 by Rep. Sabatini and Sen. Gruters referred to as the "Stop Social Media Censorship Act," (https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0) (3) amend the original complaint to include this new cause of action to include a cause of action brought under the Stop Social Media

consistent Federal court in one of the other 11 Circuits likely will, permitting Section 230 to be struck down completely in view of the *Netchoice* decision. This will start a causal chain that will cultivate additional problems that are different but perhaps not quite as bad as allowing social media websites to operate under total immunity.

## B.  How Did We Get Here - Understanding The Current Landscape And The Misuse Of Section 230

The evidence shows that the decision in *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710, at *3–4 (N.Y. Sup. Ct. May 24, 1995) in part led to the creation of Section 230.[13] The *Amici,* unlike the Plaintiffs, contend that there are valid uses of Section 230 that should remain in place.[14] However, what has been happening to the Plaintiffs, the *Amici,* and

---

Censorship Act.  Florida passed § 106.072, § 287.137, and § 501.2041 this session - three statutes that were initially based on the Stop Social Media Censorship Act until political ambition corrupted the process, causing the three statutes created by SB7072 for failing to survive heightened scrutiny.

[13] In *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710, at *3–4 (N.Y. Sup. Ct. May 24, 1995), an anonymous user posted allegedly defamatory content on an electronic bulletin board—an earlier version of what today might be called social media. The court said that if the provider of such a bulletin board did not undertake to review posted content—much as a librarian does not undertake to review all the books in a library—the provider would not be deemed the publisher of a defamatory post, absent sufficient actual knowledge of the defamatory nature of the content at issue. On the facts of that case, though, the provider undertook to screen the posted content—to maintain a "family-oriented" site. The court held this subjected the provider to liability as a publisher of the content.  At least partly in response to that decision, which was deemed a threat to development of the internet, Congress enacted 47 U.S.C. § 230. The Stop Social Media Censorship Act does not subject computer services to tort liability for passively hosting content posted by others but seeks to empower users by limiting how content may be censored. See 47 U.S.C. § 230(b)(2) (describing congressional purpose to ensure that users retain "a great degree of control over the information that they receive")

[14] Preliminarily, Section 230 should be explained so that a fifth-grader can understand it. Basically, Section 230 was a federal statute created by Congress, not Facebook, in 1996 that was part of the Communications Decency Act (CDA). The Communications "Decency" Act was designed to promote "decent" speech, not the "deceptive trade practices" that the Defendants have engaged in causing the direct injury of the Plaintiffs and the *Amici.*  Section 230 allows for certain internet intermediaries to invoke an immunity defense for the harmful acts of third parties, if and only if, the internet intermediary was not acting as a publisher/speaker/common carrier to a certain arbitrary and hard to determine degree. So, since that explanation is still confusing and since trying to determine whether a platform provider was a speaker,  publisher, or common carrier tends to be a linguistic nightmare, the best way for anyone to understand a valid

millions of Americans, who are both registered Democrat and Republican, is that social media

websites have been arbitrarily censoring their speech when it offends the delicate sensibilities of

the employees who happen to work at the social media website at that time. When censored

individuals file a lawsuit against the social media website for such injurious wrongdoing, the

social media defendants invariably make the same questionable argument that they were "merely

engaging in general editorializing and should not be held liable in view of the Section 230

immunity shield." So far in such cases, the courts have reluctantly allowed the social media

defendants to barely escape liability, like a man jumping through flames. See 1 Corinthians 3:15.

In rendering such decisions, the courts have been hinting that if the state legislature was to enact

a statute that was (1) narrowly tailored, (2) consistent with the spirit of Section 230, and (3)

intentionally designed to fall in the state-law exemption, then such a cause of action would

successfully pierce through a Section 230 immunity defense. The Stop Social Media Censorship

Act - a state statute - is the answer that everyone is looking for whether they realize it or not.[15]

### C.  The Stop Social Media Censorship Act Is The Cure-all In View Of The Significant State-law Exemption Already Built Into Section 230 By Congress

There is no need to throw the baby out with the bathwater in doing away with Section

230 in view of the state-law exemption and the potential passing of the Stop Social Media

---

Section 230 immunity defense is through the following example: "If a Floridian maliciously posts a defamatory comment on Facebook against a person from New York, the New Yorker who was defamed could legitimately sue the Floridian for defamation. However, if the New Yorker named Facebook as a co-defendant in the lawsuit, then Youtube could successfully file a motion to dismiss under FRCP 12 et. seq. invoking Section 230 immunity defense as the legal basis, and legitimately have the lawsuit dismissed with prejudice against it."

That example involves a good use of Section 230 - showing that Section 230 is good law - because Youtube was merely acting as an innocent platform in that scenario. Therefore, the Plaintiffs demand that the Court completely strike down Section 230 of the Communications Decency Act should not be granted on the condition that the Court finds that the Social Media Censorship Act would survive judicial review if enacted.

[15] A bill is just words on a piece of paper, and by enacting the Stop Social Media Censorship Act, it will not necessarily help the *Amici* when it comes to credit and glory, but it will help the Nation, and helping the Nation flourish is the paramount mission of the *Amici*.

Censorship Act. 47 U.S.C. § 230(e)(3). Again to reiterate, this Court must either declare that Florida should have passed HB 33 over SB 7072 or render Section 230 unconstitutional under the petition and access clause of the First Amendment.[16] Any choice beyond that would be intellectually dishonest. The Stop Social Media Censorship Act is the escape hatch, built-in by Congress in the statute itself. The "state-law exemption" is the only provision of Section 230 that speaks directly to the relationship between this federal statute and state law expressly *preserves* the states' authority to "enforc[e] any State law that is consistent with this section." 47 U.S.C. § 230(e)(3). In fact, the wording of this provision—which is expressly tied to particular actions "enforcing" acts like the Stop Social Media Censorship Act *id.*—disfavors preemption challenges in a pre-enforcement posture. In conformity with that provision and the well-established presumption against preemption, this Court should construe the rest of Section 230 narrowly and in a manner that allows federal and state law in this area to coexist. In doing so, this Court should find that the Stop Social Media Censorship Act, if enacted, would neatly fall within the state-law exemption and that if Florida wants to protect consumers like the Plaintiffs, then it should enact the Stop Social Media Censorship Act sooner rather than later.

If, however, the Stop Social Media Censorship was found to be unconstitutional or preempted by Section 230, as was seeming the case with SB7072, then a serious First Amendment challenge to Section 230 would exist under *Cf. Agency for Int'l Dev. v. All. for Open*

---

[16] In creating this "broad federal immunity" in passing section 230, *Almeida v. Amazon.com*, Inc., 456 F.3d 1316, 1321 (11th Cir. 2016), Congress gave statutory form to the core First Amendment right to editorial judgment. See *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016), but Congress cannot have legitimately done that by totally blocking access to petition against obvious grievances without violating the First Amendment. While Federal law preempts state under the Supremacy Clause, the First Amendment of the United States Constitution preempts and outranks Federal laws, like Section 230, that violate the petition and access clause. The *Amici* believe that the state-law exemption provides the only way around this dilemma. The Stop Social Media Censorship Act is not just the best solution to this problem, it is the only solution to stop Section 230 from being completely struck down.

*Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)  (discussing when conditions on federal funding "result in an unconstitutional burden on First Amendment rights").  Accordingly, the courts should not lightly conclude that Congress made a law that not only allows unbridled censorship, but also prevents states from doing anything about it. The States have an ongoing compelling interest to protect their citizens in step with their police powers under the Tenth Amendment of the United States Constitution from fraud, deceptive trade practices, breach, bad faith, etc - none of which is protected speech for purposes of the First Amendment.

### D.  Comparing The Differences Between HB 33, the Stop Social Media Censorship Act & SB 7072

Never since the inception of American jurisprudence has a plaintiff brought a lawsuit under a state statute and argued that the Section 230 immunity defense could not be successfully invoked because the lawsuit was filed under a statute that fell within the state-law exemption, piercing through the Section 230 immunity defense.  Yet, when comparing the Stop Social Media Censorship Act to SB 7072, the *Amici* somewhat agree with Judge Hinkle's sentiment that the "statutes [created by SB7072] are not narrowly tailored" and might constitute an "instance of burning the house to roast a pig."  See *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) (page 27 of DE 113).  See also, e.g., *Reno v. American Civil Liberties Union,* 521 U.S. 844, 882 (1997*)*; *Sable Commc'n of Cal., Inc. v. FCC,* 492 U.S. 115, 131 (1989).  It would be more accurate to say that striking down Section 230 of the CDA completely as the Plaintiffs' request would be an "instance of burning the house to roast a pig" when the Stop Social Media Censorship Act is obviously the cure-all from the perspective of any reasonable observer to this ongoing dilemma because it falls squarely in the state-law exemption.

There are several differences between the Stop Social Media Censorship Act and SB 7072 that should be identified.  First, SB7072 is vague and the Stop Social Media Censorship

Act is not.[17]  "A fundamental principle in our legal system is that laws which regulate persons or

entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations,*

*Inc.*, 567 U.S. 239, 253 (2012).  The Stop Social Media Censorship Act is not vague whatsoever

in view of its ten legislative findings, the purpose section, and the straightforward structure of the

language.  The legislative findings of the Stop Social Media Censorship Act spell out the

legislative intent in a common sense manner.[18]  Furthermore, the purpose and legal framework of

---

[17] "[A]n enactment is void for vagueness if its prohibitions are not clearly defined."
*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). To pass muster, laws must "give the
person of ordinary intelligence a reasonable opportunity to know what is prohibited" and prevent
"arbitrary and discriminatory enforcement" by "provid[ing] explicit standards for those who
apply them." Id.; accord *Wollschlaeger v. Governor*, 848 F.3d 1293, 1320 (11th Cir. 2017).
Although greater clarity is necessary when a statute regulates expression, "perfect clarity and
precise guidance have never been required even of regulations that restrict expressive activity,"
*Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); see also *Grayned*, 408 U.S. at 110
("Condemned to the use of words, we can never expect mathematical certainty from our
language."). Furthermore, "the mere fact that close cases can be envisioned" does not "render[] a
statute vague." *United States v. Williams*, 553 U.S. 285, 305 (2008).

[18] The legislative findings of the Stop Social Media Censorship Act are as follows:
    WHEREAS, the Communications Decency Act was created to protect decent speech, not
deceptive trade practices, and
    WHEREAS, repealing section 230 of the Communications Decency Act at the federal
level is unnecessary because it already includes a state-law exemption and the Stop Social Media
Censorship Act was crafted to fall squarely in the state-law exemption of section 230 to cure
abuses of section 230 to protect the consumers of this state, and
    WHEREAS, contract law is a state-law issue, and when a citizen of this state signs up to
use certain social media websites, they are entering into a contract, and
    WHEREAS, this state has a compelling interest in holding certain social media websites
to higher standards for having substantially created a digital public square through fraud,  false
advertising, and deceptive trade practices, and
    WHEREAS, major social media websites have engaged in the greatest bait and switch of
all times by marketing themselves as free, fair, and open to all ideas to induce subscribers only to
then prove otherwise at great expense to consumers and election integrity, and
    WHEREAS, breach of contract, false advertising, bad faith, unfair dealing, fraudulent
inducement, and deceptive trade practices are not protected forms of speech for purpose of the
first amendment of the United States Constitution or the Constitution of this state, and
    WHEREAS, the major social media websites have already reached critical mass, and they
did it through fraud, false advertising, and deceptive trade practices at great expense to the
health, safety, and welfare of consumers of this state, while making it difficult for others to
compete with them, and

the Stop Social Media Censorship Act is crystal clear, whereas the purpose of SB7072 is not.

The purpose section of the Stop Social Media Censorship Act states:

> This section is intended to create a statute that parallels the spirit of 47 U.S.C. § 230 that falls within the state law exemption under 47 U.S.C. § 230(e)(3) and create a civil right of action that will deter the following: (1) Deceptive trade practices; (2) False advertising; (3) Breach of contract; (4) Bad faith; (5) Unfair dealing; (6) Fraudulent inducement; and(7) The stifling of political and religious speech in the modern-day digital public square cultivated by social media websites that have achieved critical mass through fraud.

The purpose of the Stop Social Media Censorship Act is to parallel the goals and spirit of Section 230 so that the state statute threads the needle and unquestionably falls within the state-law exemption of Section 230 in a way that SB7072 fails to do so.

Second, unlike with SB7072, the language of the Stop Social Media Censorship Act and Section 230 are parallel and identical in some respects. For example, 47 U.S.C. § 230(c)(2)(A) states that an interactive computer service, like the Defendants, cannot be "held liable" on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." Similarly, the Stop Social Media Censorship Act states that social media websites that are subject to the act cannot be held liable if they censor content that:

> 1. Calls for immediate acts of violence; 2. Is obscene, lewd, lascivious, filthy or pornographic in nature; 3. Is the result of operational error; 4. Is the result of a court order; 5. Comes from an inauthentic source or involves false personation; 6. Entices

---

WHEREAS, the state has an interest in helping its citizens enjoy their free exercise rights in certain semi-public forums commonly used for religious and political speech, regardless of which political party or religious organization they ascribe to, and

WHEREAS, this state is generally opposed to online censorship unless the content is injurious to children or promotes human trafficking; only then does this state accept limited censorship, and

WHEREAS, this act is not intended to apply to a website that merely deletes comments posted by members of the general public in response to material published by the website's owner,

criminal conduct; 7.  Involves minors bullying minors; 8.  Constitutes trademark or copyright infringement; 9.  Is excessively violent; and 10.  Constitutes harassing spam of the commercial, not religious or political, nature.

