# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP, the Forty-Fifth President of
the United States, ELIZABETH ALBERT,
KIYAN AND BOBBY MICHAEL, JENNIFER
HORTON, ANDRES CABO, MAGALYS RIOS,
AND MARIA RODRIGUEZ-FRESNEDA,
INDIVIDUALLY, AND ON BEHALF OF
THOSE SIMILARLY SITUATED,

          Plaintiffs,

          v.

FACEBOOK, INC., and MARK ZUCKERBERG,

          Defendants.

Civil Action No. 1:21-cv-22440-KMW

**PLAINTIFFS' RESPONSE TO DEFENDANTS'**
**FACEBOOK, INC.'S, AND MARK ZUCKERBERG'S MOTION TO TRANSFER**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 1

I.   FACEBOOK'S FORUM SELECTION CLAUSE DOES NOT APPLY TO PLAINTIFF
     DONALD J. TRUMP ................................................................................................ 1

II.  NO ENFORCEABLE FORUM SELECTION CLAUSE EXISTS AS A MATTER OF
     FACT AND LAW ..................................................................................................... 5

III. THE FORUM SELECTION CLAUSE IS AMBIGUOUSLY DRAFTED ...................... 7

IV.  THE CLAIMS DO NOT ARISE FROM THE TERMS ........................................... 11

V.   PUBLIC INTEREST COMPELS THAT THE COURT RETAIN JURISDICTION ....... 13

VI.  RETENTION IS APPROPRIATE UNDER 28 U.S.C. § 1404(A) .................................. 18

CONCLUSION .................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**

*Ageless Found., Inc. v. Quincy Invs., Corp.*,
    No. 06-20293-CIV, 2006 WL 8432572 (S.D. Fla. Aug. 15, 2006) ........................................... 8

*Ahearn v. Mayo Clinic*, 180 So. 3d 165 (Fla. 1st DCA 2015) ............................................................ 13

*Am. Online, Inc., v. Pasieka*, 870 So.2d 170 (1st DCA 2004)............................................................. 12

*America Online, Inc., v. Booker*, 781 So.2d 423 (3rd DCA 2001)...................................................... 13

*Atlantic Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49 (2013)............ 7, 14, 18, 19

*Biden v. Knight First Amendment Inst.*, 141 S. Ct. 1220 (2021) ............................................... 4, 17

*Caribbean Gardens Condo. Ass'n, Inc. v. Markel Ins. Co.*,
    No. 1:16-CV-21329-UU, 2016 WL 11201233 (S.D. Fla. May 12, 2016) ................................. 8

*Citro Florida, Inc. v. Citrovale, S.A.*, 760 F.2d 1231 (11th Cir. 1985) ....................................... 8

*Contractor's Mgmt. Sys. of N.H., Inc., v. Acree Air Conditioning, Inc.*,
    799 So.2d 320 (2nd DCA 2001) ................................................................................................ 13

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019)......................................................................... 5, 6

*Day v. Le–Jo Enters., Inc.*, 521 So. 2d 175 (Fla. 3d DCA 1988) .................................................. 12

*DEUTZ Corp. v. City Light & Power, Inc.*,
    No. 1:05-CV-3113-GET, 2006 WL 8432920 (N.D. Ga. Aug. 15, 2006) .................................. 8

*e-ventures Worldwide, LLC, v. Google, Inc.*
    2017 WL 2210029 (M.D. Fla. February 8, 2017 ..................................................................... 18

*First Pacific Corp. v. Sociedade de Empreendimentos E Construcoes, Ltda.*,
    566 So. 2d 3, 15 Fla. Law W. D 1285 (Fla. 3d DCA 1990)...................................................... 12

*Howell v. Tanner*, 650 F.2d 610 (5th Cir., Unit B 1981)................................................................ 20

*Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955 (5th Cir. 1974) ................................................. 9

*Knight First Amdt. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) ........ 3, 4, 5, 6

*Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279 (11th Cir. 2009) ........................................ 13

*Loomer v. Facebook, Inc.*,
    No. 19-CV-80893, 2020 WL 2926357 (S.D. Fla. Apr. 13, 2020) ............................................ 17

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020)......................... 18

*Management Computer Controls, Inc. v. Charles Perry Constr., Inc.*,
    743 So.2d 627 (1st DCA 1999)........................................................................................... 11, 12

*Manuel v. Convergys Corp.* 430 F.3d 1132 (11th Cir. 2005) ....................................................... 19

*Mindbasehq LLC, v. Google, LLC*, 2021 U.S. Dist. Lexis 91089 (S.D. Fla. May 12, 2021) ....... 20

*Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271 (1984).................................... 6

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ................................................. 3, 4, 5, 17

*Pincus v. Speedpay, Inc.*, 161 F. Supp. 3d 1150 (S.D. Fla. 2015) ............................................... 12

*PNR Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So2d 773 (Fla. 2003)............................................... 12

*Reno v. Am. C.L. Union*, 521 U.S. 844 (1997)............................................................................... 17

*Robinson v. Giamarco & Bill, P.C.*, 74 F.3d 253 (11th Cir. 1996) .............................................. 20

*SAI Ins. Agency, Inc., v. Applied Sys*, 858 So2d 401 (1st DCA 2003) ........................................ 13

*Seaman v. Priv. Placement Cap. Notes II, LLC*,
    No. 16-CV-00578-BAS-DHB, 2017 WL 1166336 (S.D. Cal. Mar. 29, 2017)......................... 15

