**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 21-22440-CIV-WILLIAMS**

DONALD J. TRUMP, *et al.*,

      Plaintiffs,

vs.

FACEBOOK, INC., *et al.*,

      Defendants.

_____/

<u>**ORDER**</u>

**THIS MATTER** is before the Court on the motion to transfer this case to the United States District Court for the Northern District of California ("***Motion to Transfer***"), filed by Defendants Facebook, Inc. ("***Facebook***") and Mark Zuckerberg (collectively, "***Defendants***"). (DE 75.) Defendants argue that the forum-selection clause in Facebook's Terms of Service governs this case and warrants its transfer to the Northern District of California. (*Id.* at 2.) This matter has been fully briefed and is now ripe for disposition. (DE 77; DE 79; DE 86.) For the reasons set forth below, Defendants' Motion to Transfer is **GRANTED**.

    I.   **BACKGROUND**

Defendant Facebook, Inc. is a publicly-traded corporation incorporated in Delaware, with its headquarters and principal place of business located in Menlo Park, California. (DE 75-1 at ¶ 1.) Facebook "operates a social-media service that almost three billion people worldwide use to . . . share content." (*Id.* at 2 (citing DE 16 at ¶¶ 2, 20).) Defendant Mark Zuckerberg is a California resident who co-founded Facebook and currently serves as its chief executive officer. (DE 75 at 2.)

Any person who creates a Facebook account must agree to its Terms of Service ("***Terms***") (DE 75-1 at ¶ 2), which include a forum-selection clause. Generally, a forum-selection clause is "[a] contractual provision in which the parties [to an agreement] establish the place (such as the

country, state, or type of court) for specified litigation between them." *Black's Law Dictionary* (11th ed. 2019). The forum selection clause in Facebook's Terms provides:

> For any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms or the Facebook Products ("claim"), you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions.

(DE 75-2 at 11.)

Plaintiff Donald J. Trump established a page on Facebook's social media platform in the spring of 2009. (DE 16 at ¶ 59; DE 78 at 8; DE 79 at 3.) Before announcing his candidacy for President of the United States in July 2015, Mr. Trump states that he "used the account . . . to engage with his followers about politics, celebrities, golf, and his business interests, among other topics." (DE 16 at ¶ 59.) During his presidential candidacy, Mr. Trump used his Facebook account "to speak directly to his followers and the public at large." (*Id.*)

On January 20, 2017, Mr. Trump was sworn in as President of the United States. While President, Mr. Trump continued to use his Facebook account, viewing it as "an instrument of his presidency . . . . [and] an important source of news and information about the government . . . ." (*Id.* at ¶ 60.) Plaintiffs characterize Mr. Trump's use of his account as "a digital town hall in which the President of the United States communicated news and information to the public directly." (*Id.* at ¶ 62.)

On January 6, 2021, then-Vice President Mike Pence and Congress met to satisfy their obligations under the Twelfth Amendment to the U.S. Constitution and the federal Electoral Count Act and ratify the electoral votes cast in the 2020 presidential election.[1] While the ratification was ongoing in the United States Senate, a mob of individuals—many of whom had attended a rally where Mr. Trump had spoken—attacked the Capitol, temporarily impairing then-Vice President

---

[1] Andrew Restuccia & Ted Mann, *Jan. 6, 2021: How it Unfolded*, Wall St. J. (Feb. 12, 2021 6:47 PM), https://www.wsj.com/articles/jan-6-2021-how-it-unfolded-11613047105.

Pence and Congress from satisfying their obligations to ratify electoral votes.[2] During this time, Mr. Trump posted messages and shared content on various social media platforms,[3] including Facebook. The following day, January 7, 2021, Facebook "indefinitely banned" Mr. Trump's account (*id.* at ¶ 6), stating that he had violated its Terms that prohibit users from employing the platform to incite violence. On June 4, 2021, months after Mr. Trump's presidential term ended, Facebook announced that he would remain suspended from the platform "for at least 2 years until January 2023." (*Id.* at ¶ 52.)

On July 7, 2021, Mr. Trump and Elizabeth Albert, Andres Cabos, Jennifer Horton, Bobby Michael, Kiyan Michael, Magalys Rios, and Maria Rodriguez-Fresneda (collectively, "***Plaintiffs***") initiated this action against Defendants, alleging that they violated Plaintiffs' First Amendment rights and seeking declaratory judgment that Section 230 of the federal Communications Decency Act, codified at 47 U.S.C. § 230, is unconstitutional. (DE 1.) On July 27, 2021, Plaintiffs amended their complaint and brought additional claims against Defendants under the Florida Deceptive and Unfair Trade Practices Act ("***FDUTPA***"), codified in relevant part at Fla. Stat. §§ 501.2041, 501.211, seeking damages and injunctive relief. (DE 16 at ¶¶ 52–56.)

Plaintiffs in this action constitute current and former users of Facebook. All but one, including Mr. Trump, are residents of Florida. (*See id.* at ¶¶ 19–24.) However, Plaintiffs purport to represent a nationwide class inclusive of "[a]ll Facebook platform [u]sers . . . who have resided in the United States between June 1, 2018, and [the date Plaintiffs filed this suit] that had their Facebook account censored by Defendants and were damaged thereby." (*Id.* at ¶ 25.) Some of the named Plaintiffs in this action have been banned from Facebook after posting messages or

---

[2] *Id.*; *see also* George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina, & Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today (Jan. 6, 2021 11:19 PM), https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/.