Because the Stop Social Media Censorship Act neatly parallels the spirit and intent of Section 230, threading the needle in a way that SB 7072 does not. From every angle, it is clear that the Stop Social Media Censorship Act has been crafted for all 50 states in a manner that respects federal law, while allowing the state's consumers to be protected from deceptive trade practices.

Third, by framing the issues as breach of contract, bad faith, false advertising, unfair dealing, unjust enrichment, deceptive trade practices, and consumer protection violations, the Stop Social Media Censorship Act fulfills a litany of compelling government interests in ways that SB7072 fails to do so. The Stop Social Media Censorship Act "promote[s] the widespread dissemination of information from a multiplicity of sources," an interest that the Supreme Court in *Turner* had "no difficulty concluding" was "an important governmental interest." *Turner Broad. Sys.. Inc. v. FCC ("Turner"),* 512 U.S. 622, 662–63 (1994). Ensuring that the public "has access to a multiplicity of information sources," the Supreme Court explained, "is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Id.* at 663. Furthermore, Florida has a substantial interest in protecting its residents from unfair or deceptive acts or practices in commerce. *See* FLA. STAT. § 501.204; *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978); *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 12 (1st Cir. 1994). Additionally, Florida also has a compelling interest in preserving the democratic process and ensuring fair elections. *Burroughs v. United States*, 290 U.S. 534 (1934); *Curry v. Baker*, 802 F.2d 1302, 1317 (11th Cir. 1986).

Fourth, by framing the issue as arising under breach of contract, bad faith, fraudulent inducement, false advertising, unjust enrichment principles, a social media website sued under

the Stop Social Media Censorship Act could not assert "good faith" protections under Section

230(c)(2)(A).[19] Judge Hinkle seemed incapable of or unwilling to pick up on this critical factor in

*Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021).

     Fifth, where SB7072 construes social media websites as common carriers,[20] the Stop

Social Media Censorship Act focuses more on consumer protection violations, existing torts, and

existing breach of contract principles. The Stop Social Media Censorship treats social media

websites like any entity doing business in the state, and prevents the business from harming

consumers for engaging in fraud, breach, deceptive practices, false advertising, etc.  While the

Florida Legislature permissibly determined that the "old rules" applicable to common carriers

should be applied to the "new circumstances" of social media in SB7072, the Stop Social Media

Censorship Act merely gets existing consumer protection laws and contract law principles to

apply to the "new circumstances" of social media, while invoking the state-law exemption

---

[19] Section 230(c)(2)(A) does not provide blanket immunity. It only applies when an interactive computer service acts in "good faith." While the parameters of "good faith" immunity under Section 230(c)(2)(A) are not necessarily well-defined in the caselaw, courts might ultimately conclude that a social media platform's acting differently than how it marked itself and shifting its standards is determinative as to whether the platform acted in "good faith." *See Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2010 WL 1799456, at *7 (D.N.J. May 4, 2020).   In *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021), the court stated in its order granting a preliminary injunction that "the legislation compels providers to host speech that violates their standards—speech they otherwise would not host—and forbids providers from speaking as they otherwise would."  But that court fails to realize that the social media website providers shift those standards in bad faith in an arbitrary and dishonest manner in total breach of how they marked themselves to the public to induce reliance. That court also fails to realize that the providers invited, enticed, and induced members of the public to speak out openly and freely on different religious and political doctrines without any threat of emotional or economic reprisal, only to then turn around and deploy a "gotcha game" with the expectation of total immunity.

[20] In Section 1 of SB7072, the Florida Legislature found that "[s]ocial media platforms have become as important for conveying public opinion as public utilities are for supporting modern society," and they "hold a unique place in preserving first amendment protections for all Floridians and should be treated similarly to common carriers." SB 7072 § 1(5), 1(6). In fact, as Justice Thomas recently explained, "[i]n many ways, digital platforms that hold themselves out to the public resemble traditional common carriers." *Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring)

directly. See *Parks v. Alta Cal. Tel. Co.,* 13 Cal. 422, 422 (1859). Put simply, the Stop Social Media Censorship Act does not ask the judicial branch to reinvent the wheel; it merely asks that existing law be permitted to catch up to modern-day technology to safeguard consumers and election integrity in a manner that accords with the policing powers of the State.

Sixth, because the Stop Social Media Censorship Act is framed on breach of contract, tort, and consumer protection principles, jurisdiction for enactment and enforcement is not Constitutionally probematic in view of the Ten Amendment of the United States Constitution, unlike with SB 7072.[21]

Seventh, perhaps the biggest distinction between the Stop Social Media Censorship Act and SB7072 is that the Stop Social Media Censorship only applies to social media websites that have more than 75 million profile users that were never affiliated with any particular religious or political party from their inception.[22] A social media website that was affiliated with a religious

_____

[21] The state of Florida has the legal authority to enact the Stop Social Media Censorship and injured parties, like the Plaintiffs, have the right to enforce it under the long-arm statute. See Fla. Stat. § 48.193. When the Plaintiffs signed up to use Facebook and Twitter, they entered into a contract in Florida. One of the oldest jurisprudence is that "contract law" is a "state-law issue." States have paramount jurisdiction to enact statutes that place certain restrictions on contracts to protect consumers from harm. Otherwise, all consumer protection laws and all products liability laws could be declared to violate the First Amendment. Twitter reached into the state of Florida and induced the Plaintiffs to sign up to use their services by a contract, which gives the state of Florida jurisdiction to regulate those contracts. While it is an undisputed fact that a contract does exist between the Defendants and the Plaintiffs, the contract is only relevant for the purpose of the state having jurisdiction to regulate those contracts because the contract at issue is undoubtedly a contract of adhesion. Twitter and Facebook have billions of subscribers, they never had a realistic expectation that the Plaintiffs would employ lawyers to review their contract. Therefore, the contract is a contract of adhesion. Accordingly, the specific terms of the adhesion contract do not matter. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119, 126–27 (2d Cir. 2012). However, what does matter is the fact that Twitter, Facebook, and Youtube have conspired to falsely market themselves as being "free, fair, open to the public, and open to all religious and political ideas" to induce reliance only to then break their promise and censor certain users in bad faith. This is a problem of broken promises and lying out of the overflow of moral superiority complexes.

[22] The reason why the Stop Social Media Censorship Act only applies to social media websites that have more than 75 million users is not to treat different potential speakers differently. The reason for this threshold is because the purpose of Section 230 was to allow

or political party can, therefore, continue to censor users at will.[23] If from their inception Facebook, Twitter, or Youtube had marked themselves as being aligned with the Democrat Party or with the licentious religion of secular humanism, then they would have a defense for the removal of political and religious speech that does not happen to conform to their favored religious and political worldview.[24] But those social media websites did not make such affiliations known upfront causing a classic reliance and inducement problem. The Stop Social Media Censorship Act and the Lanham Act are both calculated to stop businesses from harming consumers through broken promises, false advertisement, and fraud.  The so-called "standards" floated by Facebook, Twitter, and Youtube have always been unclear, vague, and shifting, constituting per se bad faith. While it is true that social media websites might be able "to establish standards of decency without risking liability for doing so," what they cannot do is to

---

websites on the internet to grow without the fear of certain liability. The evidence shows from the reasonable observer perspective that a social media website that has over 75 million profile users has "sufficiently grown." Therefore, a statute, such as the Stop Social Media Censorship Act, that allows victims of the deceptive, fraudulent, and dishonest honest trade practices of social media websites to acquire relief against a social media provider with more than 75 million subscribers is consistent with the spirit and "growth goals" of Section 230, which further causes it to fall squarely in the state-law exemption.  The 75 million threshold is not imposed to treat smaller and larger social media websites differently. The threshold is included out of respect for the doctrine of preemption so that the Stop Social Media Censorship Act will squarely fall in the state-law exemption.

[23] A Black Lives Matter social media website, a Christian social media website, a Muslim social media website, an LGBTQ social media website could censor any profile user who opposed their fundamental doctrine and not be subjected to liability under the Stop Social Media Censorship Act.

[24] The United States Supreme Court found that Secular Humanism is a religion for the purposes of the First Amendment Establishment Clause in *Torcaso v. Watkins*, 367 U.S. 488 (1961); *School District of A Bington Township, Pa. v. Schempp*, 374 U.S. 203, 225 (1963); *United States v. Seeger*, 380 US 163, 166 (1965); and *Welsh v. United States*, 398 U.S. 333 (1970). Most of the Federal Court of Appeals have found that Secular Humanism is a religion in cases such as: (A) *Malnak v. Yogi*, 592 F.2d 197, 200-15 (3d Cir.1979);  *Theriault v. Silber*, 547 F.2d 1279, 1281 (5th Cir.1977); *Thomas v. Review Bd.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981);  *Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir.2003); *Real Alternatives, Inc. v . Sec'y Dep 't of Health & Human Servs.*, 150 F. Supp. 3d 419, 2017 WL3324690 (3d Cir. Aug. 4, 2017), and Cir. 2001); and  *Wells v. City and County of Denver*, 257 F.3d 1132, 1148 (10th Cir. 2001).

change those standards arbitrarily after they induced billions of people to subscribe and invest in user profiles, having relied on the fact that the social media websites marketed themselves as free, fair, open to the public, and neutral towards political and religious speech. See *Domen v. Vimeo, Inc.*, 991 F.3d 66, 73 (2d Cir. 2021). The court in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) failed to pick up on the critical factor that Facebook, Twitter, and Youtube arbitrarily changed their standards in bad faith all the time, after fraudulently inducing billions of people to subscribe and invest in their service at great personal expense to themselves, their families, and their communities. That court ignored the shifting standards completely, shrugging it off in callous disregard.

In sum, this controversy is just about making the mega social media websites keep their promises to consumers. The goal of the Stop Social Media Censorship Act is not to punish disfavored, out-of-state businesses and to stop or deter them from exercising their First Amendment rights in ways the *Amici* dislikes. The goal is to force certain social media websites to honor their promises and to live up to the way that they marketed themselves from their inception in order to induce reliance. Social media websites, like Facebook, marked themselves as being neutral on religion and politics, and they should be legally forced to remain so despite the unwarranted inflated view that the employees who work there arrogantly harbor for themselves.

### E.  The First Amendment Is On The Side Of The Stop Social Media Censorship Act

The First Amendment combined with the state's inherent policing powers to protect consumers from fraud are the underlying legal basis supporting the Stop Social Media Censorship Act.  The state of Florida has a narrowly tailored compelling interest to pass the Stop Social Media Censorship Act in order to protect the varying religious and political views of their

citizens from deceptive censorship trade practices because the Defendants, Youtube, and
Facebook have set out to create a digital public square and they have successfully done so
through fraud. Attorney General Barr called the concerted deceptive efforts of the major social
media websites the greatest "bait and switch" of all time.[25]   The Plaintiffs should press the State
of Florida to enact the Stop Social Media Censorship Act because the State of Florida has a
narrowly tailored compelling interest to ensure that its citizens all across the political and
religious spectrums are permitted to share their views in what amounts to as the modern-day
digital public square.[26]  The Stop Social Media Censorship Act is not about helping Democrats or
Republicans or about putting one religion over another. It is about making social media websites
that marked themselves as being neutral on issues of religion and politics to be just that.
Democrats in Hawaii, Rhode Island, and New York are the prime sponsor of the Stop Social
Media Censorship Act because this is a bi-partisan problem.

### V. CONCLUSION.

This Court must either find that in order to prevail the Plaintiffs must proceed under a law
like the Stop Social Media Censorship Act or that Facebook cannot invoke Section 230 as a
defense in view of the petition and access clause of the First Amendment.

---

[25]https://www.rawstory.com/2020/05/barr-blasts-social-medias-bait-and-switch-and-censo
rship-as-trump-suggests-hed-shut-down-twitter/

[26]  As the Supreme Court has said, "the vast democratic forums of the Internet, and social
media in particular" have become "the most important places . . . for the exchange of views."
*Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (cleaned up). According to the Pew
Research Center, 71% of Americans get news from social media. App.534. It is not surprising
then that news publishers feel "increasingly beholden" to digital platforms. App.90.