*Stewart Organization, Inc., v. Ricoh Corp.*,
   810 F.2d 1066 (11th Cir. 1987), *aff'd*, 487 U.S. 22 (1988) ..................................... 11
*Travelcross, S.A. v. Learjet, Inc.*,
   No. 10-61842-CIV, 2011 WL 13214118 (S.D. Fla. Mar. 28, 2011)................................. 8, 9, 10
*World Vacation Travel v. Brooker*, 799 So.2d 410 (3rd DCA 2001) .......................................... 13

**Statutes**

36 C.F.R § 1220 ...................................................................................................................... 4
41 C.F.R. § 1 ........................................................................................................................... 4
28 U.S.C. § 1404 ........................................................................................................ 1, 8, 10, 18
28 U.S.C. § 2671 ...................................................................................................................... 7
31 U.S.C. § 1341 ................................................................................................................... 4, 7
44 U.S.C. § 2202 ...................................................................................................................... 4
44 U.S.C. § 2904 ...................................................................................................................... 4
47 U.S.C. § 230 ...................................................................................................................... 18
Florida Deceptive and Unfair Trade Practices Act .................................... 1, 11, 12, 13, 14, 18, 19
Florida Stop Social Media Censorship Act ......................................................... 11, 14, 15, 18, 19

**Other Authorities**

The Antideficiency Act ............................................................................................................. 7
The Federal Tort Claims Act ...................................................................................................... 7

## INTRODUCTION

Plaintiff Donald J. Trump ("Plaintiff"), and plaintiffs Elizabeth Albert, Kiyan and Bobby Michael, Jennifer Horton, Andres Cabo, Magalys Rios, and Maria Rodriguez-Fresneda, Individually, and on behalf of those similarly situated (collectively, "Plaintiffs"), respectfully submit this Memorandum of Law in Opposition to the Motion by Defendants Facebook, Inc. ("Facebook") and Mark Zuckerberg (collectively, "Defendants") pursuant to 28 U.S.C. § 1404, dated September 17, 2021, to transfer venue to the United States District Court for the Northern District of California ("Motion").

As set forth herein, Defendants' Motion should be denied on six grounds.  First, Facebook's Terms of Service ("TOS"), including the forum selection clause upon which Defendants' Motion relies, do not apply to governmental entities, including Plaintiff, as the Forty Fifth President of the United States. Second, the forum selection clause in Facebook's TOS is unenforceable.  Third, under Florida law, the forum selection clause is ambiguous and should be construed against Defendant. Fourth, Plaintiffs' claims in the instant action do not arise from the specific terms of the forum selection clause.  Fifth, there is a strong public interest in keeping the claims under the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes Chapter 501, Part II ("FDUTPA"), in Florida.  Sixth, as the forum selection clause is inapplicable, Defendants' Motion should be decided by application of 28 U.S.C. § 1404(a), and under its parameters, this matter should remain before the Court.

## ARGUMENT

### I.     Facebook's Forum Selection Clause Does Not Apply To Plaintiff Donald J. Trump

Defendants' Motion should be denied because the forum selection clause relied upon by Defendants in their Motion does not apply to Plaintiff, who at all times relevant to this dispute was

1

the sitting President of the United States and the head of the Executive Branch of the federal government.  Defendants' Motion fails to disclose to the Court that the forum selection clause that Defendants rely on does not apply to any federal entity using a Facebook account, as Plaintiff was on January 6, 2021.

The federal government recognizes that government entities using social media platforms do not have the authority to bind themselves to the standard choice of forum, choice of law, or choice of venue terms that the major social media platforms have in their general terms of service. As a result, the federal government has issued guidelines to be used by government entities that enter into User Agreements with social media companies, including Facebook.  For example, as far back as 2009, Facebook had entered into an Amended Terms of Use with the National Archives and Records Administration, a copy of which is annexed hereto as Exhibit 1 (Ex. 1), and the Federal Trade Commission, a copy of which is annexed hereto as Exhibit 2 (Ex. 2), both agencies of the Executive Branch of government, that specifically excluded the choice of forum, choice of law, and choice of venue clauses found in the general User Agreement employed by Facebook at that time.

The federal government has reiterated its position that government entities cannot contractually bind themselves to social media companies and has directed government entities to craft TOS agreements with social media companies specific to their needs.  (Exhibit 3, Federal-Compatible Terms of Service Agreements (Ex. 3).)  The "Amendment, Facebook Terms of Use," a boilerplate agreement prepared by Facebook to be used between Facebook and government entities, provides: "Governing Law; Venue and Jurisdiction. These Terms of Use will be governed, interpreted and enforced in accordance with the laws of the United States of America.  In the absence of federal law, the laws of the state of California will apply." (Ex. 1 and 2.)  The guidelines

2

in Ex. 1 and 2 make it clear that there are no forum selection clauses in its User agreements with government entities, and that all disputes arising between Facebook and government entities "will be governed, interpreted and enforced in accordance with the laws of the United States of America."  (Ex. 1 and 2.)  Curiously, in the Declaration of Michael Duffey, the eDiscovery and Litigation Case Manager in the Legal Department of Facebook, he failed to disclose to the Court that there has been a long-standing Amendment to Facebook's TOS that exempts government entities from its forum selection clause in its standard User Agreement.  In fact, the Amended Agreement for government entities that was employed as far back as 2009 by Facebook provides that "this amendment may only be amended upon written agreement executed by both parties." (Ex. 1)

On January 20, 2017, when Plaintiff was sworn in as the Forty-Fifth President of the United States, he continued using the same Facebook account that he had been using before entering office.  (Amended Complaint dated July 27, 2021, Doc. 21 ("A.C.") ¶¶ 59, 60.)  As such, Plaintiff's Facebook account, like his other social media accounts, became one of the White House's main vehicles for conducting official business.  *See Knight First Amdt. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 232 (2d Cir. 2019).  For example, Plaintiff repeatedly used his Facebook account(s) to report to the citizens of the United States on virtually every major aspect of Presidential activity. This included using his account(s) to announce, describe, and defend his policies; to promote his Administration's legislative agenda; and to make other official presidential statements.  (A.C. ¶¶ 60-62.)