[3] *See, e.g.*, Order Grant Mot. to Transfer (DE 87), *Trump v. Twitter, Inc.*, No. 21-CIV-22441 (S.D. Fla. Oct. 26, 2021); Order Grant Mot. to Transfer (DE 70), *Trump v. YouTube, LLC*, No. 21-CIV-22445 (S.D. Fla. Oct. 6, 2021).

photos that purportedly violate Facebook's Terms (*see, e.g.*, *id.* at ¶ 146), while others have been temporarily suspended. (*Id.* at ¶¶ 170, 172.)

After waiving service (DE 73; DE 74), Defendants moved to transfer this action to the Northern District of California, arguing that the forum-selection clause in Facebook's Terms is valid, mandatory, and enforceable against Plaintiffs, including Mr. Trump. (DE 75.) Plaintiffs responded in opposition (DE 77) and Defendants replied.[4] (DE 79.)

## II.    LEGAL STANDARD

Under 28 U.S.C. § 1404(a), "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Section 1404(a) authorizes parties to a contract to enforce forum-selection clauses via a motion to transfer. *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 59 (2013). Section 1404(a) is "merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer." *Id.* at 60 (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007)).

"When the parties [to a contract] have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause. Only under extraordinary circumstances unrelated to the convenience of the parties should a [Section] 1404(a) motion be denied." *Atl. Marine Constr. Co.*, 571 U.S. at 62–63. A valid forum-selection clause "represents the parties' agreement as to the most proper forum" for a dispute and

---

[4] On October 19, 2021, the Court granted Plaintiffs' motion for leave to file a sur-reply in this matter (DE 85) to address Judge K. Michael Moore's opinion in *Trump v. YouTube, LLC*, No. 21-CIV-22445, which Defendants reference in their reply supporting the Motion to Transfer and attached as an exhibit. (DE 79 at 2; DE 79-1.) In *YouTube*, Mr. Trump and putative class members brought suit against social media platform YouTube and its parent company Alphabet, Inc.'s chief executive officer, alleging the same claims advanced in this suit. (*See* DE 75-1 at 3–4.) The *YouTube* defendants filed a motion to transfer that case to the Northern District of California, "premised upon the forum-selection clause included in YouTube's [terms of service]." (*Id.* at 3.) Plaintiffs filed their sur-reply on October 19, 2021. (DE 86.)

therefore, the clause should ordinarily govern to determine where parties litigate disputes. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988). Thus, if a court determines that a forum-selection clause is valid and enforceable, a "modified [version of the] analysis in *Atlantic Marine*" would apply to determine whether a transfer is warranted. *Gordon v. Sandals Resorts Int'l, Ltd.*, 418 F. Supp. 3d 1132, 1142 (S.D. Fla. 2019); *see also Atl. Marine Constr. Co.*, 571 U.S. at 63 (stating that the Section 1404(a) analysis is "adjust[ed]" and applied in the presence of a valid forum-selection clause to determine whether a transfer is proper).

Under this modified analysis, a plaintiff's decision to choose a given forum by initiating the lawsuit is irrelevant. Instead, a plaintiff who initiates a lawsuit in a different forum than agreed upon in a contract "bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.* And this is a significant burden, since courts normally must not disregard forum-selection clauses that fall within the scope of relevant claims. Accordingly, the Court must (1) "determine whether an adequate alternative forum exists"; and (2) "consider the relevant public interest factors to determine whether [transfer and] dismissal is appropriate." *Gordon*, 418 F. Supp. 3d at 1142. The Parties' private interests are irrelevant in determining whether transfer is warranted under this modified analysis; rather, the Court must look to public interest factors alone, which "rarely defeat a transfer motion." *Atl. Marine Constr. Co.*, 571 U.S. at 64.

III.   **DISCUSSION**

    a.   **Plaintiff Donald J. Trump is not exempt from Facebook's forum-selection clause because he was President of the United States when Facebook banned him.**

Before the Court can assess whether Facebook's forum-selection clause is valid, mandatory, and enforceable, it must first address Plaintiffs' argument that the clause does not apply to Mr. Trump. (DE 77 at 6.) Specifically, the Court looks to whether Mr. Trump's former status as "the sitting President of the United States and the head of the Executive Branch of the federal government" on January 6, 2021—when he posted content on Facebook that led to his

indefinite suspension from the platform—precludes Facebook from enforcing its forum-selection clause against him. Plaintiffs argue that Facebook's forum-selection clause "does not apply to any federal entity using a Facebook account . . . . [because] government entities using social media platforms do not have the authority to bind themselves to the standard choice of forum . . . terms that the major social media platforms have in their general terms of service." (*Id.*) They contend that Mr. Trump, in his capacity as President and head of the Executive Branch, constituted a federal entity and was not subject to Facebook's forum-selection clause on January 6, 2021.

As support for these claims, Plaintiffs cite to a printout of a webpage of information issued by the General Services Administration ("*GSA*"), titled "Federal-Compatible Terms of Service Agreements." (DE 77 at 6 (citing DE 80-3).) It is unclear whether this information constitutes official advisory guidance, let alone whether it has precedential value, given that the printout contains an alert issued by the GSA stating that its Terms of Service Program is "no longer active." (DE 80-3 at 1.) Regardless, this printout neither states nor suggests that all federal governmental entities are prohibited from entering into agreements with Facebook or other social media platforms that contain forum-selection clauses.[5] This language from a printout of a webpage— which may no longer be a viable directive for the GSA or any other federal agency—is in no way dispositive of whether Facebook is prohibited from enforcing its forum-selection clause against Mr. Trump.