/s/Christopher Sevier Esq./
DE FACTO ATTORNEYS GENERAL
Mailing: 118 16th Ave S #247 - Music Row
Nashville, TN 37203
(615) 500-4411
BCN: 026577
909 Santa RosaBlvd,
Fort Walton Beach, FL 32548
ghostwarsmusic@gmail.com
www.specialforcesoflibety.com
www.chrissevier.com
www.stopsocialmediacensorship.com
1LT 27A JAG
Bravo Two Zero

/s/Greg Degeyter Esq./
DE FACTO ATTORNEYS GENERAL
BCN: 24062695
degeyterlaw@gmail.com
9898 Bissonnet St Ste 626
Houston, Texas 77036
(713) 505-0524
Attorney On Behalf Of Special Forces Of Liberty &
Warriors For Christ

## CERTIFICATE OF SERVICE

A true copy of the foregoing was emailed and/or mailed to the following address on August 2, 2021 for the Attorneys of record: Frank C. Dudenhefer , Jr. The Dudenhefer Law Firm, LLC 2721 St. Charles Ave, Suite 2A New Orleans, LA 70130 (504) 616-5226 Email: FcdLaw@aol.com; John P. Coale 2901 Fessenden St. NW Washington, DC 20008 (202) 255-2096 Email: johnpcoale@aol.com; John Q. Kelly Ivey, Barnum & O'Mara 170 Mason Street Greenwich, CT 06830 (203) 661-6000 Email: jqkelly@ibolaw.com; Michael J. Jones Ivey, Barnum & O'Mara 170 Mason Street Greenwich, CT 06830 (203) 661-6000; Roland A. Paul Ivey Barnum & O'Mara 170 Mason Street Greenwich, CT 06830 (203) 661-6000; Ryan Tougias Ivey, Barnum & O'Mara 170 Mason Street Greenwich, CT 06830 203-661-6000; Sean M. Hamill Ivey, Barnum & O'Mara 170 Mason Street Greenwich, CT 06830 (203) 661-6000; Matthew Lee Baldwin Vargas Gonzalez Hevia Baldwin, LLP 815 Ponce de Leon Blvd. Third Floor Coral Gables, FL 33134 (305) 631-2528 Fax: (305) 631-2741 Email: MBaldwin@VargasGonzalez.com;

/s/Christopher Sevier Esq./

Case 1:21-cv-22440-KMW  Document 27-2  Entered on FLSD Docket 08/04/2021  Page 27 of 69
Case 1:21-cv-22577-DPG  Document 1  Entered on FLSD Docket 07/20/2021  Page 62 of 145

1

## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION

**Chris Sevier, DE FACTO ATTORNEYS GENERAL, John Gunter, SPECIAL FORCES OF LIBERTY, Richard Penkoski, WARRIORS FOR CHRIST**

COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF

**Plaintiffs,**

**V.**

**Merrick Garland, IN HIS OFFICIAL CAPACITY OF THE UNITED STATES, Ron DeSantis, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF FLORIDA**

**Defendants.**

### ORIGINAL COMPLAINT

*What the ACLU started in Reno American Civil Liberties Union, 521 U.S. 844 (1997), we intend to finish and perfect. - De Facto Attorneys General*

*Understanding the Stop Social Media Censorship Act*
*https://www.youtube.com/watch?v=CCcOALXNteM*

*http://www.specialforcesofliberty.com/*

1. This is an action for declaratory and injunctive relief that challenges the sole surviving

provisions of the "Communications Decency Act of 1996", 47 U.S.C. § 230 et. seq.,[1] (hereinafter

referred to as "Section 230") for namely violating the Petition and Access Clause of the First

Amendment of the United States Constitution, as well as the Free Speech, Free Exercise and

Establishment Clauses. The Plaintiffs attack this issue from a different angle than the Trump

---

[1] In 1996, Congress passed the Communications Decency Act of 1996, which amended the Telecommunications Act of 1934 with Section 230(c), intending to promote the growth and development of Internet platforms, as well as to protect against the transmission of obscene materials over the Internet to children. Section 230 is vague and not the least restrictive means to fulfill any interests asserted by the government.

Washington, DC 20816
(801) 654-5973
pastor@wfcchurch.org
https://www.wfcchurch.org
(TO BE REPRESENTED PRO HAC)

/s/Greg' Degeyter Esq./
DE FACTO ATTORNEYS GENERAL
BCN: 24062695
degeyterlaw@gmail.com
9898 Bissonnet St Ste 626
Houston , Texas 77036
(713) 505-0524
Attorney On Behalf Of Special Forces Of Liberty &
Warriors For Christ
(*PRO HAC APPLICIATION FORTHCOMING*)

Case 1:21-cv-22440-KMW Document 27-2 Entered on FLSD Docket 08/04/2021 Page 29 of 69
Case 1:21-cv-22577-DPG Document 1 Entered on FLSD Docket 07/20/2021 Page 120 of 145

59

under the state statute without the lawsuit being automatically preempted by the Supremacy Clause in view of Section 230;

E. Alternatively, requiring Defendant Governor DeSantis to call a special session pursuant to Article III, Section 3 of the Florida Constitution in step with his oath of office under Clause 3 of Article VI of the United States Constitution to deliberate enacting the Stop Social Media Censorship Act to cure Constitutional defects of SB7072[54] in view of the decision in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) so that the Plaintiffs and other Floridians who have been injured by social media websites can finally and properly petition the government for redress in a legally proper manner so that they could have the chance to be made whole again;

F. Alternatively, declaring that the Plaintiffs could bring a lawsuit under § 501.2041 against social media websites that have victimized them and that § 501.204 would not be automatically preempted by Section 230 because § 501.2041 within the state-law exemption subsection (e) subparagraph (3).

G. Permitting an award of attorneys' fees and costs to Plaintiffs in an amount to be determined at trial.

H. Permitting an award of such other and further relief as the Court may deem just and proper.

I. Granting Plaintiff Sevier ECF filing access;

J. Granting the Plaintiffs leave to file two separate motions for preliminary injunction, permanent injunction, and/or summary judgment and that they be given leave to file excessive pages for the same reasons the plaintiffs in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) were given.

---

[54] SB7072 the bill which created §106.072, § 287.137, and § 501.204

Case 1:21-cv-22440-KMW  Document 27-2  Entered on FLSD Docket 08/04/2021  Page 30 of 69
Case 1:21-cv-22577-DPG  Document 1  Entered on FLSD Docket 07/20/2021  Page 118 of 145

57

_____110. Plaintiffs re-allege and re-aver all of the allegations contained in the previous

paragraphs. This claim for declaratory relief is pleaded in the alternative. 47 U.S.C. § 230(3)(c)

states "Nothing in this section shall be construed to prevent any State from enforcing any State

law that is consistent with this section. No cause of action may be brought and no liability may

be imposed under any State or local law that is inconsistent with this section.

111. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the

Plaintiffs does not violate the First Amendment only if Florida or any other state were to enact a

statute, like the Stop Social Media Censorship Act, that is narrowly tailored to fall in the state

law exemption under subsection (e) subparagraph (3) of Section 230 because a lawsuit brought

under such a statute would allow litigants to seek redress against social media websites that act in

bad faith and commit fraud.

112. Issuing a declaration that clarifies the state-law exemption is not enough. Therefore,

the Plaintiffs ask this Court to direct Governor DeSantis to call a special session pursuant to

Article III, Section 3 of the Florida Constitution in step with his oath of office under Clause 3 of

Article VI of the United States Constitution to enact the Stop Social Media Censorship Act to

cure constitutional defects of SB7072 in view of the decision in *Netchoice, LLC et al., v. Moody

et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) so that the Plaintiffs can finally have the

actual ability to properly petition the courts of competent jurisdiction for redress against

deceptive social media websites that defrauded and dehumanized them.

113. The Plaintiffs seek declaration and clarification from the Court on whether the

Plaintiffs and other injured Floridians could bring a lawsuit under § 501.2041 against social

media websites that have victimized them in view of the preliminary injunction entered in

55

102.  The social media websites would not have deplatformed the Plaintiffs or similarly situated profile users but for the immunity purportedly offered by Section 230.

103.  Section 230(c)(2) purports to immunize social media companies from liability for action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that speech is "constitutionally protected" under the Free Speech Clause and Free Exercise Clause of the First Amendment.  47 U.S.C. § 230(c)(2).

104.  In addition, Section 230(c)(1) also has been interpreted as furnishing an additional immunity to social media companies for action taken by them to block, restrict, or refuse to carry constitutionally protected speech.

105.  Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social medial companies to accomplish an objective—the censorship of supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress could not constitutionally accomplish itself.

106.  Congress cannot lawfully induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 US 455, 465 (1973).

107.  Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has been interpreted to immunize social media companies for action they take to censor constitutionally protected speech.

106.  Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content- and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and

53

*Casey*, 505 U.S. 833, 846-47 (1992), when he stated that "at the heart of liberty is the right to

define one's own concept of existence, of meaning, of the universe." Hitler believed this as well

and hung the same condescending message over the front gate of Buchenwald concentration

camp. The largest religion in the United States is Secular Humanism, also referred to by

theologians as anti-theism, postmodern individualistic western moral relativism and expressive

individualism. [50]

96. The Plaintiffs have standing as taxpayers under *Flast v. Cohen*, 392 U.S. 83 (1968)[51]

and other cases to pursue this cause of action. The Plaintiffs have a logical nexus as taxpayers

to pursue this cause of action as the authors of the Stop Social Media Censorship Act. [52]

---

[50] Critical race theory, Black Lives Matter's ideology, Planned Parenthood's dogma, and the LGBTQ orthodoxy are doctrines that are inseparably linked to the religion of Secular Humanism. While Facebook, Twitter, and Youtube marketed themselves as being neutral on matters of religion, they have used Section 230 to excessively entangle the Nation with the irrational and licentious religion of Secular Humanism. What the Democrat party fails to understand is that Secular Humanism promotes licentiousness and is an attempt to justify practices that are inconsistent with the peace and safety of the state. The government has the right to regulate the fire out of Secular Humanism practices because the Free Exercise Clause is not absolute.

[51] The general rules regarding standing to challenge governmental actions are designed to ensure that courts are addressing actual cases that can be resolved by the judicial system. However, in some circumstances, individuals may seek to challenge governmental actions for which neither those individuals nor any other individuals could meet standing requirements. Indeed, the Supreme Court has noted that in some instances "it can be argued that if [someone with a generalized grievance] is not permitted to litigate this issue, no one can do so." *United States v. Richardson*, 418 U.S. 166 (1974). Generally, the Supreme Court has noted, "lack of standing within the narrow confines of Art.III jurisdiction does not impair the right to assert [one's] views in the political forum or at the polls." However, the ability of individuals to affect change through political and democratic means does not eliminate all cases where a large group of individuals would be affected by the challenged governmental action. In particular, the Court has specifically allowed taxpayer standing for claims arising under the Establishment Clause. Under the *Flast* exception to the general prohibition on taxpayer standing, taxpayers may raise challenges of actions exceeding specific constitutional limitations (such as the Establishment Clause) taken by Congress under Article I's Taxing and Spending Clause which is applicable to the states under the Fourteenth Amendment. *Flast v. Cohen*, 392 U.S. 83 (1968). As Justice Ginsburg shrewdly pointed out, "the underlying premise of *Flast v. Cohen* [is] that the Establishment Clause will be unenforceable unless we recognize taxpayer standing." *Id.* At 8

[52] The Plaintiffs pay every form of conceivable state and federal tax in Florida. The federal taxes that the Plaintiffs pay in Florida go to the United States' general fund. The salaries

Case 1:21-cv-22440-KMW  Document 27-2  Entered on FLSD Docket 08/04/2021  Page 33 of 69
Case 1:21-cv-22577-DPG  Document 1  Entered on FLSD Docket 07/20/2021  Page 112 of 145

51

93.  The Establishment Clause of the First Amendment forbids the enactment of any law,

program, or practice "respecting an establishment of religion." Congress is required to pursue a

course of neutrality with respect to religion.

94.  From the reasonable person perspective, Congress's enactment of Section 230 fails

all three prongs of the Lemon Test and violates the First Amendment Establishment Clause for

constituting a non-secular sham that lacks a primary secular purpose that has cultivated an

indefensible legal weapon against non-observers of the religion of Secular Humanism, and for

serving to excessively entangle the government with the religion of Secular Humanism.[48]

95.  The Supreme Court and nearly all of the Federal Court of appeals have recognized

that Secular Humanism is a religion for the purpose of the First Amendment's Free Speech, Free

---

[48] To pass muster under the Establishment Clause, a practice must satisfy the *Lemon* test, pursuant to which it must: (1) have a valid secular purpose; (2) not have the effect of advancing, endorsing, or inhibiting religion; and (3) not foster excessive entanglement with religion. Id. at 592 (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). It is important to understand that government action "violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *Ag ostini v. Felton*, 521 U.S. 203, 218 (1997). The evidence will show that Congress's make Section 230 fails all three prongs of the *Lemon* Test. At the core of the "Establishment Clause is the requirement that a government justify in secular terms its purpose for engaging in activities which may appear to endorse the beliefs of a particular religion." *ACLU v. Rabun Cnty. Chamberof Commerce, Inc.,*698 F. 2d 1098, 1111 (11th Cir.1983).T his secular purpose must be the "pre-eminent" and "primary" force driving the government's action, and "has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary Cnty, Ky. v. ACLU of Ky.,* 545 U.S. 844 (2005). Under this second prong of the *Lemon* test, courts ask, "irrespective of the . . . stated purpose, whether [the state action] . . has the primary effect of conveying a message that the [government] is advancing or inhibiting religion." *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 771 (7th Cir. 2001). The "effect prong asks whether, irrespective of government's actual purpose," *Wallace v. Jaffree,* 4 72 U.S. 38, 56 n.42 (1985), the "symbolic union of church and state...is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *School Dist. v. Ball*, 473 U.S. 373, 390 (1985);*see also Larkin v. Grendel's Den*, 459 U.S. 116, 126-27 (1982)(even the "mere appearance" of religious endorsement is prohibited). Congress's enactment of Section 230 has constituted a "legal weapon that no [Christian or non-observer of Secular Humanism] can obtain." *City of Boerne v. Flores,* 521 U.S. 507 (1997).  Social media websites have wielded a legal weapon in direct violation of prong II of Lemon.