In 2017, federal agencies and the federal courts began treating Plaintiff's statements on social media, which were deemed public forums for interactive discussion about government business, as official statements.  The courts view government use of large digital platforms

similarly with respect to the First Amendment and public access.  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017) ("[I]t is enough to assume that the law applies to commonplace social networking sites like *Facebook*, LinkedIn, and Twitter" (emphasis added.)  Consistent with the holding in *Packingham* , Plaintiff's Facebook posts are also official content of the federal government.

 Accordingly, Plaintiff's Facebook account consists of "official responses" for the purposes of The Presidential Records Act of 1978 and, like Plaintiff's other social media accounts, has been treated as such and relied upon by politicians and foreign heads of state.  (*See  Biden v. Knight First Amendment Inst.*, 141 S. Ct. 1220 (2021).)  As a result, as the Second Circuit determined with respect to Plaintiff's Twitter Account, at all times relevant to this action, Plaintiff's account was not privately owned by Plaintiff or by Twitter, but was subject to "public ownership." *Id.* (citing 44 U.S.C. § 2202.)  Similar to his Twitter account, Plaintiff had an enormous number of followers on Facebook, approximately 35 million, when he was de-platformed on January 7, 2021. (A.C. ¶ 139)

At all times relevant to this action, Plaintiff was the sitting President of the United States, and used his Facebook account(s) in that capacity as a public forum.  *Knight First Amdt. Inst. at Columbia Univ.*, 928 F.3d at 226.  Further, Plaintiff could not accept the controlling law, jurisdiction, or venue clauses contained in Facebook's TOS without input from other agencies, including the National Archives and Records Administration, in accordance with the requirements of the Federal Acquisition Regulation.  *See* 44 U.S.C. § 2904, *et seq.*; 36 C.F.R § 1220, *et seq.*; *see also* 31 U.S.C. § 1341; 41 C.F.R. § 1, *et seq.*

Plaintiff is currently banned for two (2) years from Defendant's platform, after having been initially banned indefinitely on January 7, 2021, while President, for conduct of his that occurred

on January 6, 2021, while President.  Therefore, Plaintiff is exempted from the forum selection clause relied upon by Defendants in their Motion, and this matter is properly before this Court.

## II.     No Enforceable Forum Selection Clause Exists As A Matter Of Fact And Law

One thing is undeniably clear: President Trump's social media accounts were government accounts, and not private ones when he was censored on or about January 7, 2021.  In *Knight First Amdt. Inst. at Columbia Univ.*, 928 F.3d at 236, the Second Circuit held, "the [social media] account is not private."[1]  Incongruously, Facebook does not even reference this adjudication in determining the status of President Trump's social media accounts, although Facebook has an entire separate contract it uses for government accounts.  The Supreme Court treats large social media companies like Facebook, as well as their function in society and implications on the First Amendment, similarly: "it is enough to assume that the law applies to commonplace social networking sites like Facebook, LinkedIn, and Twitter."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017).  *See also, Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) (similarly to the ruling in *Knight*, Facebook accounts, specifically where the government interacts with the public about official business, are government accounts creating a public forum).

*Knight*  held that President Trump's social media platforms were government accounts, and that he could not constitutionally limit access to this public forum, "[t]he salient issues in this case arise from the decision of the President to use a relatively new type of social media platform . . . We also conclude that once the President has chosen a platform and opened up its interactive space to millions of users and participants, he may not selectively exclude those whose views he

---

[1] The Court commandeered the President's entire account, holding in 2019, "[t]his litigation concerns what the Account is now." *Id*. at 231 (emphasis added.)  Consequently, the court held the account constituted a public forum. *Id*.  *After* the Plaintiff's account was censored, *Knight* was vacated on other grounds.

disagrees with." *Knight*,  928 F.3d at 226, 234.  Accordingly, Facebook's argument fails—either it expressly contracted to omit a forum selection clause given the constraints of federal law, which it has to do, but has not shown, or it fails otherwise to show a valid contract with the Plaintiff.

In *Knight* , the Second Circuit evaluated President Trump's entire Twitter account, its use, various views on what it was, including from numerous *amici,* with the government representing President Trump's interests in the protracted litigation where "the government conceded that the Account is not 'independent of [Trump's] presidency.'" *Knight*, 928 F.3d at 234 (brackets in the original).  Ultimately, the Court affirmed the trial court's declaratory judgment that the account was a government account, irrespective of the fact that the government control over the property was temporary.  *Id*. at 235.  Under the declaratory judgment, Plaintiff was expressly prevented from using his social media as he had been, dictating the new terms of his social media usage, given the First Amendment.  *Id*.  Facebook clearly stands in the same position as Twitter as to the holding in *Knight* as it applied to his social media accounts, ("[the President's account] has interactive features open to the public, making pubic interaction a prominent feature of the account . . . the account is not private.") *Id*. at 236.  As mentioned above, *Davison* makes it clear that Facebook and Twitter are interchangeable, given the court's analysis.