Plaintiffs also discuss two agreements that Facebook appears to have entered into in 2009 and 2010 with the National Archives and Records Administration ("*NARA*") and the Federal Trade Commission ("*FTC*"), each of which are independent federal government agencies. (DE 77 at 6.) In both instances, Facebook and these independent agencies agreed to replace Facebook's standard forum-selection clause with a clause that does not specify the specific forum or venue

---

[5] The guidance merely states that "the standard Terms of Service . . . for most free digital products and services are incompatible with federal law, regulation, or practice . . . . [and that] a coalition of federal agencies . . . works with a broad range of providers of no-cost social and digital media products to develop amended, federally compatible [Terms of Service] agreements." (DE 80-3 at 1.)

where the parties must litigate any disputes. (DE 80-1 at 1; DE 80-2 at 1.) The fact that Facebook entered into agreements with NARA and FTC over a decade ago that do not contain forum-selection clauses does not mean that a federal agency or actor is prohibited from doing so; it simply demonstrates that this is what these respective entities and Facebook agreed to in their contracts. And even if it was or is standard practice for Facebook to amend its Terms when contracting with federal governmental entities, Plaintiffs offer no evidence to suggest that Facebook and Mr. Trump entered into such an agreement regarding his personal account when he became President of the United States.

Plaintiffs also state that Mr. Trump's Facebook account constituted a government account during his presidency, because it "became one of the White House's main vehicles for conducting official business" upon his inauguration and because Mr. Trump used the account "to report to the citizens of the United States on virtually every major aspect of [p]residential activity." (DE 77 at 7.) Therefore, Plaintiffs declare that Mr. Trump's Facebook account was a "public forum[] for interactive discussion about government business" during his presidency and that his account is owned by the public.[6] (*Id.* at 7–8.)

Plaintiffs rely on just one case, *Knight First Amendment Institute at Columbia University v. Trump*, as support for these propositions. 928 F.3d 226 (2d Cir. 2019), *vacated on other grounds sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021). In *Knight*, the Second Circuit Court of Appeals affirmed a district court opinion finding that Mr. Trump violated Twitter users' First Amendment rights when he blocked them from accessing his account and replying to his tweets. *See* 928 F.3d at 230–33. However, the issue here is not, as in *Knight*, whether actions that Mr. Trump took on social media during his presidency constitute official

---

[6] Plaintiffs also opine that Mr. Trump's Facebook account is a public forum subject to public ownership and that Mr. Trump "could not accept the controlling law, jurisdiction, or venue clauses contained in Facebook's [Terms] without input from other agencies, including [NARA], in accordance with the requirements of the Federal Acquisition Regulation." (DE 77 at 7–8.) And since Mr. Trump did not obtain the requisite input, Plaintiffs state that he prevails here. The Court does not find this argument either logically sound or legally meritorious.

actions subject to First Amendment scrutiny. Rather, the issue here is whether Mr. Trump's former status as President of the United States prohibits Facebook from enforcing its forum-selection clause against him.

In sum, Plaintiffs fail to substantiate these claims with any case law, statute, or regulation prohibiting the President of the United States and/or federal governmental entities from executing agreements that contain forum-selection clauses. Plaintiffs further fail to cite to any case law, statute, or regulation that nullifies a forum-selection clause in an agreement between a private corporation and a private individual, once that private individual becomes a federal governmental official. Therefore, Plaintiffs have failed to establish that Mr. Trump's former status as President of the United States on January 6, 2021 precludes Facebook from enforcing its forum-selection clause against him. Now that the Court has resolved this issue, it turns to whether the forum-selection clause is valid, mandatory, and enforceable against all Plaintiffs.

        **b.  Facebook's forum-selection clause is valid.**

Forum-selection clauses are "presumably valid . . . unless the plaintiff makes a 'strong showing' that enforcement would be unfair or unreasonable under the circumstances." *Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY), Ltd.*, 722 F. App'x 870, 883 (11th Cir. 2018) (quoting *Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009)). In the Eleventh Circuit, forum-selection clauses are invalid when: (1) their formation "was induced by fraud or overreaching"; (2) the plaintiff "effectively would be deprived of [their] day in court because of inconvenience or unfairness"; (3) "the chosen law would deprive the plaintiff of a remedy"; or (4) enforcing the forum-selection clause "would contravene public policy." *Gordon*, 418 F. Supp. 3d at 1138 (quoting *Krenkel*, 579 F.3d at 1281); *see also Aviation One of Fla., Inc.*, 722 F. App'x at 883 (quoting *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1296 (11th Cir. 1998)).

i. **Facebook's forum-selection clause was not induced by fraud or overreaching.**

First, to determine whether the formation of a non-negotiated forum-selection clause (*i.e.*, a clause present in a take-it-or-leave it contract or clickwrap agreement) was induced by fraud or overreaching, courts in the Eleventh Circuit "examine whether the clause was 'reasonably communicated to the consumer.'" *Rigsby v. GoDaddy Inc.*, 2019 WL 9806587, at *3 (N.D. Ga. Nov. 25, 2019) (quoting *Krenkel*, 579 F.3d at 1281). To do so, courts "take[] into account the clause's physical characteristics and whether plaintiffs had the ability to become meaningfully informed [about] the clause and to reject its terms." *Krenkel*, 579 F.3d at 1281.