Case 1:21-cv-22440-KMW   Document 27-2   Entered on FLSD Docket 08/04/2021   Page 34 of 69
Case 1:21-cv-22577-DPG   Document 1   Entered on FLSD Docket 07/20/2021   Page 110 of 145

49

76. The Plaintiffs seek a declaration that Section 230 on its face and as applied to the

Plaintiffs as victims of bad faith social media censorship violates the Petition Clause of the First

Amendment to the U.S. Constitution.

77. Based on prior interpretations of Section 230 by the judicial branch, the Plaintiffs are

under the apprehension that Section 230 serves as a total immunity blanket for social media

websites that falsely market themselves and censor consumers after inducing them to invest.

## FREE SPEECH - COUNT TWO
### [U.S. Const., amend. 1 (Freedom of Speech)]

78. Plaintiffs re-allege and incorporate by reference all allegations set forth above.

79. The Free Speech Clause of the First Amendment to the U.S. Constitution provide:

"Congress shall make no law . . . abridging the freedom of speech."

80. The Challenged Provision prevents speech and expressive activity by allowing social

media websites to act in bad faith while engaging in fraud, false advertising, theft-by-trick,

breach of contract, unfair dealing, and deceptive trade practices with immunity.

81. The Challenged Provision is unconstitutionally overbroad on its face because its

unconstitutional applications are substantial in relation to its legitimate applications.

82. As applied to the Plaintiffs, the Challenged Provision unconstitutionally restricts their

protected speech.

83. The Challenged Provision is not narrowly tailored to any legitimate, compelling, or

overriding government interest.

84. The Challenged Provision violates the Free Speech of the First Amendment in its

making by Congress and its enforcement.

Case 1:21-cv-22440-KMW  Document 27-2  Entered on FLSD Docket 08/04/2021  Page 35 of 69
Case 1:21-cv-22577-DPG  Document 1  Entered on FLSD Docket 07/20/2021  Page 108 of 145

47

[the Plaintiffs] freedom of speech" and "the [Plaintiffs] right to petition the government for redress of grievances" in the wake of bad faith acts of social media websites that have engaged in self-evidently immoral consumer protection violations to include indecent deceptive trade practices, fraudulent inducement, unjust enrichment, bad faith, unfair dealing, breach of contract, and false advertising.

65. The First Amendment right to petition the government for redress of grievances encompasses both the right to attempt to persuade the legislative and executive branches and the right to access the courts. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

66. While at the United States Capitol in D.C. in the halls of the Senate Russell building, in a heated exchange with Mark Zuckerberg, Plaintiff Sevier did the Christian thing and threatened to sue Mark Zuckerberg's "as@#$$ into powder," if his entity did not "stop its political and religious censoring of theists for being theists. In response, Mr. Zuckerberg, authorized agents, retorted that Facebook would invoke a Section 230 immunity blanket defense in the litigation threatened by De Facto Attorneys General, stating that Facebook could do "whatever the hell it wanted." [47] The posturing of Facebook's CEO combined with judicial interpretation of Section 230 has given the Plaintiffs the reasonable apprehension that the making of Section 230 by Congress constituted a legal blockade that has stopped the Plaintiffs from being able to seek redress from the government for the bad faith injurious actions of social media websites, like Facebook, that has harmed the Plaintiffs personally.

67. Pursuant to Section 230, the government's creation or enforcement or lack of responsiveness to Section 230 has encouraged social media websites to censor the

---

[47] This interaction is included pursuant to the state of mind exception of the hearsay rule, and not to prove the truth of the matter asserted.

Case 1:21-cv-22440-KMW Document 27-2 Entered on FLSD Docket 08/04/2021 Page 36 of 69
Case 1:21-cv-22577-DPG Document 1 Entered on FLSD Docket 07/20/2021 Page 106 of 145

45

beings at conception and convience abortions are self-evidently immoral and subversive to human florishing;" (6) "the First Amendment Establishment Clause is the underlying legal basis for the Hyde Amendment and for the government to award public funds to convenience abortion providers is unconstitutional under the Establishment Clause for failing the prongs of the Lemon Test;" (7) "Black Lives Matter thinks that only the lives fthat matter are the one's who agree with their communist ideology - see Candice Owens;" (8) "the reason it is called the 'gay pride movement' is because everyone knows that there is nothing to be 'proud' about;" (9) "when a person says 'love is love' what they really mean is that they are perfectly ok with government assets being used to crush anyone who dares to suggest that homosexuality is entirely immoral, which is a position that is unloving;" (10) critical race theory is racists; (11) "Jesus is Lord;" (12) "what non-theistic leftist don't seem to understand is that love without truth is just shallow sentimentality."

61. In a trial against social media webistes, the Plaintiffs could show that the social media websites decision to delete, shadow-ban, and censor the Plaintiffs' profiles costs the Plaintiffs hundreds of thousands of dollars. This is especially true in the case of Warriors For Christ, which had accumulated over 226,000 followers on Facebook, 575,000 followers on Youtube, and 335,000 followers on Twitter. Warriors For Christ followers tuned in to watch weekly sermons provided by Pastor Rich and made donations to the ministry through its social media profiles. In a coordinated effort, social media websites deleted, banned, or froze Warriors For Christ user profiles just because the messages offered by Pastor Rich offended the delicate sensibilities of the brainwashed employees who work for the social media website in response to their refusal to think logically. After building entire business platforms on social media websites with the promise that the social media websites were neutral on politics and religion, the Plaintiffs have

Case 1:21-cv-22440-KMW Document 27-2 Entered on FLSD Docket 08/04/2021 Page 37 of 69
Case 1:21-cv-22577-DPG Document 1 Entered on FLSD Docket 07/20/2021 Page 104 of 145

43

56. While residing in West Virginia (4th Circuit), Tennessee (6th Circuit), Florida (11th Circuit), Louisiana (5th Circuit), the District Of Columbia (DC Circuit) and elsewhere, the Plaintiffs were induced and enticed to contract witih Facebook, Twitter, Youtube, and Tictok, creating and investing substantially in user profiles on the promise that the platforms were (1) free, (2) fair, (3) open to the public, (4) a place where the free exchange of ideas by the user was permitted and encouraged, and (6) neutral on issues of religion and politics.

57. At the time the Plaintiffs created their user profiles just about everyone they knew had a user profile to include people who shared the same religious and political beliefs as themselves. The Plaintiffs, like virtually all of the other billions of users of social media websites, did not retain lawyers who are subject matter experts in digital contracts to review the terms of services of what was apparently an adhesion contract. Instead, the Plaintiffs predominately consider how social media websites marketed themselves as being neutral on political and religious speech in deciding to create and invest substantially in their user profiles. The social media websites gave the Plaintiffs and millions of others the reasonable expectation that religious and political views could be expressed at will without the fear of punishment and reprisal by the social media website employees.

58. The Plaintiffs are Christ-Followers who believe that the Bible is the Divine word of God and that Jesus Christ was exactly who He said He was. See John 14:6. The Plaintiffs are advocates for the radically transformative gospel narrative and feel compelled to attempt to gracefully fulfill the great commision in response to the love they believe that God has for them. See John 3:16; see Matthew 28:16-20. The gospel can in-part be summarized as, "humans are far worse than we ever dared to imagine, but we are far more loved by God than we could have ever dreamed." It is a faith-based worldview that humbles them and uplifts believes at the same

Case 1:21-cv-22440-KMW Document 27-2 Entered on FLSD Docket 08/04/2021 Page 38 of 69
Case 1:21-cv-22577-DPG Document 1 Entered on FLSD Docket 07/20/2021 Page 102 of 145

41

SB12, paid Facebook large amounts to promote his campaign posts on his user profile. Facebook

pocketed the money and did not allow the campaign advertisements to be viewed by the public.

Then Facebook began shadow banning Senator Hughe's posts and shutting down his profile page

---

*Post*'s story about a Black Lives Matter co-founder's expensive real estate purchases, citing the story as against its "community standards."

Individuals and journalistic enterprises alike have had to grapple with social media platforms' inconsistent and unfair practices regarding COVID-19. In February 2021, Facebook announced that it would expand its content moderation on COVID-19 to include "false" and "debunked" claims such as that "COVID-19 is man-made or manufactured." It blocked the *New York Post*'s article written that month suggesting that the virus could have leaked from a Chinese virology lab.. But now, given "ongoing investigations into the origin of COVID-19 and in consultation with public health experts," Facebook has decided that it will no longer "remove the claim that COVID-19 is man-made or manufactured."

The social media platforms' behavior has also affected politicians. YouTube removed a video of Governor Ron DeSantis holding a panel with pandemic health experts for allegedly violating community standards regarding COVID-19 medical information. YouTube stated that the video included information on mask-wearing that "contradicts the consensus of local and global health authorities." In April 2020, Twitter terminated the account of Howie Hawkins, a Green Party candidate for President, for allegedly violating its rule on "impersonation." And in early 2021, Facebook, Twitter, Instagram, and YouTube banned President Trump in the wake of the January 6 Capitol riot out of concerns that he would encourage violence on their platforms, while taking no action against Representative Maxine Waters for her statements to protestors during Derek Chauvin's trial for the murder of George Floyd.

Social media platform users are not always notified that they have been deplatformed or given an explanation for how they violated the platforms' content guidelines. When a social media platform shadow bans a user, that user is still able to access the platform, post content, and comment on others' posts, but their actions are invisible to all other normal users. The user is not notified of the shadow ban. In one instance, a user was shadow banned from Reddit but continued to spend four to five hours a day posting content for weeks before realizing that the content was invisible to all other normal users.

These examples of social media platforms' inconsistent and unfair practices are further evidenced by systematic examinations of how the platforms implement their own content guidelines. Social media platforms apply their content guidelines differently to posts with similar content,, and some suspend the accounts of right-leaning individuals at a higher rate than left-leaning individuals,. Officials of the platforms themselves have admitted that employees in charge of content moderation "could be biased and pursuing their own political agendas."

The social media platforms' inconsistent treatment of user content would be bad enough if they were transparent about how they make moderation decisions. But some of the most important platforms are notoriously secretive about such matters, even while publicly claiming—contrary to the public record—that they apply their policies "in a way that is fair and consistent to all," (quoting prior version of Facebook report on enforcement of community standards). Perhaps most notoriously, senior Google executives have publicly claimed that the company does not manually alter search results despite public reporting to the contrary.

Case 1:21-cv-22440-KMW Document 27-2 Entered on FLSD Docket 08/04/2021 Page 39 of 69
Case 1:21-cv-22577-DPG Document 1 Entered on FLSD Docket 07/20/2021 Page 100 of 145

39

52. The Plaintiffs authored the Stop Social Media Censorship Act for all 50 states, not for personal glory or donations but because it is the right thing to do and because as Christian missionaries, the Plaintiffs have set out to advance human flourishing as far as they are able.

53. Defendant Attorney General Garland is the chief legal officer of the United States and heads the United States Department of Justice, which is the agency of the United States government responsible for enforcement of federal civil laws, including the statute at issue in this case.[43]

54. Governor DeSantis is the Governor of Florida. He resides in Florida and is sued in his official capacity. His staff members were the architects of SB7072 which has been set on the path of nullification in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113). Defendant Governor DeSantis has the authority under Article III, Section 3 of the Florida Constitution to convene a special session so that the Stop Social Media Censorship Act can be enacted in a manner that will allow the Plaintiffs here and the Trump Plaintiffs in *Trump v. Twitter*, 1:21-cv-22441 (S.D.F.L. 2021) to get relief from the government for their injuries inflicted by social media websites that engage in breach of contract, bad faith, unfair

---

https://www.specialforcesofliberty.com/. Here is a short video that the Plaintiffs provide to state legislatures who prime sponsor, co-sponsor, or support the bill so that they can easily understand the bill and the issues involved: (https://youtu.be/CCcOALXNteM).