Similar to the facts here, the Court used the fact that Plaintiff's statements were archived with the National Archives to demonstrate that it already was a government account before it was declared as such by the trial court in 2018.  *Id*. at 235.  Just as the public has "no constitutional right to force the government to listen to [its] views," as asserted in *Knight*, Facebook has no right to force a private contract on the federal government.  *Id*. at 238 (citing, *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 283 (1984)).  Several laws and regulatory procurement

processes prevent the imposition of private contracts upon the federal government, which Facebook acknowledges with its own separate contracts.[2]

Nor has Facebook shown when and where its purported Contract was entered, further evidencing the lack of any valid forum selection clause.  Facebook has made no effort whatsoever to notify Users of its sporadic and frequent changes, irrespective of the changing conditions of Plaintiffs, such as is the case with Plaintiff, as simply one example.  Defendants' instant Motion does not show the existence of any kind of contract that Facebook had with the government.  Facebook cannot plausibly assert that it has an enforceable forum selection clause because the burden is on it to negotiate, "bargain," and achieve settled "legitimate expectations" as to same, all of which are absent here.  *Atlantic Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 63 (2013).

## III.   The Forum Selection Clause Is Ambiguously Drafted

Facebook's forum selection clause is ambiguously drafted, and ambiguous terms, particularly when part of a contract of adhesion, are construed against the drafter.  *Arriga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228 (11th Cir. 2002) (applying Florida law and holding that ambiguous terms in contracts of adhesion should be construed against the drafter); *Varela v. Lamps Plus, Inc.*, 701 Fed. Appx. 670 (9th Cir. 2017), *reversed on other grounds, Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407 (2019) (applying California law and holding that ambiguous terms in contracts of adhesion should be construed against the drafter).  When an ostensible mandatory clause is construed against the drafter, courts deem such clauses to be permissive in nature, and simply analyze a request to change venue under 28 U.S.C. § 1404.  *Travelcross, S.A. v. Learjet,*

---

[2] *See generally* 31 U.S.C. § 1341, *The Antideficiency Act* would prevent any kind of routine indemnity provision; 28 U.S.C. § 2671, *The Federal Tort Claims Act* prevents ordinary tort claims as would be the case with the private sector.  Facebook's undisclosed agreements for which this Court can take judicial notice have terms which acknowledge these commonly understood legal prohibitions.

*Inc.*, No. 10-61842-CIV, 2011 WL 13214118, at *1 (S.D. Fla. Mar. 28, 2011).  Facebook's forum

selection clause is part of a contract of adhesion and its mix of permissive and mandatory language

creates an inherent and irreconcilable ambiguity.  Accordingly, this Court should deem the clause

to be permissive in nature and deny the request, applying the criteria pertinent to § 1404 motions

and discussed more fully at Point VI, below.

  Federal courts interpret forum selection clauses pursuant to federal common law standards,

and courts apply ordinary contract principles.  *Caribbean Gardens Condo. Ass'n, Inc. v. Markel

Ins. Co.*, No. 1:16-CV-21329-UU, 2016 WL 11201233, at *1 (S.D. Fla. May 12, 2016).  Federal,

Florida, and California law are all in general harmony in the application of the same principles of

contract law to forum selection clauses.  *Ageless Found., Inc. v. Quincy Invs., Corp.*, No. 06-

20293-CIV, 2006 WL 8432572, at *5 (S.D. Fla. Aug. 15, 2006) .

  Permissive clauses allow for actions to be brought in a certain location without requiring

it, while mandatory clauses dictate exclusive forums for a lawsuit.  *Caribbean Gardens  Condo.

Ass'n*, 2016 WL 11201233, at *1.  Importantly, when a court cannot determine if a forum selection

clause is permissive or mandatory, the clause is deemed ambiguous, and construed against the

drafter.  *Id.*  at *4; *Citro Florida, Inc. v. Citrovale, S.A.*, 760 F.2d 1231 (11th Cir. 1985) .

Furthermore, before a court can deem a clause to be mandatory, it must conclusively find that the

clause dictates an exclusive forum for litigation.  *DEUTZ Corp. v. City Light & Power, Inc.*, No.

1:05-CV-3113-GET, 2006 WL 8432920, at *2 (N.D. Ga. Aug. 15, 2006).

  Facebook's forum selection clause reads as follows:

> For any claim, cause of action, or dispute you have against us that
> arises out of or relates to these Terms or the Facebook Products
> ("claim"), you agree that it will be resolved exclusively in the U.S.
> District Court for the Northern District of California or a state court
> located in San Mateo County. You also agree to submit to the
> personal jurisdiction of either of these courts for the purpose of

> litigating any such claim, and that the laws of the State of California
> will govern these Terms and any claim, without regard to conflict of
> law provisions.

(Declaration of M. Duffey in support of Defendants' Motion to Transfer ("Duffey Dec."), Exhibit A, at 11.)  Facebook's forum selection clause contains contradictory mandatory and permissive language.  While it references exclusivity in that "any claim . . . will be resolved exclusively" in California, it then proceeds to state that parties to this clause "agree to submit to the personal jurisdiction of either of these courts."