Here, Plaintiffs have not alleged that the formation of the forum-selection clause was induced by fraud or overreaching. Defendants note—and Plaintiffs do not dispute—that Plaintiffs "could have declined the Terms at the outset [by] terminat[ing] the registration process." (DE 75 at 7); *see also Loomer v. Facebook*, 2020 WL 2926357, at *3 (S.D. Fla. Apr. 13, 2020) ("[W]hile the Terms are presented on a take-it-or-leave-it basis [as an adhesion contract], [the] [p]laintiff was under no obligation to enter into the agreement. Social media is not a requirement of life and there are other social media platforms available . . . ."). And it is uncontroverted that Plaintiffs ultimately agreed to the Terms and used Facebook's services. (*See* DE 16 at ¶¶ 12, 41–45, 47, 160, 220–32, 236–42; DE 75 at 7.) Therefore, the Court finds that Facebook's forum-selection clause cannot be nullified because it was not induced by fraud or overreaching.

ii. **Enforcing Facebook's forum-selection clause would not deprive Plaintiffs of their day in court because of inconvenience or unfairness or otherwise deprive them of a remedy.**

Second, enforcing Facebook's forum-selection clause would not deprive Plaintiffs of their ability to litigate or remedy the issues they raise in this matter. The Northern District of California is as capable as the Southern District of Florida to render a decision in this case. Indeed, all federal district courts are well-equipped to adjudicate the federal causes of action in this matter. Moreover, the Northern District of California and other federal district courts outside of Florida

have ably adjudicated FDUTPA claims, without issue. *See, e.g.*, *Parziale v. HP, Inc.*, 445 F. Supp. 3d 435 (N.D. Cal. 2020) (granting in part and denying in part defendant's motion to dismiss a putative class action lawsuit initiated under FDUTPA, the Florida Misleading Advertisement Law, and the federal Computer Fraud and Abuse Act); *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239 (E.D.N.Y. Mar. 31, 2019) (adopting magistrate judge's recommendation certifying a class of plaintiffs who initiated a claim against a manufacturer of infant formula, alleging "deceptive, misleading[,] and unfair practices in violation" of FDUTPA); *Davidson v. Apple, Inc.*, 2019 WL 1004543, at *1 (N.D. Cal. Mar. 1, 2019) (reaffirming the district court's earlier decision denying the defendant's motion for summary judgment regarding plaintiffs' claims under FDUTPA regarding "an alleged touchscreen defect in Apple's iPhone . . . ."). Additionally, Plaintiffs have not alleged that they would in any way be inconvenienced by such transfer.

### iii. Plaintiffs have failed to show that enforcing Facebook's forum-selection clause would contravene public policy.

This leaves one remaining consideration: whether enforcing Facebook's forum-selection clause would contravene public policy. Although Plaintiffs apply the modified *Atlantic Marine* analysis in their briefing to argue that public interest factors weigh against enforcing Facebook's forum-selection clause with respect to their FDUTPA claims, *see infra* at 19–21, Plaintiffs do not otherwise assert that Facebook's forum-selection clause contravenes public policy in a manner that renders it invalid. In fact, courts in the Eleventh Circuit and across the nation have repeatedly held that Facebook's forum-selection clause is valid. *See, e.g.*, *Loomer*, 2020 WL 2926357, at *2–*3 (plaintiff failed to "show[] that [Facebook]'s forum-selection clause is invalid"); *Franklin v. Facebook, Inc.*, 2015 WL 7755670, at *2 (N.D. Ga. Nov. 24, 2015) (stating that the court could not "identify a single instance where any federal court has struck down [Facebook's Terms] as an impermissible contract of adhesion induced by fraud or overreaching or held the forum selection clause . . . to be otherwise unenforceable due to policy considerations"); *Moates v. Facebook, Inc.*, 2021 WL 3013371 (E.D. Tex. May 14, 2021) (finding that Facebook's forum-selection clause

was valid, mandatory, and enforceable against plaintiff, and granting Facebook's motion to transfer the case to the Northern District of California). Not only have Plaintiffs failed to distinguish these holdings from this matter, but they also have failed to cite to a single case where a court has found Facebook's forum-selection clause to be invalid. Therefore, consistent with precedent, the Court finds that Facebook's forum-selection clause is valid.

### c. Facebook's forum-selection clause is mandatory and enforceable against Plaintiffs.

Courts in the Eleventh Circuit "enforce[] 'only those [forum-selection] clauses that unambiguously designate the forum in which the parties must enforce their rights under the contract.'" *Jiangsu Hongyuan Pharm. Co., Ltd. v. DI Glob. Logistics Inc.*, 159 F. Supp. 3d 1316, 1323 (S.D. Fla. 2016) (quoting *Fla. Polk Cty. v. Prison Health Servs., Inc.*, 170 F.3d 1081, 1083 n.8 (11th Cir. 1999)). Therefore, courts must assess whether forum-selection clauses are permissive or mandatory to determine whether they are enforceable. While a permissive clause "authorizes jurisdiction in a designated forum but does not prohibit litigation elsewhere," a mandatory clause "'dictates an exclusive forum for litigation under the contract.'" *Glob. Satellite Commc'n Co. v. Starmill U.K. Ltd.*, 378 F.3d 1269 (11th Cir. 2004) (quoting *Snapper, Inc. v. Redan*, 171 F.3d 1249, 1262 n.4 (11th Cir. 1999)). Given that "the plain meaning of a contract's language governs its interpretation," *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011), courts look to the text of a forum-selection clause to determine whether it is permissive or mandatory. *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1297 (11th Cir. 2021). When a forum-selection clause employs language of exclusivity (*i.e.*, stating that a specific court or venue will be the *exclusive* or *only* forum for parties to litigate relevant disputes), or states definitively that a specific court *shall* or *will* be the forum to litigate disputes between parties to an agreement, the clause is mandatory. *See, e.g.*, *Glob. Satellite Commc'n Co.*, 378 F.3d at 1272 (use of the word "shall" indicated forum-selection clause was mandatory); *Emerald Grande, Inc. v. Junkin*, 334 F. App'x 973, 975-76 (11th Cir. 2009) ("will be" confirmed that forum-selection

clause was mandatory); *Berg v. MTC Elecs. Techs. Co.*, 71 Cal. Rptr. 2d 523, 530 (Cal. Ct. App. 1998) (stating that, under California law, "language giving exclusive jurisdiction to the forum is required" for a forum-selection clause to be mandatory).