Over 25 states moved on two primary bills written to stop the on-going problem of social media censorship that were drafted by either De Facto Attorneys General or Professor Hamburger of Columbia Lawschool. Countless Republicans and Democrats prime sponsored, co-sponsored, or supported these legislative measures. For a breakdown by state and by prime sponsor for the 2021 legislative session and the 2022 legislative session of the proposed language of the bills see Appendix A.

[43] Attorney General Garland is unfit for the job because his paramount agenda is to excessively entangle the government with the religion of Secular Humanism in direct violation of the Establishment Clause. Attorney General Garland lacks the character and fitness to serve on the courts or as Attorney General because he does not understand the differences between "right and wrong," "real and fake," and "secular and non-secular." This individual has checked his brain at the door of secular humanism to the point that he does not even operate in objective reality or see that most of the Democrat party platform is cultish and unconstitutional under the Establishment Clause.

Case 1:21-cv-22440-KMW Document 27-2 Entered on FLSD Docket 08/04/2021 Page 40 of 69
Case 1:21-cv-22577-DPG Document 1 Entered on FLSD Docket 07/20/2021 Page 98 of 145

37

Graham Foundation had over a million followers on his facebook profile page. The Plaintiffs were followers of his page and benefitted greatly from his life-giving posts that were rife with Bible verses. One day, Facebook's employees decided to delete Pastor Graham's Facebook page without warning, simply because the employees felt entitled to metaphorically crusify Pastor Graham and punish his followers for seeking the truth of the Gospel. Deleting Pastor Graham's profile had transferable injury on the Plaintiffs who were not only inconvenienced but stifled by the threat of deletion themselves.

## JURISDICTION AND VENUE

47. This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the federal Constitution and 28 U.S.C. §§ 1331 and 1361.

48. The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

49. The Court has the authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

50. Venue is proper in this district under 28 U.S.C. § 1391(e)

## THE PARTIES

51. John Gunter Jr. is the executive director of Special Forces Of Liberty. Christopher Sevier Esq. is the executive director of De Facto Attorneys General. Pastor Rich Penkoski is the executive director of Warriors For Christ. Deb Maxwell is a Florida chapter leader of Special Forces Of Liberty and Warriors For Christ. De Facto Attorneys General, Special Forces Of Liberty, and Warriors For Christ are partners, who have served as administrators on social media websites through Facebook, Twitter, Youtube, and Tictok. Plaintiff Gunter lives in Miami, and

45. Seventh, perhaps the biggest distinction between the Stop Social Media Censorship

Act and SB7072 is that the Stop Social Media Censorship only applies to social media websites

that have more than 75 million profile users that were never affiliated with any particular

religious or political party from their inception.[39] A social media website that was affiliated with

a religious or political party can, therefore, continue to censor users at will, since they do not

suffer from the same false marketing problem.[40] If from their inception Facebook, Twitter,

Youtube, or Tictok had openly marked themselves as being aligned with the Democrat Party or

with the licentious religion of secular humanism, then they would have a defense for the removal

of political and religious speech that does not happen to conform to their favored religious and

political worldviews. But those social media websites that have brutalized the Plaintiffs and

---

relevant for the purpose of the state having jurisdiction to regulate those contracts because the
contract at issue is undoubtedly a contract of adhesion. Twitter and Facebook have billions of
subscribers, they never had a realistic expectation that the Plaintiffs would employ lawyers to
review their contract. Therefore, the contract is a contract of adhesion. Accordingly, the
specific terms of the adhesion contract do not matter. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110,
119, 126–27 (2d Cir. 2012). However, what does matter is the fact that Twitter, Facebook, and
Youtube have conspired to falsely market themselves as being "free, fair, open to the public, and
open to all religious and political ideas" to induce reliance only to then break their promise and
censor certain users in bad faith. This is a problem of broken promises flowing out of egoism.

[39] The reason why the Stop Social Media Censorship Act only applies to social media
websites that have more than 75 million users is not to treat different potential speakers
differently. The reason for this threshold is because the purpose of Section 230 was to allow
websites on the internet to grow without the fear of certain liability. The evidence shows from
the reasonable observer perspective that a social media website that has over 75 million profile
users has "sufficiently grown." Therefore, a statute, such as the Stop Social Media Censorship
Act, that allows victims of the deceptive, fraudulent, and dishonest honest trade practices of
social media websites to acquire relief against a social media provider with more than 75 million
subscribers is consistent with the spirit and "growth goals" of Section 230, which further causes
it to fall squarely in the state-law exemption. The 75 million threshold is not imposed to treat
smaller and larger social media websites differently. The threshold is included out of respect for
the doctrine of preemption so that the Stop Social Media Censorship Act will squarely fall in the
state-law exemption.

[40] A Black Lives Matter social media website, a Christian social media website, a Muslim
social media website, an LGBTQ social media website could censor any profile user who
opposed their fundamental doctrine and not be subjected to liability under the Stop Social Media
Censorship Act, if they made their affiliation and preference of a certain worldview known
upfront.

Case 1:21-cv-22440-KMW   Document 27-2   Entered on FLSD Docket 08/04/2021   Page 42 of 69
Case 1:21-cv-22577-DPG   Document 1   Entered on FLSD Docket 07/20/2021   Page 94 of 145

33

copyright infringement; 9. Is *excessively violent*; and 10. Constitutes *harassing* spam of the commercial, not religious or political, nature.[33]

These parallel exemptions and exceptions are all based on common sense. The government has a narrowly tailored compelling interest to uphold community standards of decency.

41. Third, by framing the issues as breach of contract, bad faith, false advertising, unfair dealing, unjust enrichment, deceptive trade practices, and consumer protection violations, the Stop Social Media Censorship Act fulfills a litany of compelling government interests in ways that SB7072 fails to do so.[34]

42. Fourth, by framing the issue as arising under breach of contract, bad faith, fraudulent inducement, false advertising, unjust enrichment principles, a social media website sued under the Stop Social Media Censorship Act could not assert "good faith" protections under Section 230(c)(2)(A).[35] Judge Hinkle failed to pick up on this critical factor in *Netchoice, LLC et al., v.*

---

[33] Because the Stop Social Media Censorship Act neatly parallels the spirit and intent of Section 230, it "threads the needle" in a way that SB7072 does not. From every angle, it is clear that the Stop Social Media Censorship Act has been crafted for all 50 states in a manner that respects federal law, while allowing consumers to be protected from deceptive trade practices. The Stop Social Media Censorship Act respects the doctrine of preemption and the First Amendment rights of social media websites, while protecting consumers from deceptive trade practices.

[34] The Stop Social Media Censorship Act "promote[s] the widespread dissemination of information from a multiplicity of sources," an interest that the Supreme Court in *Turner* had "no difficulty concluding" was "an important governmental interest." *Turner Broad. Sys., Inc. v. FCC ("Turner")*, 512 U.S. 622, 662–63 (1994). Ensuring that the public "has access to a multiplicity of information sources," the Supreme Court explained, "is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Id.* at 663. Furthermore, Florida has a substantial interest in protecting its residents from unfair or deceptive acts or practices in commerce. *See* FLA. STAT. § 501.204; *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978); *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 12 (1st Cir. 1994). Additionally, Florida also has a compelling interest in preserving the democratic process and ensuring fair elections. *Burroughs v. United States*, 290 U.S. 534 (1934); *Curry v. Baker*, 802 F.2d 1302, 1317 (11th Cir. 1986).

[35] Section 230(c)(2)(A) does not provide blanket immunity. It only applies when an interactive computer service acts in "good faith." While the parameters of "good faith" immunity under Section 230(c)(2)(A) are not necessarily well-defined in the case law, courts might ultimately conclude that a social media platform's acting differently than how it marked itself and shifting its standards is determinative as to whether the platform acted in "good faith." *See*

Case 1:21-cv-22440-KMW   Document 27-2   Entered on FLSD Docket 08/04/2021   Page 43 of 69
Case 1:21-cv-22577-DPG   Document 1   Entered on FLSD Docket 07/20/2021   Page 92 of 145

31

36. There are several factual differences between SB7072 and the Stop Social Media

Censorship Act that are appropriate to identify for this Honorable Court. [30]

37. First, SB7072 is vague and the Stop Social Media Censorship Act is not. [31]

38. The Stop Social Media Censorship Act is not vague whatsoever in view of its ten

legislative findings and purpose section and the straightforward structure of the language. The

legislative findings of the Stop Social Media Censorship Act spell out the legislative intent in a

common sense manner.

39. Furthermore, the purpose and legal framework of the Stop Social Media Censorship

Act is crystal clear, whereas the purpose of SB7072 is not. The purpose section of the Stop

Social Media Censorship Act states:

---

[30] Never since the inception of American jurisprudence has a plaintiff brought a lawsuit under a state statute and argued that the Section 230 immunity defense could not be successfully invoked because the lawsuit was filed under a statute that fell within the state-law exemption, piercing through the Section 230 immunity defense. Yet, when comparing the Stop Social Media Censorship Act to SB7072, the *Amici* somewhat agree with Judge Hinkle's sentiment that the "statutes [created by SB7072] are not narrowly tailored" and might constitute an "instance of burning the house to roast a pig." See *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) (page 27 of DE 113). See also, e.g., *Reno v. American Civil Liberties Union,* 521 U.S. 844, 882 (1997*); Sable Commc'n of Cal., Inc. v. FCC,* 492 U.S. 115, 131 (1989). It would be more accurate to say that striking down Section 230 of the CDA completely would be an "instance of burning the house to roast a pig" when the Stop Social Media Censorship Act is obviously the cure-all from the perspective of any reasonable observer to this ongoing dilemma because it falls squarely in the state-law exemption.

[31] "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.,* 567 U.S. 239, 253 (2012). "[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972). To pass muster, laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and prevent "arbitrary and discriminatory enforcement" by "provid[ing] explicit standards for those who apply them." Id.; accord *Wollschlaeger v. Governor,* 848 F.3d 1293, 1320 (11th Cir. 2017). Although greater clarity is necessary when a statute regulates expression, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989); see also *Grayned,* 408 U.S. at 110 ("Condemned to the use of words, we can never expect mathematical certainty from our language."). Furthermore, "the mere fact that close cases can be envisioned" does not "render[] a statute vague." *United States v. Williams,* 553 U.S. 285, 305 (2008).

Case 1:21-cv-22440-KMW   Document 27-2   Entered on FLSD Docket 08/04/2021   Page 44 of 69
Case 1:21-cv-22577-DPG   Document 1   Entered on FLSD Docket 07/20/2021   Page 90 of 145

29

(6) Fraudulent inducement; and

(7) The stifling of political and religious speech in the modern-day digital public square cultivated by social media websites that have achieved critical mass through fraud.

**Section 3.** Social media website speech; cause of action; penalties.—

(1) As used in this section, the term:

(a) "Algorithm" means a set of instructions designed to perform a specific task.

(b) "Hate speech" means a phrase concerning content that an individual finds offensive based on his or her personal moral code.

(c) "Obscene" means that an average person, applying contemporary community standards, would find that, taken as a whole, the dominant theme of the material appeals to prurient interests.

(d) "Political speech" means speech relating to the state, government, body politic, or public administration as it relates to governmental policymaking. The term includes speech by the government or a candidate for office and any discussion of social issues. The term does not include speech concerning the administration, law, or civil aspects of government.

(e) "Religious speech" means a set of unproven answers, truth claims, faith-based assumptions, and naked assertions that attempt to explain such greater questions created, what constitutes right and wrong what happens after death.

(f) "Social media website":

1. Means an Internet website or application that enables users to communicate with each other by posting information, comments, messages, or images and that meets all of the following requirements:

i. Is open to the public.

ii. Has more than 75 million subscribers with personal user profiles.

iii. From its inception, has not been specifically affiliated with any one religion or political party.

iv. Provides a means for the website's users to report obscene materials and has in place procedures for evaluating those reports and removing obscene material; and

v. Allows for subscribers to sign up for a personal user profile page or account where beliefs and preferences can be expressed by the user.

2. The term does not include a website that merely permits members of the general public to post comments on content published by the owner of the website.

(g) "User profile" means a collection of settings and information associated with a user or subscriber who signs up for an account made available by a social media website. Such accounts often include the explicit digital representation of the identity of the user or subscriber with respect to the operating environment of a social media website. Such accounts often associate characteristics with a user or subscriber, which may help in ascertaining the interactive behavior of the user along with their personal preferences and beliefs.

(2)(a) The owner or operator of a social media website who contracts with a social media website user in this state is subject to a private right of action by such user if the social media website purposely:

1. Deletes or censors the user's religious speech or political speech; or

2. Uses an algorithm to disfavor or censure the user's religious speech or political speech.

(b) A social media website user may be awarded all of the following damages under this section:

1. Up to $75,000 in statutory damages.

Case 1:21-cv-22440-KMW Document 27-2 Entered on FLSD Docket 08/04/2021 Page 45 of 69
Case 1:21-cv-22577-DPG Document 1 Entered on FLSD Docket 07/20/2021 Page 88 of 145

27

33. The "state-law exemption" is the only provision of Section 230 that speaks directly to the relationship between this federal statute and state law expressly *preserves* the states' authority to "enforc[e] any State law that is consistent with this section." 47 U.S.C. § 230(e)(3).