By using "agree to submit," the clause suggests that Users cannot raise an objection to lawsuits filed in California, while leaving the door open to Defendants initiating actions in different courts.  Numerous courts have held that the use of the phrase "submitting to" in forum selection clauses creates a permissive, rather than an exclusive or mandatory clause.  *Aung Lin Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261 (S.D. Fla. February 23, 2004) (collecting at footnote 7 numerous cases wherein "submit" was deemed to create a permissive clause).  The combined references "resolved exclusively" with "agree to submit" creates an ambiguity which is fatal to the clause's effectiveness.  As Facebook drafted the forum selection clause, this ambiguity is to be read against it and this Court should deem the clause to be permissive.  *Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955, 957 (5th Cir. 1974).

The flaw in Facebook's forum selection clause is clearly demonstrated by Judge Jordan's analysis of a similar clause in *Travelcross , S.A.*, 2011 WL 13214118 at *1. The clause in that case read as follows (emphasis added):

> This Agreement shall be governed by and interpreted and construed
> in accordance with the substantive laws of the State of Kansas,
> U.S.A., excluding any conflicts of law provisions thereof. **The
> courts of Kansas shall have exclusive jurisdiction** to hear and
> determine all claims, disputes, actions or suits which may arise
> hereunder. **[Travelcross ] expressly consents to jurisdiction and**

> **venue** in the state and federal courts of Kansas for any claims or disputes arising hereunder.

*Id.* at *2.   Addressing the issue of exclusive jurisdiction, Judge Jordan held that "exclusive jurisdiction" as used in the clause did not mandate venue in Kansas, as he held that "jurisdiction" and "venue" were separate concepts, and that the clause did not specify that venue was required in Kansas.  Importantly, Judge Jordan went on to hold that:

> The next sentence—"[Travelcross] expressly consents to jurisdiction and venue in the state and federal courts of Kansas for any claims or disputes arising hereunder"—is not apparently mandatory. **That Travelcross consents to venue and jurisdiction in Kansas does not require that Kansas courts be the exclusive forum or exclusive venue. Nowhere are words like "shall" or "only" used**. . . .  **The agreement's forum-selection clause is simply murky and ambiguous. Hence, I must read the clause against the drafter, which is Learjet.** . . . After interpreting the clause against the drafter, I hold that the forum-selection clause here is permissive.  And, hence, Learjet's motion to dismiss for improper venue is denied.

*Id.* at *2 (emphasis added).  While Judge Jordan denied the transfer motion on the basis of a mandatory forum selection clause, he nevertheless transferred the case under the traditional private/public analysis of 28 U.S.C. § 140 4(a) (Point VI, *infra*.)

As with the clause at issue in *Travelcross*, *S.A.*, Facebook's forum selection clause contains contradictory terms.  It at once combines language suggesting an exclusive forum with consensual language indicating that it is permissive in nature.  Plaintiffs respectfully submit that this combination of exclusive and permissive language in the forum selection clause renders it ambiguous, and that the Court should deny Defendants' Motion.

**IV.**   **The Claims Do Not Arise From The Terms**

Even if the Court finds the forum selection clause is mandatory, it must still find that the claims arise from within the scope of the clause. *Stewart Organization, Inc., v. Ricoh Corp.*, 810 F.2d 1066 (11th Cir. 1987), *aff'd*, 487 U.S. 22 (1988).

Defendant's clause encompasses claims arising out of or related to, "these Terms or the Facebook Products." (Duffey Dec. Ex. A at 11.) The scope of the "Terms" and the definition of "Facebook Products" are set out in the Terms of Service:

> [The Terms] govern [a User's] use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software we offer (the Facebook Products or Products).

(Duffey Dec. Ex. A at 2.) Plaintiffs' claims are not based on the "Terms" or "Facebook Products," but rather Defendants' deceptive practices towards Florida consumers. Plaintiffs' FDUTPA and SSMCA[3] claims assert that the Defendants engage in deceptive practices towards all current and prospective Users in Florida; the claims do not relate to the Plaintiffs' own use of the Facebook Products.

The leading case holding that a FDUTPA action can be outside the scope of a forum selection clause is *Management Computer Controls, Inc. v. Charles Perry Constr., Inc.*, 743 So.2d 627 (1st DCA 1999). The scope of the clause in that case encompassed, "[a]ny action . . . arising out of this Agreement . . . " *Id.* at 629. The plaintiff brought several claims related to breach of contract, but the court held that the FDUTPA claim was an independent claim, outside the scope of the forum selection clause:

> The unfair trade claim is an independent statutory claim that is severable from all the remaining claims. It does not arise out of the contract, nor does it exist solely for the benefit of the parties to the

---

[3] Violations of the SSMCA are deemed to be violations of FDUTPA as well; unless otherwise noted, henceforth the use of "FDUTPA" will necessarily encompass the SSMCA as well.

> contract. . . . The use of the venue clause as a defense to the statutory claim in this case would undermine the effectiveness of the statute.

*Id.* at 632 (citing *First Pacific Corp. v. Sociedade de Empreendimentos E Construcoes, Ltda.*, 566 So. 2d 3, 15 Fla. Law W. D 1285 (Fla. 3d DCA 1990) ).

Akin to *Management Computer Controls,* the causes of action in this case do not, "arise out of the contract, nor [do they] exist solely for the benefit of the parties to the contract." Plaintiffs' action seeks injunctive relief that is no less pertinent to themselves as it is to each Florida User of Facebook's services, and, in fact, every Floridian who may be tempted to rely on Facebook's deceptive policy statements.