On the other hand, if parties to an agreement simply *consent* to a court's jurisdiction or specific venue, that forum-selection clause is deemed permissive because it does not prevent the parties from litigating elsewhere. *See, e.g.*, *Cluck-U Chicken, Inc. v. Cluck-U Corp.*, 2016 WL 1588677, at *1 (M.D. Fla. Apr. 20, 2016) (quoting *Ocwen Orlando Holdings Corp. v. Harvard Prop. Trust, LLC*, 526 F.3d 1379, 1381 (11th Cir. 2008) (concluding that a forum-selection clause in which the parties "consent[ed] to jurisdiction and venue" in a Maryland county "include[d] no words of command and no words of conclusion . . . . [and therefore] is 'permissive' . . . [because it] 'authorizes jurisdiction in a designated forum but does not prohibit litigation elsewhere.'"); *i9 Sports Corp. v. Cannova*, 2010 WL 4594666, at *3 (M.D. Fla. Nov. 3, 2010) (stating that forum-selection clauses in which parties "consent[ed] and irrevocably submit[ted] to the jurisdiction and venue" of a court was permissive, because it "specifically allow[ed], but d[id] not compel, [the plaintiff] to select [specific] courts . . . in enforcing its rights with respect to the contract."). However, "if a [forum-selection] clause is ambiguous, such that a court cannot determine whether a clause is permissive or mandatory, the clause should be construed against the drafter." *Caribbean Gardens Condo. Ass'n, Inc. v. Markel Ins. Co.*, 2016 WL 11201233, at *1 (S.D. Fla. May 12, 2016) (citing *Glob. Satellite Commc'n Co.*, 378 F.3d at 1271).

Plaintiffs argue that Facebook's forum-selection clause is ambiguous and therefore should be construed against the drafter, rendering the clause permissive. First, Plaintiffs describe Facebook's forum-selection clause as part of a take-it-or-leave it contract with a "mix of permissive and mandatory language [that] creates an inherent and irreconcilable ambiguity." (DE 77 at 12.) Plaintiffs appear to acknowledge that some language in the clause is mandatory, stating that Facebook's forum-selection clause "references exclusivity in that 'any claim . . . will be resolved exclusively' in California . . . ." (*Id.* at 13 (quoting DE 75-2 at 11).) Nonetheless, Plaintiffs point to

what they characterize as ambiguous language: that the Parties also "agree[d] to submit to the personal jurisdiction" of either the Northern District of California or state court in San Mateo County. (DE 77 at 13.) Plaintiffs note that the term 'submit to' has been interpreted to render a forum-selection clause permissive and thus, Plaintiffs argue that the term 'agree to submit to' opens the door for Facebook to initiate actions involving its users in different courts. (*Id.* (citing *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1272 n.7 (S.D. Fla. 2004) ("[I]n reliance upon the extensive line of cases holding that forum selection clauses containing the same or very similar language ('submitting to' jurisdiction) are permissive, and not exclusive or mandatory, the undersigned finds the clause here to be permissive.")).)

Plaintiffs also argue that the decision in *Travelcross, S.A. v. Learjet, Inc.*, 2011 WL 13214118 (S.D. Fla. Mar. 28, 2011), applies here. In *Travelcross, S.A.*, the parties to a contract agreed to a forum-selection clause, which stated in part that "[t]he courts of Kansas shall have exclusive jurisdiction to hear and determine all claims, disputes, actions[,] or suits which may arise hereunder." *Id.* at *1 (citation omitted). The court in *Travelcross, S.A.* determined that, while the forum-selection clause "[gave] courts in Kansas *exclusive jurisdiction*, . . . jurisdiction is not the same as 'venue[]'" and therefore, the "'exclusive jurisdiction' language does not [necessarily] mandate venue in Kansas." *Id.* at *2 (emphasis added) (citing *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992) ("[W]here only jurisdiction is specified [with mandatory language], the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive.")) Moreover, the next sentence of the forum-selection clause stated that the plaintiff, Travelcross S.A., "expressly consents to jurisdiction *and venue* in the state and federal courts of Kansas for any claims or disputes hereunder." 2011 WL 13214118, at *1 (emphasis added) (citation omitted). Consequently, the court concluded that "Travelcross['s] consent[] to venue and jurisdiction in Kansas does not require that Kansas courts be the exclusive forum or exclusive venue." *Id.* In other words, while the forum-selection clause in *Travelcross, S.A.* provided that venue was permissive, it teetered

between exclusivity and permissiveness with respect to jurisdiction, declaring in one sentence that Kansas courts would have "exclusive jurisdiction" before stating that the parties could "consent[] to jurisdiction . . . in the state and federal courts of Kansas." *Id.* This "murky and ambiguous" clause with respect to jurisdiction prompted the court in *Travelcross, S.A.* to "read the clause against the drafter" and determine that not only venue, but also jurisdiction, was "permissive." *Id.* Plaintiffs contend that, "[a]s with the clause at issue in *Travelcross, S.A.*, Facebook's forum[-]selection clause contains contradictory terms . . . . at once combin[ing] language suggesting an exclusive forum with consensual language indicating that it is permissive in nature." (DE 77 at 14.)