34. In the wake of the decision in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113) regarding SB7072, it is unclear whether the courts are suggesting that no state statute could fall in the state-law exemption that would allow the Plaintiffs to acquire relief against the deceptive bad faith trade practice routinely perpetrated by social media websites.[29] On the one hand, the Plaintiffs in this case have sensibly concluded that Section 230 does create total and perpetual immunity as a result of Congressional action for social media websites who engage in fraudulent and bad faith consumer protection violations, and therefore, the statute violates the First Amendment's Petition and Access Clause. On the other hand, the Plaintiffs believe that perhaps Governor DeSantis and the Florida general assembly errored in enacting SB7072 over the amended version of the Stop Social Media Censorship Act and that if the Stop Social Media Censorship Act was enacted, then and only then could the Plaintiffs and other similarly situated victims legitimately seek redress from the government regarding the deceptive trade practices perpetrated social media websites.

35. The language of the Stop Social Media Censorship Act was carefully and intentionally written by the Plaintiffs for all 50 states so that it would fall squarely in the

---

[29] Because it is possible that the Stop Social Media Censorship could be construed to be unconstitutional or preempted by Section 230, as was seeming the case with SB7072, then the Plaintiffs First Amendment claim to strike down Section 230 must prevail under *Cf. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (discussing when conditions on federal funding "result in an unconstitutional burden on First Amendment rights"). Accordingly, the courts should not lightly conclude that Congress made a law that not only allows unbridled censorship, but also prevents states from doing anything about it. The states have an ongoing compelling interest to protect their citizens in step with their police powers under the Tenth Amendment of the United States Constitution from fraud, deceptive trade practices, breach, bad faith, etc - none of which is protected speech for purposes of the First Amendment. It is up to this Court to decide the fate of the state-law exemption and Section 230.

Case 1:21-cv-22440-KMW  Document 27-2  Entered on FLSD Docket 08/04/2021  Page 46 of 69
Case 1:21-cv-22577-DPG  Document 1  Entered on FLSD Docket 07/20/2021  Page 86 of 145

25

30. The Plaintiffs in this case, unlike the Trump Plaintiffs in their cases, contend that

there are valid uses of Section 230 that should remain in place, if and only if this Court clarifies

that the state-law exemption can be used by states to provide consumers with the means for

recourse, as was perhaps intended by Congress.[27] However, what has been happening to the

Plaintiffs, the Trump plaintiffs, and millions of profile users, who are both registered Democrat

and Republican, is that social media websites have been arbitrarily censoring users speech in bad

faith when it just so happens to offend the delicate sensibilities of the employees who happen to

work at the social media website at the time of the censorship. When censored individuals file a

lawsuit against the social media website for such injurious wrongdoing, the social media

defendants invariably float the same questionable argument that they were "merely engaging in

'editorializing' and should, therefore, not be held liable in view of the Section 230 absolute

immunity shield." So far in these kinds of cases, the courts have reluctantly allowed the social

media defendants to barely escape liability, like a man jumping through flames. See 1

---

[27] Preliminarily, Section 230 should be explained so that a fifth-grader can understand it.
Basically, Section 230 was a federal statute created by Congress that was part of the
Communications Decency Act (CDA). The Communications "Decency" Act was designed to
promote "decent" speech, not the "deceptive trade practices" that social media websites have
engage in to the direct injury of the Plaintiffs. Section 230 allows for certain internet
intermediaries to invoke an immunity defense for the harmful acts of third parties, if and only if,
the internet intermediary was not acting as a publisher/speaker/common carrier to a certain
arbitrary and hard to determine degree. So, since that explanation is still confusing and since
trying to determine whether a platform provider was a speaker, publisher, or common carrier
tends to be a linguistic nightmare, the best way for anyone to understand a valid Section 230
immunity defense is through the following example: if a Floridian maliciously posts a
defamatory comment on Twitter against a person from New York, the New Yorker who was
defamed could legitimately sue the Floridian for defamation. However, if the New Yorker named
Twitter as a co-defendant in the lawsuit, then Youtube could successfully file a motion to dismiss
under FRCP 12 et. seq. invoking Section 230 immunity defense as the legal basis, and
legitimately have the lawsuit dismissed with prejudice against it.

That example involves a good use of Section 230 - showing that Section 230 is good law
- because Youtube was merely acting as an innocent platform in that scenario. Therefore, this
Court could find that Section 230 does not violate the First Amendment Petition but only if it
finds that the Stop Social Media Censorship Act, if enacted, would fall in the state-law
exemption and not be preempted by the doctrine of preemption like SB7072 was.

Case 1:21-cv-22440-KMW Document 27-2 Entered on FLSD Docket 08/04/2021 Page 47 of 69
Case 1:21-cv-22577-DPG Document 1 Entered on FLSD Docket 07/20/2021 Page 84 of 145

23

Petition and Access Clause of the First Amendment and subject the Plaintiffs to harmful fraud

without remedy. Former Attorney General Bill Barr described this scenario as "the greatest bait

and switch in history" stating that social media websites created the modern-day public square

"by saying that they were open to all views" until they reached critical mass only to prove

otherwise after the fact. (See interview with Michael Knowles of the Daily Wire on Verdict with

Ted Cruz: https://youtu.be/_HVqRE-6bkc)

27. Section 230(b)(1) asserts that "it is the policy of the United States to promote the

continued development of the Internet and other interactive computer services and other

interactive media" but that policy must fail if completely blocks aggrieved parties, like the

Plaintiffs and the Trump plaintiffs, from having the opportunity to petition the government for

redress against social media websites that have engaged in harmful consumer protection

violations in view of the First Amendment. [24]

28. Section 230(c)(2)(A) does not apply for blanket immunity for social media websites

that censor in bad faith. [25] Yet, so far, this has been misconstrued by the courts to allow for a

___

[24] As discussed in the Harvard Journal of Law & Public Policy, Leary, Mary Graw, *The Indecency and Injustice of Section 230 of the Communications Decency Act, Vol. 41, No. 2*, pg. 564, 565 (2018): Congress expressly stated that th[is] is the policy of the United States 'to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.' That said, Congress appeared to recognize that unlimited tort-based lawsuits would threaten the then-fragile Internet and the 'freedom of speech in the new and burgeoning Internet medium.' Although these two goals required some balancing, it was clear from the text and legislative history of § 230 that it was never intended to provide a form of absolute immunity for any and all actions taken by interactive computer services. Section 230 is not 'a general prohibition of civil liability for web-site operators and other content hosts.' Rather, Congress sought to provide limited protections for limited actions.

[25] Section 230(c)(2)(A) does not provide blanket immunity. It only applies when an interactive computer service acts in "good faith." While the parameters of "good faith" immunity under Section 230(c)(2)(A) are not necessarily well-defined in the caselaw, courts might ultimately conclude that a social media platform's acting differently than how it marked itself and shifting its standards is determinative as to whether the platform acted in "good faith." *See Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2010 WL 1799456, at *7

Case 1:21-cv-22440-KMW   Document 27-2   Entered on FLSD Docket 08/04/2021   Page 48 of 69
Case 1:21-cv-22577-DPG   Document 1   Entered on FLSD Docket 07/20/2021   Page 82 of 145

21

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c)  Protection for "Good Samaritan" blocking and screening of offensive material**

(1)  Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2)  Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A)  any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B)  any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1). [1]

(d)  Obligations of interactive computer service

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e)  Effect on other laws**

(1)  No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

(2)  No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

(3)  State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4)  No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

(5)  No effect on sex trafficking law

Case 1:21-cv-22440-KMW  Document 27-2  Entered on FLSD Docket 08/04/2021  Page 49 of 69
Case 1:21-cv-22577-DPG  Document 1  Entered on FLSD Docket 07/20/2021  Page 80 of 145

19

*Moody et. al.* 4:21-cv-00220-RH-MAF (N.D.F.L 2021). Countless lawmakers around the

country implored the Plaintiffs to intervene in that case, and the Plaintiffs refused to be

responsive knowing from personal experience - with all due respect - that if you give Judge

Hinkle of the Northern District of Florida enough rope, he will metaphorically hang himself.[22]

22. On June 30, 2021, Judge Hinkle in *Netchoice* granted the plaintiffs' motion for

preliminary injunction to enjoin Florida state officials from enforcing parts of SB7072. Id. at

(DE 113). This decision, taken with others, gave the Plaintiffs the apprehension that there is no

way for the Plaintiffs to seek redress from the harmful acts of social media websites because of

the unconstitutional actions of Congress in making Section 230.

23. On July 7, 2021, President Trump and others filed a lawsuit against Twitter,

Facebook, and Youtube but did not include a cause of action under state statute written to fall

within the state-law exemption of Section 230. See *Trump v. Twitter*, 1:21-cv-22441 (S.D.F.L.

2021); *Trump v. Facebook*, 1:21-cv-22440 (S.D.F.L. 2021); *Trump et al v. YouTube, LLC*,

1:21-cv-22445-KMM (S.D.F.L. 2021). On July 16, 2021, the Plaintiffs, in this case, filed an

---

imaginable. They routinely distort the law unethically and ultimately are driven by greed. Their
entire position can be boiled down to "big tech should be permitted to do whatever it wants
because it is big tech." Widgets and the Internet are special. Fundamental rights are, like the
freedom to practice one's religion.
    [22]https://www.lifesitenews.com/news/former-jag-officer-highlights-absurdity-of-gay-marr
iage-by-suing-to-marry-h
The courts should have dismissed the same-sex marriage cases for lack of subject matter
jurisdiction. The Establishment Clause of the First Amendment of the United States Constitution
prohibits the states and federal government from legally recognizing or promoting any form of
non-secular parody marriage. Also, the states can limit marriage to one man and one woman
because all other forms of marriage policies promote licentiousness and undermine the state's
compelling interest to uphold community standards of decency. In the wake of the judiciaries
unconstitutional endorsement of the LGBTQ secular humanist religion, the Plaintiffs have
authored the Establishment Act for all 50 states. See Florida's version:
https://www.dropbox.com/s/iwam8l7t7madp4r/2021%20Florida%20Establishment%20Act.pdf?
dl=0

Case 1:21-cv-22440-KMW Document 27-2 Entered on FLSD Docket 08/04/2021 Page 50 of 69
Case 1:21-cv-22577-DPG Document 1 Entered on FLSD Docket 07/20/2021 Page 78 of 145

17

13. In working with 37 state legislative bodies on the Human Trafficking And Child Exploitation Prevention Act/SOCA, many of the legislatures in both parties asked the Plaintiffs to draft an additional piece of legislation so that their party would not be construed as "the party of censorship" and so that the code under a new area of law called "indecent deceptive trade practices" would be balanced out. In response, the Plaintiffs custom-designed the language for the Stop Social Media Censorship for all 50 states for the benefit of their legislative drafting commissions - also referred to commonly as Legislative Research Commission (LRC) or the Office of Legal Services (OLS). The Stop Social Media Censorship At is based on well-settled existing contract and tort principles. By introducing the Stop Social Media Censorship Act and the Human Trafficking And Child Exploitation Prevention Act contemporaneously, several state created a seamless narrative that their statehouse is not for censorship (see the Stop Social Media Censorship Act) unless the content is injurious to children or facilitates human trafficking (See the Human Trafficking And Child Exploitation Prevention Act-SOCA), and even then, their statehouse was not for total censorship.

14. The goals of the Human Trafficking And Child Exploitation Prevention Act/SOCA and the Stop Social Media Censorship Act was not to reinvent the wheel but to merely get existing law to catch up to modern-day technology to protect the general public from objective harm. Internet-enabled devices makers and social media websites have been operating in direct violation of the law under a double standard without consequence in a manner that is devastating our democracy and undermining National unity.

15. In 2017, before being elected to Congress, Florida state Rep. Spano introduced the Human Trafficking And Child Exploitation Prevention Act at the Plaintiffs' request. [17]

---

[17] See the current modified version for the 2022 legislative session https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

Case 1:21-cv-22440-KMW   Document 27-2   Entered on FLSD Docket 08/04/2021   Page 51 of 69
Case 1:21-cv-22577-DPG   Document 1   Entered on FLSD Docket 07/20/2021   Page 76 of 145

15

Internet-enabled devices to distribute prostitution websites and pornographic websites in flagrant

disregard of obscenity codes and products liability statutes.[11] While the manufacturers and

retailers of Internet-enabled devices are not creating pornography content or offering sex

trafficking themselves directly, their distribution of pornographic websites and prostitution hubs

make them the head of the causal chain of harm.  To kill a snake, you have to cut off its head.