This goes to the core function of FDUTPA.  Courts have long held that FDUTPA must be "construed liberally" to "protect the consuming public and legitimate business enterprises" from unfair or deceptive business practices.  *Id.* § 501.202; *see also Pincus v. Speedpay, Inc.*, 161 F. Supp. 3d 1150, 1157 (S.D. Fla. 2015)  ("Courts have regarded FDUTPA as 'extremely broad'" (*quoting Day v. Le–Jo Enters., Inc.*, 521 So. 2d 175, 178 (Fla. 3d DCA 1988) ).  The Florida Supreme Court defines deception as "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So2d 773 (Fla. 2003).

Plaintiffs' FDUTPA claims are, by definition, claims which must speak to a larger public interest, and the relief sought here – injunctive relief regarding practices and statements to the public at large – is necessarily of benefit to parties other than a specific plaintiff.  The larger public benefit of FDUTPA actions runs through the decisions where courts have held a FDUTPA  claim outside the scope of a forum selection clause.  *E.g. Am. Online, Inc., v. Pasieka*, 870 So.2d 170 (1st DCA 2004) ("And as indicated in *Management Com puter*, the FDUTPA does not exist solely for the benefit of the individual parties, and is instead designed to afford a broader protection to

12

the citizens of Florida."). In *Contractor's Mgmt. Sys. of N.H., Inc., v. Acree Air Conditioning, Inc.*, 799 So.2d 320 (2nd DCA 2001) the court reviewed a clause encompassing, "[a]ny lawsuit litigation or arbitration concerning this Agreement . . ." and held that as to the FDUTPA claim:

> We affirm on the venue issue because the forum selection clause in the license agreement does not apply to the claim that CMS violated the Little FTC Act. . . . That claim does not arise from the agreement, nor does it exist solely for the benefit of the parties to the agreement. . . .

*Id.* at 321 (citations omitted).[4]

The case before the Court is independent of any agreement that may exist between Plaintiffs and Defendants, and the relief sought is of benefit to countless parties outside of this lawsuit. Standing to bring a claim for injunctive relief under Florida Statutes § 501.211(1) is granted to anyone who has been "aggrieved," a term which has been defined as a person, "angry or sad on grounds of perceived unfair treatment," and, importantly, there is no requirement of financial injury. *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 172 (Fla. 1st DCA 2015). Plaintiffs' standing is not related to any breach of any prior agreement nor their use of the Facebook Products, but rather Defendants' ongoing deceptive practices towards their Users.

## V.   **Public Interest Compels That The Court Retain Jurisdiction**

Public interest compels that the Court retain jurisdiction in this action. A strong public policy can outweigh even a valid forum selection clause, negotiated at arm's length between fully informed parties, which Defendants concede in their Motion is not the case in this action. *See Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009) ; (Motion at 3). The

---

[4] It should be noted that several Florida courts have held that a forum selection clause did mandate transfer, but in numerous such cases the clause's contractual language was far broader than in the case before the Court. *See, e.g., SAI Ins. Agency, Inc., v. Applied Sys*, 858 So.2d 401, 402 (1st DCA 2003) (contract language stated, "any action or claim between the parties"); *World Vacation Travel v. Brooker*, 799 So.2d 410, 411 (3rd DCA 2001) (contract language stated, "[i]n case of any controversy or dispute in the interpretation of this agreement"); *America Online, Inc., v. Booker*, 781 So.2d 423, 424 n.1 (3rd DCA 2001) (contract language stated, "any claim or dispute with AOL").

Supreme Court has recognized that such factors include "the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atlantic Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 62 n.6 (2013).

This case should remain before the Court because the FDUTPA  claims in Counts III and IV allege what is in essence a localized controversy.  The relief sought here will primarily affect the way Defendants engage in business in Florida.  No relief this Court may grant under FDUTPA will affect any California consumers.  The impact on California will be limited to a burden on software engineers and marketers to ensure that Facebook's practices in Florida are compliant with Florida law.  Plaintiffs respectfully submit that as California has no particular interest in how Florida regulates businesses within its borders, California courts should not be burdened with enforcing Florida's laws, and matters concerning Florida consumers should not be vested in the care of Californian jurors.

Under *Atlantic Marine* , a valid forum selection clause can be ignored in "exceptional cases." *Id.* at 64.  Plaintiffs submit that this is, in fact, an exceptional case.  Plaintiff was removed from Defendants' platforms while sitting as President of the United States.  As a resident of Florida, Plaintiff has been unable to re-establish his account with Defendants.  Plaintiff is uniquely suited to bring the FDUTPA  claim of Count III, and Plaintiffs have clear standing to bring the SSMCA  claim of Count IV, as well as the constitutional claims in Counts I and II.  As to Count III, the Plaintiff need not establish any contractual relationship nor any financial loss to have standing – merely his status as an aggrieved party grants him standing.  Few other jurisdictions have such generous standing provisions for injunctive relief.  Furthermore, unlike FDUTPA, Florida's SSMCA is possibly the first social media law in the nation of its kind, and there is no

parallel law to SSMCA in California.  Count III is a localized issue given the Florida Legislature's clear preference to ease of standing to obtain injunctive relief on behalf of Florida consumers, and the Florida Legislature's enactment of the SSMCA is similarly an example of how Count IV is truly a localized controversy.