Defendants disagree. First, Defendants state that the "plain text" of Facebook's forum-selection clause—stating that all covered disputes "will be" resolved "exclusively" in the Northern District of California or in state court located in San Mateo County—is unambiguous because it "dictates an exclusive forum for litigation under the contract." (DE 79 at 4 (quoting *Coffee Bean Trading-Roasting, LLC v. Coffee Holding, Inc.*, 510 F. Supp. 2d 1075, 1077 (S.D. Fla. 2007)).) Second, Defendants argue that Plaintiffs have "manufacture[d] ambiguity" by conflating language in Facebook's forum-selection clause regarding personal jurisdiction with language that identifies the exclusive forum for disputes. (DE 79 at 6.) Defendants state that the term 'agree to submit,' which Plaintiffs interpret as ambiguous, "refer[s] to personal jurisdiction [and] does *not* change the [exclusive forum] clause's mandatory nature; it simply confirms the [P]arties 'also' submit[ted] to personal jurisdiction in the specified courts." (*Id.*) And third, Defendants argue that both *Wai* and *Travelcross, S.A.* are "inapposite" and have no bearing on the issues in this case. Defendants state that *Wai* "identified a number of permissive forum-selection clauses that included *only* a consent to jurisdiction, *without the mandatory and exclusive language found in Facebook's clause*." (*Id.* (emphasis added).) And in *Travelcross, S.A.*, Defendants note that "the forum-selection clause there spoke in mandatory terms *only with respect to jurisdiction, not venue*," while Facebook's forum-selection clause speaks in mandatory terms with respect to venue by

"expressly stat[ing] that covered disputes 'will be' resolved 'exclusively' in California." (*Id.* (emphasis added).)

The Court agrees with Defendants. First, the plain meaning of Facebook's forum-selection clause clearly and unambiguously conveys an exclusive forum and venue for the Parties to litigate disputes. The clause states that "any claim, cause of action, or dispute you have against [Facebook] that arises out of or relates to these Terms . . . ***will be*** resolved ***exclusively*** in the U.S. District Court for the Northern District of California or a state court located in San Mateo County." (DE 75-1 at 10 (emphasis added).) The terms "will be" and "exclusively" clearly indicate that the Parties agreed to litigate any disputes that arise out of the Terms in one of two forums— the federal district court in the Northern District of California or state court in San Mateo County— in the same venue, California. Second, any ambiguities that may be created by the clause's terms regarding personal jurisdiction do not interfere with the clause's clear, unambiguous directives with respect to forum and venue. While the term "agree to submit to" may be subject to discussion in certain contexts, it creates no ambiguities here with respect to venue or forum. Third, the Court agrees with Defendants that the cases Plaintiffs reference to support their claims do not apply here. *Wai* involved parties who 'submitted to' the jurisdiction of a particular forum and venue. However, neither the term 'submitted to' nor any analogous phrase is used in Facebook's forum-selection clause to characterize the choice of forum or venue. And *Travelcross, S.A.* involved parties who adopted a forum-selection clause that clearly intended for venue to be permissive but offered contradictory statements as to whether jurisdiction was mandatory or permissive, by stating that Kansas courts would have "exclusive" jurisdiction in one sentence before stating that the parties could "consent[]" to jurisdiction in federal and state courts in Kansas in another. *Travelcross, S.A.* is inapposite because Facebook's forum-selection clause is premised on exclusivity with respect to *both* jurisdiction and venue. Facebook's forum-selection clause explicitly states that the Parties agree that any claims, causes of action, or disputes "*will* be resolved *exclusively*" in either the Northern District of California or a state court located in San

Mateo County. There is no permissive language in the forum-selection clause with respect to either jurisdiction or venue. The only arguably permissive language Plaintiffs point to concerns personal jurisdiction, which is not at issue here and cannot be confused with terms involving venue to, as Defendants state, "manufacture ambiguity." (DE 79 at 6.) Accordingly, the Court finds that Facebook's forum-selection clause is mandatory and enforceable against Plaintiffs.

> **d. Facebook's forum-selection clause falls within the scope of claims at issue in this case.**

It is undisputed that Facebook's forum-selection clause falls within the scope of Plaintiffs' federal causes of action (Counts I and II of the Amended Complaint). *See also, e.g.*, *Moates*, 2021 WL 3013371, at *9 (stating that the plaintiff's "allegation that Section 230 of the Communications Decency Act is unconstitutional . . . relate to Facebook and its products . . . . fall[ing] under the forum[-]selection clauses' scope."). However, Plaintiffs argue that their Florida state law claims under FDUTPA "are not based on the 'Terms' or 'Facebook Products' [covered in the forum-selection clause], but rather Defendants' deceptive practices toward Florida consumers." (DE 77 at 15.) Upon review of Plaintiffs' Amended Complaint, the Court finds this argument untenable.

Count III of the Amended Complaint, which seeks injunctive relief under FDUTPA, states that Plaintiffs "have been aggrieved as a result of Defendants' deceptive and misleading practices" and alleges that Facebook has "repeatedly failed to act in good faith and in accordance *with [its] policies* regarding the removal, demonetization, and moderation of content on their platform." (DE 16 at ¶¶ 219–20 (emphasis added).) In Count III, Plaintiffs aver that Facebook's policies "ostensibly proclaim objective, uniform standards by which content may be censored . . . and [u]sers suspended or banned from the platform, [but] in practice, the Defendants have engaged in a subjective pattern of discriminating against disfavored parties . . . ." (*Id.* at ¶ 221.) Plaintiffs state that "a reasonable consumer, acting under the mistaken belief that the Defendants are equally and fairly applying *their content standards*, would be left to presume that [Mr. Trump] and the [p]utative [c]lass [m]embers improperly discussed the origins of the COVID-19 virus." (*Id.*

at ¶ 225 (emphasis added).) And finally, Plaintiffs state that they have been aggrieved by Defendants' "failure to act in good faith and to apply *their stated policies* to the Plaintiffs' content." (*Id.* at ¶ 231 (emphasis added).) Count IV, which alleges that Defendants have inconsistently applied content moderation standards under FDUTPA, similarly contends that Defendants have acted contrary to their "*published standards* regarding censorship" and failed to apply "*their standards* in a consistent manner." (*Id.* at ¶¶ 236, 241 (emphasis added).)