11. In response to this realization, the founder of De Facto Attorneys General, acting on

behalf of 35 different entities, filed lawsuits against the Tech Enterprise for racketeering in

violation of products liability law and obscenity codes, asserting that the current condition that

Internet-enabled devices were sold in were dangerous and defective because they exposed

consumers to prostitution websites and pornography websites, after the products were falsely

marketed as "family-friendly." *Sevier v. Google*, 15-5345 (6th Cir. 2014). The plaintiff asked the

court in *Sevier v. Google*, 15-5345 (6th Cir. 2014)[12] and *Sevier v. Apple Inc.*, 3:2013-cv-00607

(M.D.T.N. 2013) to issue an injunction that required the manufacturers and retailers of

Internet-enabled devices to sell their products in a manner that opted-out consumers by default

from having immediate access to websites that displayed obscenity, child pornography, and

revenge pornography and websites that were known to facilitate human trafficking and

_____

[11] The evidence shows that the pornography pandemic hurting the public's health and the explosion in sex trafficking across the globe is the direct result of concerted effort by the Tech Enterprise to disregard obscenity laws and products liability codes, knowingly selling their products in a dangerous and defective manner that has unleashed a litany of secondary harmful effects.

[12] Appellant brief.
https://www.dropbox.com/s/43hvt217s2p2a63/Appellant%20Brief%20in%20Sevier%20v.%20Google.pdf?dl=0
Appellee Google response
https://www.dropbox.com/s/y7y0quqs1r6c85l/Appellee%20Response%20Brief%20in%20Sevier%20v.%20Google.pdf?dl=0
Appellant reply
https://www.dropbox.com/s/3jnzmi62adsovpq/Reply%20Brief%20official.pdf?dl=0

Case 1:21-cv-22440-KMW   Document 27-2   Entered on FLSD Docket 08/04/2021   Page 52 of 69
Case 1:21-cv-22577-DPG   Document 1   Entered on FLSD Docket 07/20/2021   Page 74 of 145

13

*LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113), Governor DeSantis

has a duty pursuant to his oath of office under clause 3 of Article VI of the United States

Constitution to call a special session regarding the Stop Social Media Censorship Act in view of

the constitutional issues embodied in SB7027 as identified by the court in *Netchoice, LLC et al.,*

*v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)(DE 113). The demand asserted by the

Plaintiffs on the Governor mirrors what he is already Constitutionally obligated to do and reflects

the goals he was attempting to accomplish in enacting SB7072.

## RELEVANT PROCEDURAL AND LEGISLATIVE HISTORY OF THE CASE

8. In 1996 Congress enacted the Communications Decency Act (CDA) to promote

"decent" speech, not the deceptive trade practices that social media websites have been engaging

in with a sense of absolute impunity because of Congress's action. Congress enacted the CDA to

make it easier for consumers to avoid being exposed to ubiquitous obscene pornographic

material on Internet-enabled devices that is injurious to minors and the public's health. (Most of

the states have resolved that pornography online is creating a public health crisis that is harming

children and families). Section 230 was included in part of the CDA to encourage the free flow

exchange of ideas and to help the Internet grow, by either somewhat limiting or by totally

limiting the liability of certain Internet providers - like social media websites. The

Constitutionality of the CDA was challenged by the ALCU for good cause, and the Supreme

Court struck down all relevant parts of the CDA in *Reno American Civil Liberties Union,* 521

U.S. 844 (1997), except for Section 230, which was not challenged.[9] So what started out as an

---

[9] The Plaintiffs, who are ardent anti-pornography activists, agree with the ACLU's
positions and the *Reno* court's decision. The Plaintiffs do believe that Congress should take up
JJustice Rehnquist's suggestion of Internet zoning and zoning pornographic websites in the same
way and for the same reason that adult establishments are zoned by ordinances. After Congress
enacted the Human Trafficking And Child Exploitation Prevention Act or SOCA, the Plaintiffs
intend to aggressively take up the matter with Congress for good cause.

Case 1:21-cv-22440-KMW Document 27-2 Entered on FLSD Docket 08/04/2021 Page 53 of 69
Case 1:21-cv-22577-DPG Document 1 Entered on FLSD Docket 07/20/2021 Page 72 of 145

11

**38. Pennsylvania. SB604 sponsored by Sen. Mastriano (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/PA/text/SB604/2021

**39. Rhode Island. H5564 sponsored by Vella-Wilkinson (D)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://www.dropbox.com/s/hnk11ybifb0bqk8/2022%20Rhode%20Island%20Stop%20Social%20Media%20Censorship.pdf?dl=0

**40. South Carolina. H3450 sponsored by Rep. Burns (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/SC/text/H3450/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/73d6fwl1hwr204t/2022%20South%20Carolina%20Stop%20Social%20Media%20Censorship%20Act%20Consolidated%20%282%29.pdf?dl=0

**41. South Dakota. HB1223 sponsored by Rep. Jensen (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/SD/bill/HB1223/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/7bnc8jvt50hhzbu/2022%20South%20Dakota%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**42. Tennessee.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/y1r1biujf5awlep/2022%20Tennessee%20Stop%20Social%20Media%20Censorship%20bill%200859%20amended%20FINAL%20.pdf?dl=0

**43. Texas. SB12 sponsored by Sen. Hughes** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://www.dropbox.com/s/upeh2w5u5pn6zfc/2022%20Texas%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**44. Utah. SB228 sponsored by Sen. McKell (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/UT/text/SB0228/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/6zv60b2iqd5xpun/2022%20Utah%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED%20FINAL.pdf?dl=0

**45. Vermont.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/kyx6ok5u8o1fhwu/2021%20Vermont%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20.pdf?dl=0

**46. Virginia.** To be introduced as follows at the 2022 legislative session by Delegate Byron:

https://www.dropbox.com/s/fmbibg9oe9r6st3/2022%20Virginia%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**47. Washington.** To be introduced as follows at the 2022 legislative session:

Case 1:21-cv-22440-KMW   Document 27-2   Entered on FLSD Docket 08/04/2021   Page 54 of 69
Case 1:21-cv-22577-DPG   Document 1   Entered on FLSD Docket 07/20/2021   Page 70 of 145

9

https://legiscan.com/ME/text/LD1609/2021

To be introduced at the 2022 legislative session by Rep. Sampson as follows:

https://www.dropbox.com/s/xji2kpbtktkkrsf/2022%20Maine%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**20. Maryland. HB1314 sponsored by Del. Adams (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/MD/text/HB1314/2021

To be introduced at the 2022 legislative session by Del. Adams as follows:

https://www.dropbox.com/s/nshl9js3df3vyn5/2022%20Maryland%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**21. Massachusetts.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/yy2ubrqeo5eft6k/2022%20Massachusetts%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**22. Michigan.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/n3lqn0uw23re37z/2022%20Michigan%20Stop%20Social%20Media%20Censorship%20Act%20Final%20amendment.pdf?dl=0

**23. Minnesota.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/7zrv9qy8jzv48gi/2022%20Minnesota%20Stop%20Social%20Media%20Censorship%20Act%20Amended%20final.pdf?dl=0

**24. Mississippi: SB2617 sponsored by Sen. Hill (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/MS/text/SB2617/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/wyjq7ean5b37ogw/Mississippi%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**25. Missouri. HB482 sponsored by Rep. Coleman (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/MO/bill/HB482/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/2hj5e2vlyro8m39/2022%20Missouri%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**26. Montana.** To be introduced as follows at the 2023 legislative session:

https://www.dropbox.com/s/qtwz360f2dik04u/2023%20MONTANA%20STOP%20SOCIAL%20MEDIA%20CENSORSHIP%20ACT%20AMENDED%20FINAL.pdf?dl=0

**27. Nebraska. LB621 sponsored by Sen. Curt Friesen (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/NE/text/LB621/2021

To be introduced as follows at the 2023 legislative session:

https://www.dropbox.com/s/4s6wsko5dw9suj4/2022%20Nebraska%20%20Stop%20Social%20Media%20Censorship%20Act%20FINAL.pdf?dl=0

Case 1:21-cv-22440-KMW  Document 27-2  Entered on FLSD Docket 08/04/2021  Page 55 of 69
Case 1:21-cv-22577-DPG  Document 1  Entered on FLSD Docket 07/20/2021  Page 68 of 145

7

**1. Alabama** - Drafted as follows for the 2022 legislative session:
https://www.dropbox.com/s/mh0kpmi8s9bkisp/2022%20ALABAMA%20STOP%20SOCIAL%2
0MEDIA%20CENSORSHIP%20AMENDED%20FINAL.pdf?dl=0

**2. Alaska.** Drafted by **Senator Showers (R)** for introduction at the 2022 legislative session:
https://www.dropbox.com/s/ci7c8x9r10jb55z/2022%20Alaska%20Stop%20Social%20Media%2
0Censorship%20Act%20AMENDED%20FINAL.pdf?dl=0

**3. Arizona. SB1428 sponsored by Sen. Townsend (R)** - provided by De Facto Attorneys
General - at the 2021 legislative session:
https://legiscan.com/AZ/text/SB1428/2021

-Amended for 2022 legislative session to be introduced by **Sen. Townsend**:
https://www.dropbox.com/s/7i0iakb3z4to1eg/2022%20Arizona%20Stop%20Social%20Media%
20Censorship%20final.pdf?dl=0

**4. Arkansas.** Drafted by **Chairman Sen. Clark (R)** to be introduced at the 2023 legislative
session:
https://www.dropbox.com/s/o98fkpfblyzgkmy/2023%20Arkansas%20Stop%20Social%20Media
%20Censorship%20Act%20AMENDED%20%281%29.pdf?dl=0

**5. California.** In review by **Sen. Grove (R)** to be introduced at the 2022 legislative session as
follows:
https://www.dropbox.com/s/b7n96qegfhkgsw3/2022%20California%20Stop%20Social%20Medi
a%20Censorship%20Act.pdf?dl=0

**6. Colorado.** To be introduced by **Rep. Williams (R)** at the 2022 legislative session as follows:
https://www.dropbox.com/s/tcc7uxddoqwgs6f/2022%20Colorado%20Stop%20Social%20Media
%20Censorship%20Act%20Final.pdf?dl=0

**7. Connecticut.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/db4xv70hcu5j4jp/2022%20Connecticut%20Stop%20Social%20Med
ia%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**8. Delaware.** To be introduced by **Sen. Richardson (R)** at the 2022 legislative session:
https://www.dropbox.com/s/0x3ayrs6964xy9n/2022%20Delaware%20Stop%20Social%20Media
%20Censorship%20Act.pdf?dl=0

**9. Florida. HB 33 sponsored by Rep. Sabatini (R)** - provided by De Facto Attorneys General -
at the 2021 legislative session :
https://legiscan.com/FL/bill/H0033/2021

To be introduced at the 2022 legislative session as follows:
https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20Media%
20Censorship%20Act%20AMENDED.pdf?dl=0

**10. Georgia.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/391sacz7gg3oekj/2022%20New%20Georgia%20Stop%20Social%2
0Media%20Censorship%20Act%20FINAL%20%281%29.pdf?dl=0

**11. Hawaii. SB357 sponsored by Sen. Gabbard (D)** - provided by De Facto Attorneys General
- at the 2021 legislative session:

Case 1:21-cv-22440-KMW  Document 27-2  Entered on FLSD Docket 08/04/2021  Page 56 of 69
Case 1:21-cv-22577-DPG  Document 1  Entered on FLSD Docket 07/20/2021  Page 66 of 145

5

Censorship Act, and SB7072 in view of the doctrine of preemption created by the Supremacy

Clause and the First Amendment of the United States Constitution. The Plaintiffs need

responsiveness from the Court and the Governor because they are concerned about the statute of

limitations for the kinds of censorship they have experienced that have been detailed by some

media outlets in articles such as:

(a) *"Facebook Continues Censorship Of Warriors For Chris Page Pastor Says" -*
*Christian Post*

https://www.christianpost.com/news/facebook-continues-censorship-of-warriors-for-chris
t-page-pastor-says.html

(b) *Facebook Removes Christian Page 'Warriors for Christ' - Christian Headlines*

https://www.christianheadlines.com/blog/facebook-removes-christian-page-warriors-for-c
hrist.html

(c) *"Facebook shuts down Warriors for Christ page" - Geller Report*

https://gellerreport.com/2018/01/facebook-warriors-christ.html/

(d) *"Gay Activists Shut Down Christian Facebook Page" - Church Militant*

https://www.churchmilitant.com/news/article/gay-activists-succeed-in-getting-christian-fa
cebook-page-shut-down

(e) *"Facebook Yanks Warriors For Christ After Ignoring Death Threats To Pastor, Says*
*Angel In Armor Pic Violates Standards" - Conservative Firing Line*

https://conservativefiringline.com/facebook-yanks-warriors-christ-ignoring-death-threats-
pastor-says-angel-armor-pic-violates-standards/

(f) *"Facebook Censorship of Christians MUST STOP! Lawsuit underway!" - Counter*
*Culture Mom*

https://counterculturemom.com/facebook-censorship-of-christians-must-stop-lawsuit-und
erway/

(h) *"Youtube Censorship: 'Warriors for Christ' Channel Demonetized" - National File*

https://nationalfile.com/youtube-censorship-warriors-for-christ-channel-demonetized/

(i) *"LGBT Activists Target Pastor with Death Threats and Feces over a Facebook Emoji"*
*- CBN News*

https://www1.cbn.com/cbnnews/us/2017/july/pastor-sent-death-threats-feces-in-mail-for-
opposing-this-emoji-on-facebook

(j) *"Pastor who banned rainbow flag emoji from his Facebook page is forced to flee after*
*receiving death threats" - Christian Today*

https://www.christiantoday.com/article/pastor.who.banned.rainbow.flag.emoji.from.his.fa
cebook.page.is.forced.to.flee.after.receiving.death.threats/111157.htm

.