    *Seaman v. Priv. Placement Cap. Notes II, LLC*, No. 16-CV-00578-BAS-DHB, 2017 WL 1166336, at *1 (S.D. Cal. Mar. 29, 2017)  is instructive as to when a Court may retain jurisdiction in an extraordinary case, even where there is a valid forum selection clause.  There, the Securities and Exchange Commission brought a claim for violations of the securities laws and obtained a receiver on the subject entities.  *Id.* at *1-*2.  Facing a binding forum selection clause mandating transfer to Colorado, the California court nevertheless retained jurisdiction, stating that the "Court finds that this is the rare and unusual case where public interest factors defeat transfer to the contractually designated forum."  *Id*.  at *7.  It first held that transfer would generate additional costs to the receiver, which would deplete potential recovery for the victims of Defendants' practices.  *Id.*  The Court went on to state as an additional factor for retaining jurisdiction:

> Second, the Southern District of California has a strong local interest in this controversy. The SEC Enforcement Action from which this case stems was filed in this District. The Receivership Entities' principal places of business are in this District. The largest concentration of defrauded investors is in this District. **The Court raises these points not to suggest this District is a more convenient forum but rather to emphasize that the fallout and damage from the alleged fraudulent conduct is overwhelmingly concentrated in this District, as opposed to the District of Colorado**.

*Id*. (emphasis added).  As with the court in *Seaman*, this Court similarly confronts an issue where it is not so much the convenience of the District which should drive the Court's decision to retain this case, as the overwhelming Florida interest in the case.  Defendants have availed themselves so fully of this forum, and infiltrated the daily lives of so many of its citizens, that the State of

Florida has taken a special interest in protecting those citizens from Defendants' documented abuses.  Under Counts III and IV, Defendants' deceptive acts took place within Florida, and all of the potential relief is to be directed to Florida consumers and the means and methods by which Defendants will engage in business in Florida. Any California nexus is negligible at most, particularly in light of the fact that California has not demonstrated the same interest in protecting its citizens as Florida.

More generalized policy interests also compel that the Court retain jurisdiction.  Parties to contracts are entitled to clarity and full disclosure about the nature and scope of the agreements into which they enter.  Whistle blowers, psychologists and tech ethicists have gone on the record to document that social media companies intentionally engineer their software to be addictive, and to create dependency among their Users.  For example, in testimony before the House Committee on Technology and Commerce on September 24, 2020, former Facebook Director of Monetization Tim Kendall testified that in engineering Facebook, "we sought to mine as much human attention as possible and turn into historically unprecedented profits. To do this, we didn't simply create something useful and fun. We took a page from Big Tobacco's playbook, working to make our offering addictive at the outset."  (A true and correct copy of Mr. Kendall's testimony is annexed hereto as Exhibit 4 (Ex. 4).)  He further testified that social media is engineered such that it "preys on the most primal parts of your brain. The algorithm maximizes your attention by hitting you repeatedly with content that triggers your strongest emotions— it aims to provoke, shock, and enrage."  (Ex. 4.)  Defendants have adopted a number of the intentionally manipulative techniques first employed by Facebook, including the "infinite scroll," the "like button," and algorithmically-tailored content, and have improved upon Facebook's model by adding, among other things, user comments and a "downvote" button.

The total immersion that Facebook seeks to achieve on the part of their Users leads to a dependency that alters the relative bargaining positions of Facebook and those Users. Thus, even when Facebook prompts its Users to review its updated TOS, Facebook knows that its Users are dependent on its services and more than likely to accept its changes, whatever they may be. Further, Facebook updates its TOS and interface regularly, which can lead to fatigue and confusion among Users. Over time, the bargaining power between social media companies and their Users shifts dramatically. As a result, it is likely that a relatively small percentage of Facebook's Users have ever read and developed an understanding of Facebook's updates to its TOS or to its policies.

In enforcing a forum selection clause contained in a different social media company's terms of service, this District has noted that "[s]ocial media is not a requirement of life." *Loomer v. Facebook, Inc.*, No. 19-CV-80893, 2020 WL 2926357, at *3 (S.D. Fla. Apr. 13, 2020). That view, however, is at odds with the United States Supreme Court's prior acknowledgement that "[s]ocial media allows users to gain access to information and communicate with one another about it on any subject that might come to mind" and provides "what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). "These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'" *Id.* (quoting *Reno v. Am. C.L. Union*, 521 U.S. 844, 870 (1997)). Justice Thomas has described giant social media as "infrastructure." *Biden v. Knight First Amendment Inst.*, 141 S. Ct. at 1221 (2021). In this regard, participating in social media absolutely is a requirement of being an active, engaged and informed American citizen in the twenty-first

century, especially with respect to the health of the democratic process.

Justice Thomas also recently identified multiple cases that have been wrongly decided regarding 47 U.S.C. § 230 , or in which courts have used an overbroad approach to the immunity it confers upon tech companies. *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) ("This modest understanding [of Section 230] is a far cry from what has prevailed in court. Adopting the too-common practice of reading extra immunity into statutes where it does not belong.") Justice Thomas cited with approval a Middle District of Florida case which declined to follow Ninth Circuit and the Northern District of California cases whose holdings rendered portions of Section 230 superfluous. *Id.* at 17 (citing *e-ventures Worldwide, LLC, v. Google, Inc.* 2017 WL 2210029 (M.D. Fla. February 8, 2017) (holding that the Court would not follow Ninth Circuit case law which allows the general immunity of Section 230 (c)(1) to, "swallo[w] the more specific immunity in (c)(2)."). Plaintiffs respectfully submit that all of these claims, but in particular the FDUTPA and SSMCA claims, reflect localized issues upon which the Eleventh Circuit should decide how Section 230 applies, particularly in view of Justice Thomas's interpretation of Section 230 and warnings about continued error.