Facebook's forum-selection clause states that California is the exclusive venue "[f]or any claim, cause of action, or dispute" that a user has against Facebook "that arises out of or relates to these Terms or the Facebook Products." (DE 75-2 at 11.) The word "Terms" refers to Facebook's Terms of Service as a whole, while the phrase "Facebook Products" refers to an individual's "use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software [that Facebook, Inc.] offer[s] . . . except where [Facebook, Inc.] expressly state[s] that separate terms (and not these) apply." (*Id.* at 2.) The Terms also state that users "may not use [Facebook] Products to do or share anything[] [t]hat violates these Terms, *our Community Standards, and other terms and policies* that apply to your use of Facebook." (*Id.* at 7 (emphasis added).)

Throughout the Amended Complaint, Plaintiffs repeatedly and unequivocally characterize the nature of their FDUTPA claims as arising out of Facebook's various policies and standards, all of which the forum-selection clause expressly covers. As Defendants argue (DE 79 at 7), and as emphasized in *Loomer*, "[t]he terms of [Facebook's] forum-selection clause are broad . . . ." 2020 WL 2926357, at *3. And therefore, Plaintiffs' claims "do not have to be about breach of the parties' agreement; [Plaintiffs'] claims *merely have to 'relate' to the Terms.*" *Id.* (emphasis added). Accordingly, it is clear that Facebook's forum-selection clause falls within the scope of not only Plaintiffs' federal causes of action, but also Plaintiffs' claims under FDUTPA.

      e. **Under *Atlantic Marine*'s modified Section 1404(a) analysis, transfer is warranted to the Northern District of California.**

Now that the Court has determined that Facebook's forum-selection clause is valid, mandatory, and enforceable against Plaintiffs, and falls within the scope of claims at issue in this case, the Court looks to the modified *Atlantic Marine* analysis to determine whether transfer is warranted to the Northern District of California. *Atl. Marine Constr. Co.*, 571 U.S. at 63; *see also supra* at 4–5. First, the Court must "determine whether an adequate alternative forum exists." *Gordon*, 418 F. Supp. 3d at 1142. And then the Court must "consider [] relevant public interest factors to determine whether [transfer and] dismissal [are] appropriate." *Id.*

      i. **An adequate alternative forum exists in the Northern District of California.**

A forum is adequate "if it provides for litigation of the subject matter of the dispute and potentially offers redress for plaintiffs' injuries."[7] *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1382 (11th Cir. 2009). "'An adequate forum need not be a perfect forum,' but it must provide a satisfactory remedy." *Id.* (quoting *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001)).

Defendants contend that the Northern District of California is an adequate forum to litigate Plaintiffs' claims, because it "has personal jurisdiction over Facebook, which is headquartered there, as well as over Mr. Zuckerberg, who resides there." (DE 75 at 11.) Further, Defendants note that the Southern District of Florida has consistently enforced Facebook's forum-selection clause and transferred matters to the Northern District of California. (*Id.* (citing *Loomer*, 2020 WL 2926357, at *1; *Soffin v. Echannel Network, Inc.*, 2014 WL 2938347, at *2 (S.D. Fla. June 30,

---

[7] Typically, this analysis is most salient in instances where a forum-selection clause provides for the litigation of disputes outside of the United States, where concerns about different legal systems, different available remedies, and enforcement of judgments are at issue. *See, e.g.*, *Kolawole v. Sellers*, 863 F.3d 1361, 1370 (11th Cir. 2017) (holding that a district court did not abuse its discretion in holding that Nigeria would be an adequate forum because "reforms of the Nigerian judiciary . . . resulted in the judiciary resolving cases more expeditiously); *Gordon v. Sandals Resorts Int'l, Ltd.*, 418 F. Supp. 3d 1132, 1142 (S.D. Fla. 2019) (holding that the Turks & Caicos Islands was an adequate alternative forum because the parties "consented to jurisdiction [there] . . . [and the Turks & Caicos Islands] is a jurisdiction that could provide relief for [the plaintiff's] claims.").

2014).) Although Plaintiffs do not directly respond to these arguments, they state throughout their response opposing Defendants' Motion to Transfer that the Northern District of California is an inadequate forum. Without any support, Plaintiffs opine that "[n]o relief . . . grant[ed] under FDUTPA will affect any California consumers[] [and] [t]he impact on California will be limited . . . . [and] California has no particular interest in how Florida regulates businesses within its borders." (DE 77 at 18.) In sum, Plaintiffs state that "matters concerning Florida consumers should not be vested in the care of Californian jurors." (*Id.*)

As an initial matter, Plaintiffs have not claimed that the Northern District of California is an inadequate forum to litigate their *federal* causes of action, because it is beyond peradventure that the Northern District of California is capable of doing so. Instead, Plaintiffs pivot and assert that California is an inadequate venue to adjudicate their *state* causes of action under FDUTPA. But the Northern District of California has previously adjudicated FDUTPA claims, *see supra* at 9–10, and Plaintiffs have failed to raise any argument that would suggest that the Northern District of California is incapable of rendering appropriate remedies for FDUTPA violations. Plaintiffs assert nothing but their personal opinions about how FDUTPA claims should be adjudicated, and this is insufficient to establish that a forum is inadequate to adjudicate a claim. Therefore, the record demonstrates that an adequate alternative forum exists in the Northern District of California.

ii.   **No relevant public interest factor disfavors transfer.**

Relevant public interest factors include but are not limited to: (1) "the administrative difficulties flowing from court congestion"; (2) "the local interest in having localized controversies decided at home"; (3) "the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action"; and (4) "the avoidance of unnecessary problems in conflicts of law, or in the application of foreign law." *Gordon*, 418 F. Supp. 3d at 1142 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). As discussed earlier, these factors only "rarely defeat a transfer motion." *Atl. Marine Constr. Co.*, 571 U.S. at 64.