Case 1:21-cv-22440-KMW   Document 27-2   Entered on FLSD Docket 08/04/2021   Page 57 of 69
Case 1:21-cv-22577-DPG   Document 1   Entered on FLSD Docket 07/20/2021   Page 64 of 145

3

through fraud, breach, and other deceptive trade practices. Social media websites injured the

Plaintiffs by falsely marketing themselves as a place where the Plaintiffs were free to exchange

their political and religious views. After inducing the Plaintiffs to create and invest heavily in

their user profiles on social media webistes that marketed themselves as glorified digital bulletin

boards that were neutral on religious and political expression, the social media websites

arbitrarily shifted their standards and were no longer neutral towards religious and political

speech, engaging in self-help reprisal actions. The social media websites changed the deal terms

in bad faith after having reached critical mass and having successfully created a monopoly on the

digital public square to the shock and awe of users like the Plaintiffs. The bad faith censorship in

the wake of arbitrary shifting standards that were designed to elevate the religion of Secular

Humanism over non-religion and other religions has economically and emotionally injured the

Plaintiffs.[4] Social media websites have been permitted to get away with these consumer

protection violations because of a Congressional action in making Section 230.

    3. In determining the trajectory of the First Amendment of the United States

Constitution, the public's interest would likely best be served if the Court goes with the second

option presented. Accordingly, the Plaintiffs plead in the alternatively under FRCP 8(e)(2) and

demand that if the Court finds that Section 230 does not violate the First Amendment because

Congress included an escape hatch under subsection (e) subparagraph (3) (referred to as the

state-law exemption), that the Court should:

---

beliefs and preferences can be expressed by the user.

    2. The term does not include a website that merely permits members of the general public to post comments on content published by the owner of the website.

    [4] In this case, the Plaintiffs seek a legal path so that social media websites that were never affiliated with a religious institution or political party from their inception will be forced to keep their promises to consumers to remain neutral on political and religious speech. Social media websites that have less than 75,000,000 subscribers or that made it clear upfront to consumers that they were affiliated with a specific religious organization or political party are not of concern to the Plaintiffs in this action.

https://legiscan.com/HI/text/SB357/2021

To be introduced at the 2022 legislative session by Sen. Gabbard as follows:

https://www.dropbox.com/s/4drp0d1wrkp4gah/2022%20Hawaii%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**12. Idaho. H0323 sponsored by Rep. Nichols (R) -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/ID/text/H0323/2021

To be introduced at the 2022 legislative session by Rep. Nichols as follows:

https://www.dropbox.com/s/5m97v1mpdrs36cg/2022%20Idaho%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**13. Illinois.** Drafted as follows for the 2022 legislative session:

https://www.dropbox.com/s/tun4sxpl4r4h2ka/2022%20Illinois%20Stop%20Social%20Media%20Censorship.pdf?dl=0

**14. Indiana:** To be introduced at the 2022 legislative session by Rep. Jacobs as follows:

https://www.dropbox.com/s/laea6ssvk03j5lj/2022%20Indiana%20Stop%20Social%20Media%20Censorship%20Act%20.pdf?dl=0

**15. Iowa. HF171 sponsored by Rep. Salmon -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/IA/text/HF171/2021

To be introduced at the 2022 legislative session by Rep. Salmon as follows:

https://www.dropbox.com/s/66e8he2cd0zxsj4/2022%20Iowa%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**16. Kansas. HB2322 sponsored by Rep. Gaber (R) -** provided by De Facto Attorneys General. To be introduced by Rep. Garber at the 2022 legislative session as follows:

https://www.dropbox.com/s/6dxnzcfpzlr67qd/2022%20Kansas%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**17. Kentucky. SB 111 sponsored by Sen. Mills (R) -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/KY/text/SB111/2021

To be introduced at the 2022 legislative session by Sen. Mills as follows:

https://www.dropbox.com/s/tlr4kcqakr1elyc/2022%20Kentucky%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**18. Louisiana. SB196 sponsored by Sen. Morris (R) -** provided by De Facto Attorneys General - at the 2021 legislative session:

**https://legiscan.com/LA/text/SB196/2021**

To be introduced at the 2022 legislative session by Sen. Morris as follows:

https://www.dropbox.com/s/o0qiu7nout6np6h/Louisiana-2021-SB196-Engrossed%20%283%29.pdf?dl=0

**19. Maine. LD1609 sponsored by Rep. Sampson (R) -** provided by De Facto Attorneys General - at the 2021 legislative session:

**28. Nevada:** To be introduced as follows at the 2023 legislative session:

**29. New Hampshire. HB133 sponsored by Rep. Plett (R) -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/NH/text/HB133/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/bi1whnhjf4cfxui/2022%20New%20Hampshire%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**30. New Jersey. A578 sponsored by Asm. Auth** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/NJ/text/A578/2020

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/pkt2wqtqx8mwpjb/New%20Jersey%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**31. New Mexico.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/3rjkno4547telvr/2022%20New%20Mexico%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**32. New York.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/fretoaagwy7108z/2022%20New%20York%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20AMENDED%20.pdf?dl=0

**33. North Carolina. S497 sponsored by Sen. Alexander** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/NC/text/S497/2021

**34. North Dakota. HB1144 sponsored by Rep. Kading. -** provided by Professor Hamburger- at the 2021 legislative session:

https://legiscan.com/ND/text/1144/2021

To be introduced as follows at the 2022 legislative session by Rep. Jones:

https://www.dropbox.com/s/iwf5b1eyvj82wsi/2022%20North%20Dakota%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**35. Ohio.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/yziri2z6g80eer4/2022%20New%20Ohio%20Stop%20Social%20Media%20Censorship%20Act%20Final.pdf?dl=0

**36. Oklahoma. SB383 sponsored by Sen. Standridge -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/OK/text/SB383/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/l50i8fe4z7qwuxb/2022%20Oklahoma%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**37. Oregon.** To be introduced as follows at the 2022 legislative session by Rep. Leif:

https://www.dropbox.com/s/4k0sm4j5o0jub68/2022%20Oregon%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

https://www.dropbox.com/s/x3tig83nsjdhr0p/2022%20Washington%20Stop%20Social%20Medi
a%20Censorship%20Act%20FINAL.pdf?dl=0

**48. West Virginia.** To be introduced as follows at the 2022 legislative session by Sen Azinger:
https://www.dropbox.com/s/6tfkmxloznw5igi/West%20Virginia%20Stop%20Social%20Media%
20Censorship%20Act.pdf?dl=0

**49. Wisconsin.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/pt8v99suwbirje1/2022%20Wisconsin%20Stop%20Social%20Media
%20Censorship%20Act.pdf?dl=0

**50. Wyoming. SF0100 sponsored by Sen. Steinmetz** - provided by Professor Hamburger- at
the 2021 legislative session:
https://legiscan.com/WY/text/SF0100/id/2339364/Wyoming-2021-SF0100-Engrossed.pdf
To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/mdr58wy4wsuvh91/2022%20Wyoming%20Stop%20Social%20Me
dia%20Censorship%20Act.pdf?dl=0

Employing shifting standards is not good faith. applicable standards.

The First Amendment does not restrict the rights of private entities not performing traditional, exclusive public functions. See, e.g., *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). While it is true that a social media

First, the State has asserted it is on the side of the First Amendment; the plaintiffs are not. It is perhaps a nice sound bite. But the assertion is wholly at odds with accepted constitutional principles. The First Amendment says "Congress" shall make no law abridging the freedom of speech or of the press

(Red language means amended)

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

HB___                                                    2022

A bill to be entitled

An act relating to social media websites; providing a short title;
providing definitions; providing that the owner or operator of a
social media website is subject to a private right of action by
certain social media website users in this state under certain
conditions; providing for damages; authorizing the award of
reasonable attorney fees and costs; prohibiting a social media
website from using hate speech as a defense; authorizing the Attorney
General to bring an action on behalf of social media website users;
providing exceptions for the deletion or censorship of certain types
of speech; provides for fines by the secretary of state; provides for
severability; providing an effective date.

    WHEREAS, the Communications Decency Act was created to
protect decent speech, not deceptive trade practices, and

    WHEREAS, repealing section 230 of the Communications
Decency Act at the federal level is unnecessary because it
already includes a state-law exemption and the Stop Social Media
Censorship Act was crafted to fall squarely in the state-law
exemption of section 230 to cure abuses of section 230 to
protect the consumers of this state, and

    WHEREAS, contract law is a state-law issue, and when a
citizen of this state signs up to use certain social media
websites, they are entering into a contract, and

    WHEREAS, this state has a compelling interest in holding
certain social media websites to higher standards for having
substantially created a digital public square through fraud,
false advertising, and deceptive trade practices, and

Section 1. This act may be cited as the "Stop Social Media Censorship Act."

Section 2. This section is intended to create a statute that parallels the spirit of 47 U.S.C. § 230 that falls within the state law exemption under 47 U.S.C. § 230(e)(3) and create a civil right of action that will deter the following:

(1)  Deceptive trade practices;

(2)  False advertising;

(3)  Breach of contract;

(4)  Bad faith;

(5)  Unfair dealing;

(6)  Fraudulent inducement; and

(7)  The stifling of political and religious speech in the modern-day digital public square cultivated by social media websites that have achieved critical mass through fraud.

Section 3.  Social media website speech; cause of action; penalties.—

(1)  As used in this section, the term:

(a)  "Algorithm" means a set of instructions designed to perform a specific task.

(b)  "Hate speech" means a phrase concerning content that an individual finds offensive based on his or her personal moral code.

(c)  "Obscene" means that an average person, applying contemporary community standards, would find that, taken as a whole, the dominant theme of the material appeals to prurient interests.

(d)  "Political speech" means speech relating to the state, government, body politic, or public administration as it relates to governmental policymaking. The term includes speech by the

often associate characteristics with a user or subscriber, which may help in ascertaining the interactive behavior of the user along with their personal preferences and beliefs.

(2)(a)  The owner or operator of a social media website who contracts with a social media website user in this state is subject to a private right of action by such user if the social media website purposely:

1.  Deletes or censors the user's religious speech or political speech; or

2.  Uses an algorithm to disfavor or censure the user's religious speech or political speech.

(b)  A social media website user may be awarded all of the following damages under this section:

1.  Up to $75,000 in statutory damages.

2.  Actual damages.

3. If aggravating factors are present, punitive damages.

4.  Other forms of equitable relief.

(c)  The prevailing party in a cause of action under this section may be awarded costs and reasonable attorney fees.

(d)  A social media website that restores from deletion or removes the censoring of a social media website user's speech in a reasonable amount of time may use that fact to mitigate any damages.

(3)  A social media website may not use the social media website user's alleged hate speech as a basis for justification or defense of the social media website's actions at trial.

(4)  The Attorney General may also bring a civil cause of action under this section on behalf of a social media website user who resides in this state and whose religious speech or political speech has been censored by a social media website.

(5)  This section does not apply to any of the following:

Section 5. <u>If any section in this act or any part of any</u>
<u>section is declared invalid or unconstitutional, the declaration</u>
<u>shall not affect the validity or constitutionality of the</u>
<u>remaining portions.</u>

Section 6. This act shall take effect July 1, 2022.

_____

_____

_____

_____

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

### (C) PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE MATERIAL

#### (1) TREATMENT OF PUBLISHER OR SPEAKER
No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

#### (2) CIVIL LIABILITY

No provider or user of an interactive computer service shall be held liable on account of—

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

Case 1:21-cv-22440-KMW  Document 27-2  Entered on FLSD Docket 08/04/2021  Page 68 of 69

Case 1:21-cv-22577-DPG  Document 1  Entered on FLSD Docket 07/20/2021  Page 143 of 145
7/19/2021          47 U.S. Code § 230 - Protection for private blocking and screening of offensive material | U.S. Code | US Law | LII / Legal Information Institute

**(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18; or

**(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

## (f) DEFINITIONS

As used in this section:

### (1) INTERNET
The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

### (2) INTERACTIVE COMPUTER SERVICE
The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

### (3) INFORMATION CONTENT PROVIDER
The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

### (4) ACCESS SOFTWARE PROVIDER
The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

Case 1:21-cv-22440-KMW   Document 27-2   Entered on FLSD Docket 08/04/2021   Page 69 of 69

Case 1:21-cv-22577-DPG   Document 1   Entered on FLSD Docket 07/20/2021   Page 145 of 145
7/19/2021          47 U.S. Code § 230 - Protection for private blocking and screening of offensive material | U.S. Code | US Law | LII / Legal Information Institute

**TERMS OF USE**

**PRIVACY**