## VI.   <u>Retention Is Appropriate Under 28 U.S.C. § 1404(a)</u>

In the absence of a binding forum selection clause, the analysis under 28 U.S.C. § 140 4(a) shifts to include the private as well as the public interests set out above. *Atlantic Marine*, 517 U.S. at 62. The public and private factors to be considered include:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

18

*Manuel v. Convergys Corp.* 430 F.3d 1132, n.1 (11th Cir. 2005).   When weighed together, the balance of these nine criteria supports a conclusion that this Court should deny the Motion.   The first five criteria, witness convenience, location of evidence, convenience of parties, locus of facts, and availability of process are, in a case involving technology issues and in an era where the entire world of business and law have become accustomed to virtual meetings and the avoidance of unnecessary travel, essentially neutral in application.   This is not a case where visits to facilities will be needed, nor is it to be expected that witnesses will be avoiding service.   The vast majority of the evidence likely will be electronic.

As to the sixth criterion, the relative means of the parties, suffice it to say that Defendant (A.C. ¶ 35.)   Facebook has, as of September 2021, an estimated market capitalization of $960,000,000,000.00.   Plaintiffs' access to resources to conduct extensive litigation in Northern California are more limited.

The seventh criterion, this forum's familiarity with the law, is, Plaintiff respectfully submits, a driving factor in favor of denying this Motion.   This Court has frequently heard matters involving FDUTPA.   The new SSMCA act is housed within FDUTPA, and while it is a new law, much of the analysis of FDUTPA  cases with which this Court is already familiar will be applicable to an interpretation of the SSMCA.   There will be a decided lack of familiarity with FDUTPA by a court in California, and simply as a matter of judicial economy, a denial of the Motion would be appropriate.

The eighth criterion, the weight accorded to the Plaintiffs' choice of forum, also supports denial of the motion.   Plaintiffs' choice of forum is accorded considerable deference and should be respected unless it is clearly outweighed by other considerations.   *Atlantic Marine*, 571 U.S. at 63 ("Because plaintiffs are ordinarily allowed to select whatever forum they consider most

advantageous (consistent with jurisdictional and venue limitations), we have termed their selection the "plaintiff's venue privilege."); *Robinson v. Giamarco & Bill, P.C.*, 74 F.3d 253 (11th Cir. 1996) ("The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.") (quoting *Howell v. Tanner*, 650 F.2d 610 (5th Cir., Unit B 1981)) *Mindbasehq LLC, v. Google, LLC*, 2021 U.S. Dist. Lexis 91089 *7 (S.D. Fla. May 12, 2021) ("Traditionally, a plaintiff's choice of forum is accorded considerable deference.")  Plaintiffs respectfully submit that given the overwhelming import of Florida law on this case, and its potential impact on Florida consumers, their choice in filing before this Court should not be disturbed.

The last criteria, trial efficiency and the interest of justice, also support denial of the Motion.  Plaintiffs have set out above the point that the causes of action here are of benefit to parties well beyond the Plaintiffs, and that the relief sought is essentially prospective in nature, not retrospective.  Defendants are seeking to have this Court transfer to a California court a matter involving Florida residents' claims about how Defendants' conduct does not comport with Florida's laws.

## CONCLUSION

Based upon the foregoing, Plaintiffs respectfully submit that this Court should deny Defendants' Motion and allow this Florida matter to be heard in Florida.

Respectfully submitted,

/s/ Matthew Lee Baldwin
Matthew L. Baldwin, Esq.
Florida Bar No. 27463
VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd., Third Floor
Coral Gables, FL  33134
Telephone: 305.631.2528
Email: Matthew@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com


/s/ Carlos Trujillo
Carlos Trujillo, Esq.
Florida Bar No. 42697
VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd., Third Floor
Coral Gables, FL  33134
Telephone: 305.631.2528
Email: Ctrujillo@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com
Of Counsel

JOHN P. COALE (Pro Hac Vice)
2901 Fessenden St. NW
Washington, D.C. 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY (Pro Hac Vice)
E-mail: jqkelly@ibolaw.com
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9461

MICHAEL J. JONES (Pro Hac Vice)
E-mail: mjones@ibolaw.com
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000

RYAN S. TOUGIAS (Pro Hac Vice)
E-mail: rtougias@ibolaw.com
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9461

RICHARD P. LAWSON, ESQ.
Florida Bar No. 165085
Gardner Brewer Martinez-Monfort P.A.
400 North Ashley Drive, Ste. 1100
Tampa, Florida 33602
(813) 221-9600 Telephone
(813) 221-9611 Fax
Primary Email: rlawson@gbmmlaw.com
Secondary
Email:  litigation@gbmmlaw.com

LUIS MARTINEZ-MONFORT, ESQ.
Florida Bar No. 0132713
Gardner Brewer Martinez-Monfort P.A.
400 North Ashley Drive, Ste. 1100
Tampa, Florida 33602
(813) 221-9600 Telephone
(813) 221-9611 Fax
Primary Email: lmmonfort@gbmmlaw.com
Secondary
Email:  litigation@gbmmlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 1, 2021, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF and electronically provided to all Counsel of Record registered for service of same.


By:     <u>*/s/ Matthew Lee Baldwin*</u>
        Fla. Bar No.: 27463
        Email: Matthew@VargasGonzalez.com
        Vargas Gonzalez
        Baldwin Delombard, LLP
        815 Ponce De Leon Blvd., Third Floor
        Coral Gables, Florida  33134