Defendants argue that "[t]he relevant factors all support a transfer to the Northern District of California," stating that Plaintiffs cannot satisfy their significant burden to show that these factors "overwhelmingly disfavor" a transfer to the Northern District of California. (DE 75 at 13 (quoting *Atl. Marine Constr. Co.*, 571 U.S. at 67); *see also* DE 79 at 8.) First, Defendants state that Plaintiffs "have no reasonable basis" to argue that administrative difficulties or court congestion should preclude the Northern District of California from adjudicating this case. (DE 75 at 12.) Second, Defendants state that "this case has greater ties to California, where Facebook is headquartered and where the alleged misconduct purportedly took place." (*Id.*) Third, after noting that "the Southern District of Florida and the Northern District of California are equally capable of applying federal law," Defendants maintain that the presence of FDUTPA claims has not stopped federal district courts in Florida from enforcing forum-selection clauses and transferring cases to chosen forums and venues. (*Id.*)

In response, Plaintiffs make a series of arguments that they claim "compels the Court to retain jurisdiction in this action." (DE 77 at 17.) First, Plaintiffs argue that their FDUTPA claims amount to a "localized controversy" that should be adjudicated here in Florida. (*Id.* at 18.) Second, Plaintiffs claim that Count IV of the Amended Complaint states a claim under Florida's recently-enacted Stop Social Media Censorship Act, which they argue only Florida courts are equipped to adjudicate because, *inter alia*, "there is no parallel law [] in California." (*Id.* at 18–19.) Third, Plaintiffs cite to the Southern District of California's decision in *Seaman v. Private Placement Capital Notes II, LLC*, 2017 WL 1166336 (S.D. Cal. Mar. 29, 2017), which they claim is "instructive as to when a [c]ourt may retain jurisdiction in an extraordinary case, even where there is a valid forum[-]selection clause." (DE 77 at 19.) Fourth, Plaintiffs claim that "intentionally manipulative techniques" adopted by Facebook have made the platform so "addictive" that its users are "more than likely to accept [] changes [to the Terms], whatever they may be." (*Id.* at 20-21.) And finally, Plaintiffs argue that Supreme Court Justice Clarence Thomas's concerns regarding the

constitutionality of Section 230 of the federal Communications Decency Act counsel against transfer. (*Id.* at 22.)

The Court finds that Plaintiffs' public interest arguments are unavailing. First, despite claiming repeatedly that only courts in Florida are equipped to adjudicate FDUTPA claims, Plaintiffs have failed to articulate how or why another forum or venue could not do the same. In fact, although Defendants have cited numerous instances in which other forums have adjudicated FDUTPA claims (*see* DE 75 at 12–13; DE 79 at 8), Plaintiffs ignore these cases and fail to explain why they are not instructive in this case. Second, while it remains undetermined whether Plaintiffs have stated a cause of action under Florida's recently-enacted Stop Social Media Censorship Act (Count IV of the Amended Complaint), Plaintiffs have failed to state why such a cause of action would preclude transfer. Third, the Southern District of California's decision in *Seaman* does not apply here. In that case, a receiver authorized by the U.S. Securities and Exchange Commission initiated a lawsuit against various entities, alleging that they defrauded investors. 2017 WL 1166336, at *1. The court found that public interest factors disfavored transfer, because such a transfer would force the receivership to incur additional costs and a majority of the defrauded investors lived in the district. *Id.* at *4–*6. Here, no receivership is at issue and while most of the *named* Plaintiffs in this matter are Florida residents, they purport to represent a nationwide class. And finally, Plaintiffs' claims about Facebook's purportedly "addictive" qualities and Justice Thomas's opinions in various cases do not constitute cognizable public interest considerations.

Therefore, no public interest factor disfavors transfer and the Court's modified *Atlantic Marine* analysis fails to defeat the applicability of Facebook's forum-selection clause to Plaintiffs' claims. Transfer to the Northern District of California is therefore appropriate.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Transfer (DE 75) is **GRANTED**.[8] The Clerk of Court is directed to take all actions necessary to **TRANSFER** this matter to the United States District Court for the Northern District of California.

**DONE AND ORDERED** in Chambers in Miami, Florida on this 19th day of November, 2021.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

---

[8] As part of their sur-reply, Plaintiffs have requested oral argument regarding Defendants' Motion to Transfer. (*See* DE 86 at 1, 8.) Under S.D. Fla. Loc. R. 7.1(b), the Court "in its discretion may grant or deny a hearing as requested, upon consideration of both the request and any response thereto by an opposing party." First, the Court finds this request to be improper under the Local Rules, which state that "[a] party who desires oral argument or a hearing of any motion shall request it *within the motion or opposing memorandum in a separate section titled 'request for hearing.*'" S.D. Fla. Loc. R. 7.1(b) (emphasis added); *see also* (DE 4 at 1 (ordering "the Parties [to] adhere to the Federal Rules of Civil Procedure, the Local Rules for the Southern District of Florida, Judge Williams' Court Practices and Procedures, and Judge [Chris M. McAliley's] Discovery Procedures.").) In their opposing memorandum to Defendants' Motion to Transfer, Plaintiffs failed to request oral argument or a hearing as required. (*See* DE 77.) Instead, Plaintiffs did not make such a request until filing their sur-reply. Second, given that the Court has granted Defendants' Motion to Transfer (DE 75), Plaintiffs' request for oral argument is moot. Accordingly, the Court denies Plaintiffs' request for oral argument regarding Defendants' Motion to Transfer.